*Carroll*

66092
10/5

CASE NO. CR 03-1141

## IN THE COURT OF CRIMINAL APPEALS
## OF THE STATE OF ALABAMA

| | |
|---|---|
| RUBEN COREY MCNABB, | ) |
| | ) |
|     APPELLANT, | ) |
| | ) |
| V. | ) |
| | ) |
| STATE OF ALABAMA, | ) |
| | ) |
| | ) |
|     APPELLEE. | ) |

==================================================================

## APPEAL FROM THE CIRCUIT COURT OF
## HOUSTON COUNTY, ALABAMA

### CASE NO. CC 02-225

### BRIEF OF THE APPELLANT

==================================================================

David K. Hogg
Attorney for Appellant
188 N. Foster St., Ste. 201
Dothan, Alabama 36303
(334) 794-8559

**EXHIBIT**
B

## STATEMENT REGARDING ORAL ARGUMENT

Because of the simplicity of the factual and legal matters involved in this appeal, the Defendant does not believe oral argument is necessary or beneficial in this case.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . 1

ISSUE PRESENTED . . . . . . . . . . . . . . . . . . . . . 6

    WHETHER THE TRIAL COURT ERRED BY REFUSING TO GRANT FUNDS
    FOR MCNABB TO PURCHASE A TRANSCRIPT OF THE PRIOR TRIAL
    . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . 6

SUPPRESSION HEARING (Record Volume I) . . . . . . . . . . 6

FIRST TRIAL . . . . . . . . . . . . . . . . . . . . . . 10

RETRIAL (Record Volume II) . . . . . . . . . . . . . . . 11

    RONALD REEVES . . . . . . . . . . . . . . . . . . 11

    PATSY ROACH . . . . . . . . . . . . . . . . . . . 14

    BETTY PRESCOTT . . . . . . . . . . . . . . . . . . 16

    REGGIE HILL . . . . . . . . . . . . . . . . . . . 17

    JIMMY SINGLETON . . . . . . . . . . . . . . . . . 19

    RUBEN COREY MCNABB . . . . . . . . . . . . . . . . 22

    YVETTE MCNABB . . . . . . . . . . . . . . . . . . 28

    RONALD REEVES . . . . . . . . . . . . . . . . . . 32

    SHERRY WISDOM . . . . . . . . . . . . . . . . . . 32

    STEPHANIE REEVES . . . . . . . . . . . . . . . . . 33

    MARY BESSIE . . . . . . . . . . . . . . . . . . . 33

    GREG BRYSON . . . . . . . . . . . . . . . . . . . 34

WILLIE WILLIAMSON . . . . . . . . . . . . . . . . . . . 35

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . 36

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . 37

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 38

    THE TRIAL COURT ERRED BY REFUSING TO GRANT FUNDS FOR
    MCNABB, AN INDIGENT, TO PURCHASE A TRANSCRIPT OF HIS
    PRIOR TRIAL . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . 42

SUMMARY OF RULINGS AND ACTIONS ADVERSE TO APPELLANT . . . 43

# TABLE OF AUTHORITIES

**STATUTES**

Section 15-12-1, Ala. Code 1975 . . . . . . . . . . . . . 38


**CASES**

<u>Britt v. North Carolina</u>, 404 U.S. 226, 92 S.Ct. 431, ,30

     L.Ed.2d 400 (1971) . . . . . . . . . . . . . . . 36, 39

<u>Dunn v. State</u>, 733 S.W.2d 212, 215 (Tex.Cr.App. 1987) . . 36

<u>Grayson v. State</u>, [CR-95-1511, 824 So. 2d 804, 823 (Ala. Crim.

     App. 1999) . . . . . . . . . . . . . . . . . . 37, 39

<u>Harris v. State</u>, 552 So.2d 866, 873 (Ala.Crim.App. 1989) .

. . . . . . . . . . . . . . . . . . . . . . . . . 36-37

<u>McKinney v. State</u>, 665 So. 2d 209 (Ala. Crim. App. 1995)  40

<u>Quick v. State</u>, 825 So. 2d 246 (Ala. Crim. App. 2001) . . .

. . . . . . . . . . . . . . . . . . . . . . . . . 37-40

<u>State v. Tison</u>, 129 Ariz. 526, 633 P.2d 335(1981) . . 37, 39

## STATEMENT OF THE CASE

Ruben Corey McNabb ("McNabb") was indicted on charges of robbery in the first degree by the Grand Jury of Houston County, Alabama for the August term of 2001.(C 10-11.) The Indictment specified no bond would be set.(Id.) On February 6, 2002 McNabb filed an affidavit of hardship with the court and counsel was appointed to represent him. (C 13-14.) On February 13, 2002 McNabb, through his counsel, filed a motion for preliminary hearing and discovery (C 17-18) and a motion for bond (C 19). On March 1, 2002 he filed a written waiver of arraignment and plea of not guilty.(C 16.) In two separate orders, dated February 27, 2002 and March 6, 2002, the court granted the motion for discovery (C 20-21) and on March 11, 2002, following a hearing, set McNabb's bond at $500,000.00. (C 22.)

On March 13, 2002 McNabb filed a written motion to suppress the State's evidence.(C 23-25.) On March 18, 2002 the court ordered the motion to be heard prior to trial.(C 26.) On May 7, 2002 McNabb filed a request for reconsideration of his bond.(R 27-28.) On May 31, 2002 the court set this motion for a hearing (C 28), and on August 14, 2002 denied the motion. (C 38.) On June 19, 2002 McNabb filed a motion for speedy trial

1

(C 30), which the court granted (C 31.) On July 31, 2002 McNabb's counsel filed a second motion for discovery (C 33-36), which the court granted. (C 37.) On August 21, 2002 McNabb requested that his trial be continued. (C 39.) The court granted the continuance. (C 41.) On August 19, 2002 the State served notice of its intent to use McNabb's prior convictions for impeachment purposes. (C 42.) On August 30, 2002 McNabb filed a request that his trial be scheduled for the next term of court. (C 45.) On September 10, 2002 the court granted this motion. (C 46.)

On January 16, 2003 the case was continued unreached. (C 47.) On January 29, 2003 the State filed a notice of intent to seek the additional penalty pursuant to Ala. Code § 14A-5-6 (1975) for commission of a felony in which a firearm or deadly weapon was used. (C 48.) On February 13, 2002 McNabb filed a motion in limine seeking to preclude introduction at trial of evidence that he had been convicted of carrying a concealed firearm. (C 52-54.) On the same day the court ruled that the conviction could be used for impeachment purposes if McNabb testified at trial. (C 35.) On the same date a hearing was held on McNabb's motion to suppress the evidence.(R 2-25.) The court denied the motion to suppress.(R 25.) The case proceeded

to trial and on February 14, 2003 a mistrial was declared due
to a deadlocked jury. (C 72.)

On February 19, 2003 McNabb was mistakenly released from
jail, an alias warrant was issued, and bail was set at $1
million. (C 73.) McNabb was arrested and on February 24, 2003
he filed a motion to reduce his bond. (C 72-73.) McNabb also
filed an affidavit of hardship, showing that he was
unemployed. (C 75-76.) On February 26, 2003 McNabb filed a
request for expenses to purchase a transcript of the previous
trial. (C 79-80.) On the same day McNabb was brought before
the court for a first appearance following his arrest on the
alias warrant and counsel was re-appointed to represent him (C
81.) On March 4, 2003 the court denied the motion to reduce
bond and for funds to purchase a transcript of the prior
trial. (C 82.) On April 3, 2003 the trial was continued for
the State without objection from McNabb. (C 83.) On May 1,
2003 McNabb filed another motion to reduce bond. (C 84-85.)
The motion was set for a hearing. (C 86.) On May 15, 2003 the
court reduced McNabb's bail to $100,000.00. (C 87.) On July
15, 2003 McNabb, acting pro se, filed a motion to reconsider
the amount of his bond. (C 88-90.) The court denied the
motion. (C 91.) On August 20, 2003 trial of the case was

continued pending resolution of issues on appeal. (C 92.) On October 21, 2003 the Alabama Supreme Court issued a certificate of judgment returning McNabb's petition for mandamus to this Court. (C 93.) On November 18, 2003 this Court issued an order granting the State 21 days to respond to McNabb's petition for mandamus. (C 94.) On January 9, 2004 this Court denied the mandamus petition. (C 95.)

On February 2, 2004 the State filed a motion seeking release of trial exhibits admitted during the previous trial. (C 96.) The court granted this motion. (C 97.) On February 5, 2004 McNabb filed a motion to suppress the State's evidence.(C 98-99.) On February 10, 2004 the case proceeded to trial.(R 2-358.) On February 11, 2004 McNabb and the State agreed to incorporate the arguments from the hearing in McNabb's previous trial on the motion to suppress the evidence.(R 174.) The court denied the motion to suppress. (C 100.) On February 11, 2004 at the close of the State's evidence, McNabb moved for a judgment of acquittal, which was denied. (C 122.) The jury returned a verdict of guilty of robbery, first degree. (C 119.) A sentence hearing was scheduled for March 18, 2004. (C 120.) On March 17, 2004 the State served McNabb with notice of previous convictions.(C 123.) On March 18, 2004 the court

4

continued the sentencing hearing on motion by McNabb. (C 124.) On the same date the State served McNabb with another notice of previous convictions. (C 125.) On March 24, 2004 the court sentenced McNabb to life without parole and ordered him to pay all court costs.(C 120-21.) On the same day McNabb's trial counsel filed a motion to withdraw and requested that appellate counsel be appointed to represent McNabb. (C 126.) On March 30, 2004 the court entered an order permitting trial counsel to withdraw and appointing other counsel to represent McNabb on appeal. The court also noted McNabb's oral notice of appeal and ordered that a free transcript be furnished for the appeal. (C 127.)

On March 25, 2004 McNabb filed a motion for new trial. (C 128-29.) Newly appointed appellate counsel subsequently filed a motion to withdraw as McNabb's attorney.[1] (C 128.) On April 7, 2004, the court denied the motion for new trial, allowed newly appointed counsel to withdraw and appointed the undersigned to represent McNabb on appeal. (C 131.)

---

[1] The Stamp on this motion shows it was filed in the clerk's office on April 8, 2004; however, the motion was apparently presented to the court a day earlier, as evidenced by the date of the court's order granting the motion.

## ISSUE PRESENTED

**WHETHER THE TRIAL COURT ERRED BY REFUSING TO GRANT FUNDS FOR MCNABB TO PURCHASE A TRANSCRIPT OF THE PRIOR TRIAL.**

## STATEMENT OF FACTS

Ruben Corey McNabb ("McNabb") was indicted on charges of robbery in the first degree by the Grand Jury of Houston County, Alabama for the August term of 2001.(C 10-11.) On February 6, 2002 McNabb filed an affidavit of hardship with the court and counsel was appointed to represent him. (C 13-14.) On February 13, 2002, a hearing was held on McNabb's motion to suppress the evidence.(C 23-25, R 2-25.)

### SUPPRESSION HEARING
(Record Volume I)

At the suppression hearing, Dothan Police Sergeant Willie Williamson ("Williamson") testified that on June 7, 2001 she was called to investigate an armed robbery at Winn Dixie in Dothan.(R 5.) Upon arriving at the scene, Williamson spoke with Winn Dixie employee Betty Jean Prescott ("Prescott").(R 6.) Prescott told Williamson she arrived at the Winn Dixie at 4:00 o'clock that morning. As she drove into the parking lot, a mini van sped from around the north side of the store and

6

nearly collided with her vehicle. (Id.) Prescott said the van was possibly a 1989 through 1992 model with wood panels on the sides. (R 6-7.) Prescott entered the Winn Dixie, clocked in, walked to the back of the store and saw the manager, Ronald Reeves ("Reeves"), talking with an assistant manager, Reginald Hill ("Hill"). Shortly thereafter, the store was robbed. (R 7.)

After speaking with Prescott, Williamson and Officer Jimmy Singleton ("Singleton") began searching for the van described by Prescott. They went to Barstone Apartments ("Barstone") because the police had received numerous calls to that apartment complex. (R 7-8.) Also, Williamson had learned that Hill lived at Barstone, and the police initially thought the robbery might be an "inside job." (R 7, 8, 10.)

Upon arriving at Barstone, Williamson and Singleton found a van matching the description given by Prescott. (R 8-9.) They ran the van's tag number and learned the van was registered to Ruben McNabb ("McNabb") or Yvette McNabb, who were residents of Barstone. (R 9.) Williamson ran McNabb's "rap sheet" and learned he had some drug and weapons activity, and that he had previously been arrested for armed robbery. (R 9-10.) Williamson also learned that McNabb and Hill were acquaintances. (Id.)

7

Subsequently, Williamson took Prescott to Barstone and showed her the mini van.(R 10-11.) Prescott said the van resembled the one she saw in the parking lot the night of the robbery.(R 11.) Prescott was unsure about the color of the van, but said the wood frame on the sides was the right color. Also, the van appeared to be the same year model (Id.) Williamson then requested the Alabama Department of Public Safety Drivers License Division to email her a picture of McNabb. After receiving the emailed photograph, the police assembled a black-and-white photographic line-up which included McNabb's picture.(R 11.) The lineup was shown to Reeves, who identified McNabb as one of the robbers.(R 11-12.) Based on this information, Williamson typed up a search warrant and supporting affidavit for Singleton to sign in order to obtain permission to search McNabb's apartment.(R 12-13.)

Williamson said she typed the affidavit to state McNabb has a history of robbery, because the criminal history report she obtained shows on December 18, 1996 the Orlando Police Department charged McNabb with robbery. However, Williamson admitted she knew at the time she typed the affidavit that the charges had been reduced to larceny.(R 13-14.)

8

Williamson also admitted on cross-examination that the photograph of McNabb included in the photographic line-up is "a little more distorted than the other [photographs.]" (R 17.) However, Williamson said this was the only photograph of McNabb she could obtain.(R 15.) When asked if she could have gotten drivers license pictures for the other persons shown in the line up, Williamson said she could have if they had Alabama drivers licenses.(R 17-18.)

McNabb called Reeves to testify at the suppression hearing. Reeves had called 911 after the store was robbed.(R 18.) Reeves said one of the robbers was a black male who wore a toboggan-type cap, and was about six-feet tall.(R 19-20.) Reeves claimed that he could remember facial characteristics of the robber he described; however, after listening to defense counsel play a tape recording of his 911 call, Reeves admitted he had told the police dispatcher he could not state whether the robber was black or white.(R 21.) Reeves said he identified suspect number five in the photographic line-up as the robber because "he held me at gunpoint." (Id.) Reeves claimed he was "a hundred percent sure" he was the robber.(R 21-22.)

Defense counsel argued the search warrant was based upon

9

an unduly suggestive photographic line-up because the photograph of McNabb was a grainy digital photograph which had been enlarged and was distorted in comparison with the other photographs.(R 22.) McNabb contended this photograph would stand out to a casual observer. Moreover, immediately after the robbery, which occurred a year prior to trial, Reeves had told the police dispatcher he did not know the race of the robber.(R 23.) The trial judge opined that Reeves might have been "scared to death" when he made the 911 call.(Id.) Defense counsel also argued the sworn testimony of Officer Singleton in the search warrant was knowingly and intentionally false, because McNabb had no history of robbery. Defense counsel said the only connection between the robbery and McNabb was the fact that McNabb owned a white Dodge mini-van.(R 24.) The trial court denied the motion to suppress.(R 25.) The court denied the motion to suppress.(R 25.)

## FIRST TRIAL

McNabb's first trial ended in a mistrial after the jury deadlocked. (C 72.) On February 19, 2003 McNabb was mistakenly released from jail, an alias warrant was issued, and bail was set at $1 million. (C 73.) McNabb was arrested and filed an affidavit of hardship, showing that he was unemployed and had

no assets. (C 75-76.) On February 26, 2003 McNabb filed a request for expenses to purchase a transcript of the previous trial, stating: "Defendant's counsel is in need of the trial transcript from the mistrial and the court reporter has estimated that such a transcript would cost $800.00. Defendant's counsel is in need of said transcript for cross examination and rebuttal purposes in the next trial of this case." (C 79-80.) On the same day McNabb was brought before the court for a first appearance following his arrest on the alias warrant and counsel was re-appointed to represent him (C 81.) On March 4, 2003 the court denied the motion for funds to purchase a transcript of the prior trial with an order stating simply "[m]otion for extraordinary expenses denied." (C 82.)

## RETRIAL
### (Record Volume II)

**RONALD REEVES**

Ronald Reeves testified for the State. (R 22.) On June 7, 2001 he was an assistant manager for Winn Dixie. Reeves said money taken from cash registers is kept in a safe. (R 23.) The money is wrapped in quantities of one thousand dollars, five hundred dollars, and one hundred dollars. (Id.) The wraps are stamped with the number 426 which is the store number of that particular Winn Dixie. (R 23-24.) The store safe contained

11

postage stamps, a large amount of bills, food stamps and coins.(R 24-25.) The postage stamps were kept in a book and were self-stick type, similar to those represented by State's exhibit 9.(R 51-52.)

Reeves said the following employees were working at the store after midnight on June 7, 2001: Patsy Roach ("Roach"), Hill, John Stack, and Steven Woodham.(R 26.) Reeves had access to the safe.(R 27.) The night of the robbery, Reeves was stocking aisle one when he heard Roach call him to come to the service desk.(R 31-32.) Reeves went to the service desk where Roach was stocking cigarettes. A black male, whom Reeves identified as McNabb, was standing at the service desk.(R 32-33.) McNabb was wearing a black toboggan-type cap with a bib on it.(R 35.) Reeves identified State's exhibit 2 as the cap worn by McNabb.(Id.) Reeves asked McNabb if he could help him. McNabb replied "guess what, today is your lucky day." (Id.) McNabb produced a silver-colored nine millimeter automatic gun and ordered Roach and Reeves to go to the office.(R 34.) Reeves unlocked the office door and he, Roach, and McNabb went inside. McNabb ordered Reeves to open the safe and threatened to "bust" Reeves if he didn't.(R 40.) Reeves opened the safe, which contained mostly coins.(R 42.) McNabb then ordered

12

Reeves to open the second safe, which contained most of the cash.(R 42-43.) The currency in the second safe contained the wrappers with the store number.(R 43.) After Reeves opened the second safe, McNabb ordered him at gunpoint to get on his knees.(Id.) Acting on orders by McNabb, Roach tied Reeves's hands behind his back using a speaker wire.(R 44-45.) Once Reeves was tied up he could no longer see McNabb's face.(R 56.) After Roach tied Reeves, McNabb took a neck tie which had been hanging on the wall and used it to tie Roach.(R 47.) During this general time period, McNabb opened the office door and allowed another black male to enter.(R 48-49.) This man was about the same height as McNabb but was a little heavier, and wore a toboggan.(R 49.) The man was armed with a .380 caliber gun.(R 52.)

Reeves said tills which had been made up for use in cash registers the next morning were thrown onto the floor of the office.(R 53, 64-65.) Reeves heard the second man curse at Roach.(R 54-55.) After McNabb and the other man left, Reeves got up and looked out of the office.(R 57.) Reeves looked around the store and finally located Hill.(R 58-59.) He told Hill the store had been robbed.(R 59.) As Reeves talked to Hill he untied his hands.(Id.) The men went to check on Roach,

13

who was still in the office.(Id.) They found her in the office and untied her.(R 60.) Reeves called 911; however, he was unable to tell the operator the race of the robbers.(R 60-61.) Reeves said this was because he was afraid.(R 61.) When police arrived, Reeves told them what had happened.(R 61-62.) Reeves said the robbers were wearing sneaker-type shoes or tennis shoes.(R 62-63.) Reeves did not give McNabb permission to take any property from Winn Dixie.(R 52.)

**PATSY ROACH**

On June 7, 2001 Patsy Roach was at Winn Dixie working behind the cigarette counter stocking cigarettes and performing an inventory.(R 100-01.) Around four o'clock a black male came up to the counter and asked to speak to Ron Reeves.(R 102-03.)  The man was about six feet tall, of medium weight, had a dark complexion (R 107), wore tennis shoes (R 105) and blue-jean-type clothing. (R 107-08). Roach picked up a telephone, paged Reeves, turned her back and continued her inventory.(R 104.) Reeves came up to the counter and asked the man if he could help him. The man said "guess what, this is your lucky day." The man pulled a silver gun (R 114) from his jacket and told Roach and Reeves to "come on."(R 106.) Roach

14

identified McNabb as the robber.(R 109-110.)

McNabb forced Reeves and Roach into the office at gunpoint; the gun was touching the middle of Roach's back.(R 108.) He made Reeves open the safe and remove money. McNabb put the money into a backpack or heavy sack.(R 110-111.) McNabb made Roach tie Reeves with a speaker-type wire which McNabb pulled from a small black bag he was carrying.(R 111.) McNabb then tied Roach using a neck tie which had been hanging on the wall in the office.(R 113.)

While they were in the office another black male entered. He was shorter, darker and heavier than McNabb and wore a toboggan.(R 112.) He had a dark-colored gun.(R 114.) Roach heard tills hitting the floor. (Id.) Then she heard the door open and close. Thinking the men were gone, Roach turned around and saw the second man standing there. He said, "yeah, I'm still here, bitch, and I'm not afraid to pop you, don't do anything stupid."(R 117.) After what seemed to Roach like a long time, Reeves got up and left the office.(R 118.) He returned with Reggie Hill, who untied Roach.(R 119-20.)

On cross-examination, Roach claimed she got a "pretty good look" at the robber, and that her recollection is better now than it was then.(R 122-23.) She went with Singleton to

15

the police station and was shown different pictures on a computer.(R 123-3-24.) Later, Singleton and another officer came to her house with a picture, but she did not recall if it was the same photograph she was shown by defense counsel, nor did she recall which person in the photograph she selected.(R 124-25.) She said both robbers had light mustaches,(R 125), were medium height, were wearing tobaggans and tennis shoes.(R 126.)

**BETTY PRESCOTT**

Prescott was working at Winn Dixie the morning of June 7, 2001. When she arrived at work around 3:20 a.m. it was dark outside.(R 130.) As she pulled into the parking lot she noticed a van coming from the back of the store at a "pretty good rate of speed."(R 130-31.) The van had wood grain paneling on the sides, and appeared to be a 1989 to 1992 model.(R 131.)

She clocked in and began working.(R 132.) Hill was in the receiving room with her and they were pushing buggies to the dumpster.(R 138.) Later, Reeves came to the receiving room and said he had been held up.(R 132.) Hill went with Reeves back up to the front of the store.(R 133.) After police arrived, Prescott told them police about her encounter with the van in

16

the parking lot.(R 133-34.)

On cross-examination, Reeves said after she exited her vehicle upon arriving at work the van was not in the front parking lot. She did not know where it went.(R 136.) She did not know the color of the van, but knew it was a mid-sized van with wood grain on the sides. She also said that when Williamson took her to Barstone the night after the robbery (R 140) she could not identify the van as the same one she saw the night of the robbery, but thought it "looked familiar."(R 138.) On redirect, Prescott said since the robbery she has not seen any other vans similar to that one.(R 140-41.)

**REGGIE HILL**

On the night of the robbery Hill worked at Winn Dixie on Westgate Parkway.(R 141-42.) As managers, both he and Reeves knew the combination to the store safe.(R 143.) He knew McNabb because they both lived in Barstone Apartments, had played basketball together and he had visited in McNabb's apartment.(R 144.) During the few months before the robbery, McNabb asked Hill how many people worked the night shift at Winn Dixie and how much money the store made.(R 145.) McNabb also described Reeves to Hill and asked his name.(R 145-46.)

The night of the robbery, Reeves walked to the back of

17

the store untying his arms and told Hill the store had been robbed.(R 147.) Hill and Reeves went to the office and untied Roach. Reeves then called 911.(R 148.) Later, Hill spoke with Prescott who told him she had almost collided with a brown and white station wagon in the parking lot as she was coming to work.(R 149.) The vehicle had paneling.(R 149-50.) Hill got a police officer to talk to Prescott so she could tell what she had seen.(R 150.) Hill said coins used at Winn Dixie come from the bank in boxes and are kept in the safe. He identified State's Exhibit three as such a box.(R 150.) After the night of the robbery, Hill did not recall seeing McNabb's van at Barstone.(R 152.) Hill has never had any prior difficulties with McNabb.(R 153.)

On cross-examination, Hill said he usually saw McNabb a couple of times each week, but had not seen him for awhile before the robbery.(R 156-57.) Hill admitted he no longer works for Winn Dixie because he was asked to resign.(R 158.) Hill once drove one of McNabb's cars.(R 159.) He also went on a trip to Orlando with McNabb.(R 160.) He said McNabb did not ask him about the layout of the office; the location of the safe, or whether there was a security system, security cameras or guards in the store.(R 160-61.) Also, McNabb did not ask

18

about bait money, a bundle of cash containing ink which could stain a robber or a honing device. (R 162-63.)

Hill was at work at Winn Dixie when the store was robbed in October of 2000. He saw the robber, who wore a toboggan-type cap. (R 164.) In a June 27, 2001 statement to police, Hill said he thought McNabb committed the October 2002 robbery. (R 165-66.) However, in the earlier robbery the robber realized he was being given bait money. (R 167.) Based upon his discussions with McNabb about each other's backgrounds, Hill thought McNabb was capable of robbery. (R 169.)

### JIMMY SINGLETON

On June 7, 2001 Singleton was a criminal investigator for the Dothan Police Department and was assigned to investigate the Winn Dixie robbery. He went to the scene shortly after the robbery. (R 175.) He also went with Williamson to Barstone Apartments looking for an older model van with wood grain paneling on the side. (R 180.) They found such a van at the apartments and ran the tag number, which came back registered to McNabb. (R 181.) Singleton checked city utility records to determine McNabb's residence. (R 185.) Using this information and the description of the robbers as black males, Singleton obtained a search warrant for McNabb's residence from a

19

district judge.(R 184-86.) He and Williamson went to the apartment where they found the door had already been forced open by the Swat team.(R 187.) Entering the apartment Singleton found a bibbed black toboggan on the living room couch, and a safe in the bedroom closet.(R 188, 192.) The safe contained food stamps and money wrappers bearing Winn Dixie's stamp.(R 188-89.) It also contained a large number of postage stamps, and bullets. Near the safe in the closet was a case of rolled pennies. Singleton also found a bag of speaker wire (R 189) and some tennis shoes in the apartment (R 190). The speaker wire was found in the bedroom.(R 191.) The wire was admitted as State's Exhibit 4.(Id.) The toboggan was admitted as State's Exhibit 2.(R 192-93.) The food stamps were admitted as State's Exhibit 5.(R 193-94.) The one-thousand dollar money wrapper was admitted as State's Exhibit 9.(R 195.) The books of postage stamps were admitted as State's Exhibit 6.(R 195-97.) The case of pennies was admitted as State's Exhibit 4.(R 197-99.)

Singleton showed Roach a photographic lineup which contained pictures of people who were similar in appearance.(R 199.) Roach picked someone whom she said resembled the robber except for the mustache.(R 200.) McNabb was not in that

20

lineup. (R 201.) Singleton also searched McNabb's van and found McNabb's driver's license over the sun visor. (R 202-03.) The license was admitted as State's Exhibit 10. (R 203-04.) The van had wood grain paneling on the side and was within the 1989 to 1992 year model range. (R 204.) Singleton took Prescott to Barstone to view the van. Prescott told him she wasn't sure if the color of the van was the same but claimed she told him the wood grain paneling was "exactly the same" as she had seen. (R 205.) However, on cross-examination, Singleton admitted Prescott had actually told him the wood grain on the van was the "same type" as that on the van which almost ran her over in the parking lot. (R 206.) He admitted Prescott could not identify McNabb's van as the one she had seen in the parking lot of Winn Dixie. (R 207.) Singleton admitted he alleged in a search warrant affidavit that McNabb had a "history of robbery" while knowing that McNabb's robbery charges in Florida had been reduced to larceny. (R 207-09.) Singleton never showed Roach a lineup containing McNabb's photograph. (R 209.) Singleton did not match any shoe prints to shoes confiscated from McNabb's apartment. (R 211.) Singleton did not believe the robbery was an "inside job." (R 211-12.) Singleton denied going to Barstone to check out any connection between

21

Hill and the robbery. (R 216.) Singleton admitted although more than $900.00 in postage stamps were taken from Winn Dixie, only $118.00 worth of stamps were retrieved from McNabb's apartment. (R 216-17.)

The safe in McNabb's closet was small, about the size of two lunch boxes. (R 218.) The safe also contained some .380 caliber bullets, single postage stamps a Winn Dixie money wrapper, and a food stamp. (R 219.) Although nearly $20,000.00 was stolen from Winn Dixie, only a box full of pennies, some assorted change in a piggy bank, and three one-dollar silver certificates were found in the safe at McNabb's apartment. (R 219-20.) No gun was found in the apartment. The only thing to connect McNabb to the robbery was a food stamp and a money wrapper. Singleton said the police did consider Hill a suspect at one point. (R 220.)

The State rested and McNabb made a motion to dismiss for failure to prove a prima facie case. (R 221.) The court denied the motion. (R 222.)

### RUBEN COREY MCNABB

McNabb denied robbing the Winn Dixie. (R 222-23.) He said at the time of the robbery his car broke down in Orlando, where he had gone to pick up his daughter, Taquasia, who lives

with her mother. McNabb said he went to Orlando on Sunday, June 3, 2001.(R 224.) He did not return home, however, because he learned he was accused of robbing the Winn Dixie.(R 224-25.)

McNabb said he met Hill shortly after he moved to Dothan in September of 1999. They used to play basketball together several times each week and socialize with each other.(R 225.) Hill and McNabb occasionally drove each other's vehicles.(R 231.) Each knew where the other worked.(R 225-26.) McNabb worked at King Church Furniture. Hill dropped him off at work a couple of times. McNabb usually worked from noon to 9:30 p.m.

On McNabb's way to Orlando, the transmission in his vehicle started slipping.(R 226.) He arrived in Orlando on Sunday and the transmission became worse, so he took it to Greg's Automotive in Orlando on Tuesday or Wednesday.(R 227-28.) Someone at Greg's gave him a receipt dated June 6, 2001.(R 228-29.) The transmission had to be replaced. McNabb expected to be able to get the car back in a couple of days.(R 230.)

McNabb denied having ever seen the food stamps or money wrapper found in his apartment, but said the stamps were some

23

he used when he wrote to his wife from prison in Florida. He was recently released from prison.(R 232.) McNabb said he did not recall asking Hill how much money the Winn Dixie store earned or the name of the night manager.(R 232.) He said they had general conversations about work, but he had no interest in robbing stores because he was earning a good living at his job.(R 232-33.) On about June 13 or 14 a friend informed McNabb by telephone that his apartment had been searched.(R 233.) After he learned this he contacted the Dothan Police Department and spoke with someone who cussed at him and threatened to get his "mother f.....g ass". McNabb was afraid of police brutality, so he didn't return to Dothan.(R 234-35.)

On cross-examination, McNabb admitted he left Dothan before June 3 and went to Eufaula to see his father.(R 235-36.) He left Eufaula and went to Orlando, where he stayed with his wife's sister, Daniella.(R 245.) He stayed with her all the time  McNabb's wife, Yvette, had had a baby on May 15.(R 236-37.) McNabb quit his job working for the church furniture company about the time the baby was born.(R 237-38.) He had no income during that time, but he said his wife was getting maternity pay from her company.(R 238.) He said the family also had savings in banks in Dothan and Orlando.(R 239.)

24

McNabb admitted he and his wife owned a van with wood paneling, a Buick LeSabre, and a tan Cadillac.(R 239-40.) He originally planned to pick up his daughter in Orlando on Monday and return home.(R 240-41.) He said he and his wife were having problems because he was frequently out of town, but he denied they were separated.(R 241.) While McNabb was in Orlando, he and his wife talked with each by telephone.(R 242.) He said his wife did not tell him the police had been to their apartment.(R 243.) McNabb said when he talked to the police by telephone they asked him to come in and talk with them.(R 243.) He admitted when he was stopped by the Orlando police for a traffic violation he gave them his brother's name because he was trying to get away. (R 244.) He ran when the police tried to arrest him.(R 264.) McNabb is about six feet tall and weighs about 200 pounds.(R 245.) When he went to Orlando he didn't have a job, but had children in Orlando that he was responsible for supporting.(R 246.) McNabb claimed he asked for time off from his job to be with his baby. He claimed he went back and talked with Jimmy King, the owner of the business where he had worked.(R 246-47.) He denied that he quit his job.(R 247.) McNabb admitted he has four or five felony drug convictions.(R 248.) He said he and his wife had

25

not been on food stamps in Dothan.(R 248.) He insisted that in
June 2001 he still had the some of the same postage stamps
which he used to write his wife before he was released from
prison in September of 1999.(R 248-49.) He said the toboggan
was his little girl's and they both used it.(R249.) He
disputed that the food stamp, State's Exhibit 5, and the money
wrapper, State's Exhibit 9, were in his safe, and claimed to
have never seen them. He said someone else put them there.(R
250.)   However, he admitted his door has a deadbolt
installed.(R 251-52.) He never reported to the apartment
manager that anyone had tampered with his door. However, he
said his wife had made such a report.(R 252.) McNabb said
during the time he stayed with Daniella, he went "everywhere
in Orlando."(R 253.) McNabb said at the time of the robbery he
was asleep at Daniella's house. McNabb admitted he served time
for a battery and theft conviction which had been reduced from
robbery.(R 254.)   McNabb denied ever owning a gun. He said he
once had a gun, and admitted the .380 bullets found in the
safe were his.(R 255.) The prosecutor confronted McNabb with
previous testimony in which he denied knowing anything about
the bullets. McNabb said his memory had been "refreshed" by
his wife.(R 256-57.) McNabb said at the time of the robbery

26

his wife was in Dothan.(R 257.) He said he talked with her on June 14.(R 258.) She told him the police had searched the van, and on June 15 he talked with Lt. Martin of the Dothan Police Department. His wife came to Orlando the following Saturday. McNabb said he saw Daniella Turner on June 3 and has never talked about the robbery.(R 259.) McNabb admitted that Daniella, in her deposition, said she saw McNabb on the 4th and not the 3rd.(R 259-60.) He admitted Daniella, in her deposition, claimed McNabb stayed at her house from June 4 until June 14 and never went anywhere.(R 263.) On June 15, McNabb's wife moved to Florida to live with McNabb, because the police in Dothan were harassing her.(R. 263-64.) McNabb denied ever going into Winn Dixie.(R 265.) McNabb admitted owning tennis shoes and denied owning a blue jean jacket.(R 266.)

On redirect, McNabb said he was charged with robbery in Florida because he got into a fight with an acquaintance who stole some money from him.(R 267.) McNabb attempted to testify that after his arrest in Florida, he had been mistakenly released from the Houston County Jail and came back voluntarily. However, the court sustained the State's objection to this testimony.(R 268-70.) McNabb denied knowing

27

there was a warrant for his arrest while he was in Florida, and said had he known, he would have returned to Alabama.(R 271.)

### YVETTE MCNABB

Yvette McNabb ("Mrs. McNabb") is McNabb's wife.(R 271.) She said on June 2, 2001 McNabb went to see his father, who takes dialysis treatments, and on June 7, 2001 was gone to Orlando to get his daughter for the summer.(R 272.) She believes McNabb went to Orlando on June 3 because she is sure he spent the night with his father.(R 273.) She and McNabb had already made arrangements with the child's mother for him to pick up the child.(R 273.) Mrs. McNabb stayed in contact with McNabb on his cell phone the entire time he was gone. She admitted being upset with McNabb because she had just had a baby and didn't want to deal with three children. She had been working at Chic-fil-A but was on maternity leave. She said her boss put in time for her to get checks.(R 274.) She and McNabb supported themselves during her time off with money they had saved.(R 275.) Mrs. McNabb said she went to Orlando on June 9, 2001 so her family could see the new baby, and so she could be with McNabb.(R 275-76.) The trip was prolonged so she could see more of her family. She returned to Dothan on June 13.(R

28

276.) When she came home, she found the front door "busted," the house "tore up," and a search warrant with a "list of stuff on the table."(R 276-77.) Mrs. McNabb was shown the food stamp and postage stamps. She said the food stamp was not in her house; she also denied that the postage stamps were in the house, but said they did have postage stamps she had sent to McNabb while he was in jail.(R 277.)

On cross-examination, Mrs. McNabb said she knows McNabb spent the night in Eufaula on June 2, because she talked with him on his cell phone. When confronted with McNabb's testimony that he didn't spend the night in Eufaula, Mrs. McNabb said, "I know he told me where he was at, and I believed him."(R 279.) She denied she and McNabb had separated when he left, or that she told anyone they were separated.(R 280.) Mrs. McNabb denied quitting her job at Chic-fil-A. She claimed she took leave, and then moved to Orlando.(R 281.) She admitted while she was on maternity leave she did not receive a check every week from Chic-fil-A.(R 281-82.) Mrs. McNabb could not remember if she received more than one week's pay after she left Chick-fil-A.(R 282.) She also denied that McNabb quit his job. She said he took leave a couple of days before her baby was born on May 8.(R 282.) Mrs. McNabb has another daughter,

Dezeray, who was living in the household before the baby was born.(R 283.) Although neither she nor McNabb were working, they had money saved in accounts at AmSouth Bank in Dothan and "Washington Mutual" in Orlando. She admitted they owned a white 1989 van with wood paneling.(R 284.)

Mrs. McNabb said after McNabb left to go to Orlando she did not see him again until June 9 when she went to Orlando. She denied seeing McNabb on June 7, but said she knew he was in Orlando because she had talked with him and her sister on the phone.(R 285.) Mrs. McNabb said she did not know McNabb's cell phone number.(R 286.)

Before she left to go to Orlando, her apartment door was "messed up a little." She normally used her key to open her apartment door.(R 288.) She could not remember how many locks the door had.(R 288-89.) However, she denied the door had a deadbolt lock.(R 289.) She said she always locked her door when she slept at night.(R 289-90.) Before June 7, 2001 there were no problems locking the door. Also, she never made any reports that the door could be entered too easily.(R 290.)

When she came home from Orlando and discovered the apartment had been searched she did not initially call McNabb and tell him.(R 291.) McNabb had stayed in Orlando because his

30

car was being fixed. The day Mrs. McNabb returned from Orlando, the police stopped her and asked her to follow them in her van to the police station.(R 292.) They asked her permission to search the van, and asked where McNabb was. She didn't tell them.(R 293.) She knew from the search warrant inventory left at the apartment that he was being sought for robbery.(R 294.) She denied telling either Williamson or Singleton that she and McNabb were separated, that she hadn't seen him in two weeks, or that she couldn't explain the items found in her home during the execution of the search warrant.(R 295.) Mrs. McNabb said when she moved to Orlando she left the Cadillac behind and it probably was towed away by the apartment complex. She claimed it did not work.(R 296-97.) She said the AmSouth account had probably already been closed before she learned McNabb was wanted for robbery. She said she did not know how much money was in the account, but when asked if it had enough money to support four people, including a new baby, she said "Yes and no."(R 298.) She claimed her husband did odd jobs in Orlando, such as working on radios.(R 299.) She admitted living with him in Orlando while knowing the police wanted him for a robbery in Dothan.(R 299.) She denied being in Dothan the day police executed the search warrant,

31

and said if someone said they saw her that day it would not be true. (R 301.)

**RONALD REEVES**

The Defense recalled Reeves to the stand and showed him the speaker wire taken from McNabb's apartment. He said it was not like the wire he was tied up with. (R 304.) On cross-examination, Reeves said he had heard McNabb testify and recognized his voice as that of the robber. (R 305.)

The Defendant rested. (R 306.)

**SHERRY WISDOM**

On rebuttal, the State called Sherry Wisdom ("Wisdom"), who keeps the payroll records for King Church Furniture. The company is owned by Jimmy King ("King"). (R 307.) She said McNabb worked for the company as an upholsterer. He last worked for the company on May 15, 2001. He was not given a leave of absence. (R 308.) McNabb left and never returned. (R 308-09.) When asked by the prosecutor if McNabb could have had any conversations with the shop foreman about not returning to work, McNabb objected on grounds of hearsay. The court overruled the objection and Wisdom answered, "No." (R 309.) On cross-examination, Wisdom admitted she was not privy to all

32

conversations the owner and the foreman had with their employees. However, when he asked, "So it's possible he could have had a conversation?" Wisdom replied, "No, it's not possible. I checked with both [King] and [the foreman] before testifying to make sure."(R 310.)

**STEPHANIE REEVES**

In June 2001 Stephanie Reeves ("Ms. Reeves") lived next door to the McNabbs at Barstone.(R 311.) Prior to June 14, 2001 she had talked with both of them.(R 312.) She saw Mrs. McNabb the morning police searched McNabb's apartment, as well as on the following day.(R 313.)

**MARY BESSIE**

Mary Bessie ("Bessie") knew the McNabbs in May of 2001. Mrs. McNabb was pregnant at the time (R 315), and lived with her brother-in-law and sister at Barstone right beside the McNabbs' apartment.(R 316.) Bessie's grandmother died June 6, 2001, which was also the birthday of Bessie's brother.(R 316-17.) Bessie's family came to the apartment that night.(R 317.) That night she went outside to smoke a cigarette and saw McNabb, who was coming to his apartment from the parking lot.(R 318-19.) Bessie was crying, and McNabb asked if she was okay.(R 318.) On June 12, 2001, as Bessie was on her way to

33

work she saw Mrs. McNabb getting into her van. That evening when Bessie came home from work, she saw police in McNabb's apartment. They had kicked in the door. She also saw Mrs. McNabb during the three days preceding the 12th.(R 320.) Bessie said June 6 was the last time she saw McNabb at the apartments.(R 321.)

**GREG BRYSON**

Greg Bryson ("Bryson") operates Greg's Auto Repair in Orlando.(R 323-24.) Bryson was shown Defendant's Exhibit 1, a copy of the repair order which McNabb said he received from an employee of Greg's Auto Repair while his car was having the transmission repaired. Bryson said it was not a receipt from his business, nor did he give the receipt to McNabb. The amount of tax on the receipt is incorrect.(R 325.) His tickets are in two parts; a white copy, which is kept by the business, and a yellow copy, which is given to the customer.(325-26.) A carbon is placed between the two sheets to make a copy.(R 326.) Defendant's Exhibit 1 contains writing in blue ink.(R 327.)

On cross-examination, Bryson admitted that some of his employees do work on the side, and one of them could possibly have written the ticket and given it to McNabb.(R 328.) Bryson

said he knew McNabb, had seen him in Orlando often, and had worked on his car before.(R 328-29.) On redirect, Bryson said work orders are kept on an open counter and are accessible to the public.(R 329.) On re-cross, Bryson admitted having an independent contractor named Travis Johnson, whose nickname was Trap.(R 332.)

### WILLIE WILLIAMSON

Willie Williamson ("Williamson") worked as a City of Dothan police officer on June 14, 2001.(R 333.) On that date she saw Mrs. McNabb in a white van with wood paneling.(R 334.) Williamson spoke with Mrs. McNabb, who told her that she and McNabb were separated and hadn't seen each other in two weeks.(R 334.) When Williamson and Singletary asked if Mrs. McNabb could explain why items from the robbery were found in her apartment, she said McNabb had not been home in two weeks.(R 334-35.) She did not tell police she had just been in Orlando with McNabb.(R 335.) On June 18, 2001 Williamson, acting on a tip that McNabb might be there, went back to McNabb's apartment. Mrs. McNabb allowed her to enter the apartment. McNabb was not there. Mrs. McNabb did not tell Williamson he was in Orlando.(R 336.)

35

## STANDARD OF REVIEW

A defendant who claims the right to a free transcript does not, under our cases, bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight. Britt v. North Carolina, 404 U.S. 226, 235, 92 S.Ct. 431, 435, 30 L.Ed.2d 400 (1971). See also Dunn v. State, 733 S.W.2d 212, 215 (Tex.Cr.App. 1987) (The appellant must show due diligence in requesting [the transcript] and that failure to file or have the [transcript] timely filed is not in any way due to negligence, laches, or other fault on the part of the appellant or his counsel, indeed, the circumstances in such cases should be viewed from the appellant's standpoint, and any reasonable doubt is resolved in favor of the appellant.) Harris v. State, 552 So.2d 866, 873 (Ala. Crim. App. 1989).

Moreover, as to a required showing of particularized need by a defendant for a copy of a transcript of a prior trial, this Court has echoed the United States Supreme Court's language in Britt that [o]ur cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case. Harris v. State, supra at

36

874. . . . The United States Supreme Court in <u>Britt v. North
Carolina</u>, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971),
held that an indigent defendant must be provided with
transcripts of a prior trial that ended in a mistrial without
showing a specific need. The necessity of the transcripts to
an effective defense was to be presumed. <u>Grayson v. State</u>,
[CR-95-1511, 824 So.2d 804, 823 (Ala. Crim. App. 1999),
quoting <u>State v. Tison</u>, 129 Ariz. 526, 540, 633 P.2d 335, 349
(1981).

<u>Quick v. State</u>, 825 So. 2d 246, 260-62 (Ala. Crim. App. 2001)

## SUMMARY OF THE ARGUMENT

McNabb, an indigent, timely requested the trial court to
approve extraordinary expense funds so he could purchase a
transcript of his prior trial, which ended in a mistrial. The
trial court denied his request. It was important at trial for
McNabb to be able to challenge the ability of witnesses to
remember details of the robbery. This Court has previously
ruled that the United State Supreme Court decision <u>Britt v.
North Carolina</u>, 404 U.S. 226, 92 S.Ct. 431, ,30 L.Ed.2d 400
(1971) requires the State to furnish an indigent with a free
transcript of his prior trial which ended in a mistrial. <u>Quick</u>

v. State, 825 So. 2d 246 (Ala. Crim. App. 2001). The trial
court erred by refusing McNabb's request.

## ARGUMENT

**THE TRIAL COURT ERRED BY REFUSING TO GRANT FUNDS FOR
MCNABB, AN INDIGENT, TO PURCHASE A TRANSCRIPT OF HIS PRIOR
TRIAL.**

McNabb was clearly indigent. Prior to both of his trials,
McNabb filed an affidavit of hardship with the court. For
purposes of his first trial the court expressly determined
McNabb to be indigent. (C 14.) McNabb was not expressly
determined to be indigent for purposes of his retrial, but the
facts clearly imply that such a determination was made: McNabb
filed a second affidavit of hardship stating he was unemployed
and owned nothing of value (C 75-76), whereupon the court
reappointed counsel to represent him.(C 81.)

> Section 15-12-1, Ala. Code 1975, defines an
> indigent defendant as "[a]ny person involved in a
> criminal or juvenile proceeding in the trial or
> appellate courts of the State for which proceeding
> representation by counsel is constitutionally
> required and who under oath or affirmation states
> that he is unable to pay for his defense and who is
> found by the court to be financially unable to pay
> for his defense.

Quick v. State, 825 So. 2d 246, 256 (Ala. Crim. App. 2001)

McNabb timely filed a request for funds to purchase a transcript of the previous trial for cross-examination and rebuttal purposes. The request was made on February 26, 2003, nearly a year before his retrial.(C 79-80, R 2.)  A week after McNabb made his request the trial court summarily denied the motion.(C 82.)

This Court has previously ruled that the United States Supreme Court decision Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, ,30 L.Ed.2d 400 (1971) requires the State to furnish an indigent with a free transcript of his prior trial which ended in a mistrial.

> . . . Beninati's ability to remember and recount the events and conversations that transpired around the time of the offense was critical to the State's case; thus, the appellant's ability to cast doubt as to his ability to remember based on prior on inconsistent testimony concerning this time period was critical to the defense.
>
> . . . .
>
> . . . The United States Supreme Court in Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), held that an indigent defendant must be provided with transcripts of a prior trial that ended in a mistrial without showing a specific need. The necessity of the transcripts to an effective defense was to be presumed.'" Grayson v. State, [CR-95-1511, 824 So. 2d 804, 823 (Ala. Crim. App. 1999), quoting State v. Tison, 129 Ariz. 526, 540, 633 P.2d 335, 349 (1981).
>
> . . . .

> In the present case, because the appellant, as an indigent, was entitled to the transcript of his prior mistrial of this case, or the use of an adequate alternative, <u>McKinney v. State</u>, 665 So. 2d 209 (Ala. Crim. App. 1995) (wherein possible alternatives to a transcript are discussed); <u>Nickerson v. State</u>, <u>supra</u> (same), the judgment is due to be reversed and the cause remanded for a new trial.

<u>QUICK v. STATE</u>, 825 So. 2d 246, 260-62 (Ala. Crim. App. 2001).

As was the case in <u>Quick</u>, it was crucial for McNabb to be able to cast doubt on the ability of Roach and Reeves to remember. This fact is underscored by the contrast in Roach's testimony. She claimed that she got a "pretty good look" at the robber, and that her recollection is better at the time of trial than it was at the time of the robbery. (R 122-23.) Human experience and common sense teaches that memories fade with time. To prove the point, Roach was unable to recall on the witness stand whether a photograph she was shown was the same one Singleton and another officer brought to her house, nor did she recall which person in the photograph she selected. (R 124-25.) Also, Reeves told the police dispatcher he could not state whether the robber was black or white. (R 21.) Reeves later selected someone whom he thought resembled the robber from a photographic lineup which did not contain a photograph of McNabb. (R 199-01.)

40

## CONCLUSION

McNabb, an indigent, was entitled to have a copy of the transcript of his previous trial which ended in a mistrial provided to him by the State. The trial court erroneously denied his request for funds to purchase the transcript. Accordingly, McNabb requests this Court to reverse his conviction and order a new trial at which he will be provided a copy of the transcript of his first trial.

DAVID K. HOGG, ATTORNEY AT LAW LLC

David K. Hogg (HOG007)
ASB 4589-055D
Attorney for Defendant
188 N. Foster St., Ste. 201
Dothan, Alabama 36303
(334) 794-8559

41

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Brief upon the following persons by placing a copy of the same in the United States Mail, correctly addressed and postage prepaid on this the 14th day of September, 2004.

> Honorable Bill Pryor
> Attorney General
> Alabama State House
> 11 Union Street
> Montgomery, Alabama 36130

David K. Hogg

## SUMMARY OF RULINGS AND ACTIONS ADVERSE TO APPELLANT

| Record Page No. | Summary |
|---|---|
| Vol I | |
| 25; C 38; C 100 | Denying motion to suppress. |
| Vol. II | |
| C 38 | Denying request for reconsideration of bond. |
| C 91 | Denying motion to reconsider bond. |
| 22 | Sustaining objection to opening statement. |
| C 100 | Denying motion to suppress evidence. |
| 51 | Overruling objection to question about comparison. |
| 92 | Sustaining objection to question about witness's criminal record. |
| 140 | Sustaining objection to question already asked and answered. |
| 168 | Sustaining objection to hearsay question. |
| 183 | Overruling objection to lack of personal knowledge. |
| Vol. III | |
| 215 | Sustaining objection to question asked and answered. |

43

| | |
|---|---|
| 222; C 122 | Denying motion for judgment of acquittal. |
| 227 | Sustaining objection to hearsay. |
| 230 | Sustaining objection to hearsay. |
| 251 | Sustaining objection to hearsay. |
| 252 | Sustaining objection to hearsay. |
| 270 | Sustaining objection to Defendant being released from jail. |
| 329 | Sustaining objection to question about witness's opinion of Defendant's propensity for robbery. |
| 329 | Sustaining objection to question about witness's opinion of Defendant's propensity for robbery. |
| 333 | Sustaining objection to question whether witness's employee could have possibly forged receipt. |