1    Q    And it's possible at some point during a regular

2         working night at the Winn Dixie, Mr. Hill could be

3         in that office?

4    A    No, not really.  Because he would have been either

5         stocking or something.  We hardly very seldom went

6         in the office.

7    Q    If someone needed change, he would go in that

8         office and get change; if someone needed anything,

9         it's possible he could have gone in that office;

10        is that correct?

11   A    Yes, it's possible.

12   Q    When you left the office itself, you say you

13        walked out the door, you walked down the hallway,

14        you didn't see anybody; is that correct?

15   A    Yes, sir.

16   Q    Did you look outside for a car for the alleged

17        robbers?

18   A    Yes, sir.  I glimpsed to the -- I looked to the

19        right of me.  Because the outside doors, when you

20        walk out the office door, it's to your right when

21        you go outside the thing there.  So I looked to

22        the -- after I walked out the doors there, out of

23        the office, I come up and I looked to the right

24        where the --

25   Q    And that's the big glass windows looking out in

```
 1          the parking lot?
 2    A     No, sir.  The doors is first.  I looked out that
 3          door first.  The double doors.  And then I looked
 4          out the big glass windows there.
 5    Q     And you did not see an automobile of any type?
 6    A     No, sir.
 7    Q     No cars speeding away?
 8    A     No, sir.
 9    Q     And no sign of the alleged robbers?
10    A     No, sir.
11    Q     No sign of the robbers.
12                You also claim that you and Mr. Hill were
13          equal rank so to speak at the Winn Dixie?
14    A     Yes.
15    Q     So he wasn't your supervisor, you weren't his
16          supervisor?
17    A     No, sir.
18    Q     Both had co-equal responsibilities?
19    A     Yes.  Yes.
20    Q     Did you know about Mr. Hill's criminal history?
21                MR. VALESKA:  Objection.
22                THE COURT:  Sustained.
23    Q     In his job would Mr. Hill have access to those
24          cash register drawers?
25    A     Yes, sir.
```

```
1    Q   In his job would Mr. Hill have access to cashed
2        food stamps or discarded thousand dollar money
3        wrappers?
4    A   Access to it?
5    Q   Would he have access to it?
6    A   Well, it just stays in the office.  Yes, he can go
7        in and out of the office.
8    Q   Would he have access to the infamous Winn Dixie
9        four twenty-six stamp?
10   A   No, sir, it stays in the office there.
11   Q   But he has access to the office?
12   A   Yes.
13   Q   So he could stamp something?  If he wanted to
14       stamp a piece of paper with that stamp, he could
15       do that, couldn't he?
16   A   Yes.
17   Q   Now, the money wrapper we've discussed earlier,
18       you had stated that -- I'll withdraw that.
19           Did you ever make a statement to the Dothan
20       Police Department?
21   A   Talking about a statement in -- explain a
22       statement.
23   Q   Yes.  A statement.  Did they take a recorded
24       statement of you at any point during their
25       investigation?
```

```
1    A    I don't think so.  I don't know.  I really don't
2         know.
3    Q    Did you ever write -- did they ever get you to
4         write anything down and you sign it on the bottom
5         and say this is what happened and sign it Ron
6         Reeves?
7    A    Sir, I can't recall.
8    Q    What were your regular working hours at the time
9         of the robbery?
10   A    I would basically come in at about ten-thirty at
11        night.
12   Q    Ten-thirty at night?
13   A    Yes, sir.
14   Q    And what time did you usually get off?
15   A    Approximately around about seven.
16   Q    Seven o'clock a.m?
17   A    Yes, sir.
18   Q    So this robbery would have occurred about half way
19        through your shift?
20   A    Probably, yeah.
21   Q    One more thing about Mr. Hill.  You say -- after
22        leaving the office, you went down one of the
23        aisles and met Mr. Hill coming back up an aisle?
24   A    I don't think I said that.
25   Q    Where did you see Mr. Hill after --
```

```
 1    A    I went from -- I went to look for him, and as I
 2         was going -- I was going through like a produce
 3         section, I met him in the back -- back room.
 4         That's where I met him at.
 5    Q    So he was in the back room?
 6    A    Yes.
 7    Q    How many stamps were taken from the store?  What
 8         dollar amount?  Do you have any idea?
 9    A    No, sir.
10    Q    Would the police report have an accurate amount of
11         stamps?
12    A    That was taken?
13    Q    Yes, sir.
14    A    What they got from the house there.  That's the
15         only thing they would have.
16              MR. BAXLEY:  Nothing further of this witness
17         right now.
18              MR. VALESKA:  Just a couple of quick
19         questions if I could, Judge White.
20                        REDIRECT EXAMINATION
21    BY MR. BAXLEY:
22    Q    The question was how many stamps would have been
23         kept in the safe.  Two, three, five strips, or a
24         lot of stamps?
25    A    There was a lot of stamps.
```

```
 1    Q    What I want to ask you, Mr. Baxley was asking you
 2         about Reggie Hill working there.  How long had
 3         Reggie worked there at the time you worked there
 4         approximately?  It was more than a month or two,
 5         right?
 6    A    Yes, sir.
 7    Q    Now, did you have any internal threats or money go
 8         missing while Reggie worked there?  You didn't,
 9         did you?
10    A    No.
11    Q    Did you have any -- in other words, inventory to
12         make sure you had the food, the cans; nothing ever
13         went missing while Reggie was working there,
14         right?
15    A    No, sir.
16    Q    Let me ask you something if I could about Reggie,
17         in other words, let's talk about Mr. Baxley asked
18         you about the first robbery and make sure we have
19         this correct.  Tell the ladies and gentlemen of
20         the jury how many men you have picked out that
21         have robbed you.
22    A    One.
23    Q    Point him out.
24    A    (Witness complied.)
25    Q    McNabb, correct?
```

```
 1    A    Yes, sir.
 2    Q    The question is, the Winn Dixie was robbed one
 3         time before this robbery, right?
 4    A    Yes, sir.
 5    Q    Look at this jury.  Were you there?  Were you
 6         robbed personally?  You weren't, were you?
 7    A    No, sir.
 8    Q    So when you used the terminology on the 911 tape,
 9         you think it was the same man that did it before,
10         telling the 911 person that, you weren't there
11         when the robbery happened, right?
12    A    No, sir.
13    Q    So somebody else had to tell you, in other words,
14         the manager like Mr. Bolin or the police, what
15         happened on that robbery, correct?
16    A    Yes, sir.
17    Q    And you're not telling the jury that you can
18         identify McNabb as doing the first robbery because
19         you weren't there, right?
20    A    That's right.
21    Q    Now, if I could, look at the jury and tell them to
22         your knowledge between the four and four-thirty
23         and the picture when the clock was made with the
24         safe, did you yourself actually see while you were
25         there Reggie Hill talking to the police, being
```

```
 1              interviewed?  You did, didn't you?
 2     A    Yes, sir.
 3              MR. VALESKA:  That's all.  Pass the witness.
 4              THE COURT:  Anything else?
 5              MR. BAXLEY:  Just one small question.
 6                     RECROSS EXAMINATION
 7     BY MR. BAXLEY:
 8     Q    Why didn't you untie Ms. Roach as soon as you got
 9          up and saw everybody was gone?
10              MR. VALESKA:  Object.  That was outside the
11          scope of what I went back into.
12              THE COURT:  I overrule.  I overrule.  He can
13          ask.
14     Q    Why didn't you untie Ms. Roach after you got up
15          and saw everyone else was gone?
16     A    Why didn't I untie her?
17     Q    Yes, sir.
18     A    For her protection.  Because I didn't even know if
19          they were still in there or not.  That's the
20          reason I didn't untie her.
21     Q    You left her tied up?
22     A    Yes, sir.
23              MR. BAXLEY:  No further questions.
24              MR. VALESKA:  The question about the wire,
25          Judge White, what he said I want to ask about.
```

1                    FURTHER REDIRECT EXAMINATION

2       BY MR. VALESKA:

3       Q    Who produced the wire to tie you up or Ms. Roach?

4       A    Mr. McNabb.

5                 MR. VALESKA:  That's all.

6                 THE COURT:  You may step down.

7                      And I think this is probably a good

8             opportunity to take a recess.  We've been here

9             about two hours, and I suspect you need to make a

10            trip to the rest room.  So let's take about

11            fifteen minutes.  You can go to the jury room.

12            But feel free to go and get a soft drink if you

13            want to or go to the rest room.  But while you're

14            out of the jury box, do not discuss the case among

15            yourselves.  Do not discuss it with anyone else.

16            Do not allow anyone to discuss it with you or even

17            in your presence.  And we'll take about fifteen

18            minutes.

19                 (Jury not present.)

20               THE COURT:  We'll take about fifteen

21            minutes.

22                 (Off the Record.)

23               THE COURT:  Bring the jury.

24                 (Jury present.)

25               THE COURT:  Mr. D.A., who will you have?

```
 1              MR. VALESKA:  Patsy Roach.

 2                        PATSY ROACH

 3         having first been duly sworn, was examined and

 4         testified as follows:

 5                      DIRECT EXAMINATION

 6    BY MR. VALESKA:

 7    Q    Tell us your name, please, ma'am.

 8    A    Patsy Roach.

 9    Q    Let's go back to June 7, 2001.  Tell the jury

10         where you were.

11    A    Winn Dixie.

12    Q    Did you know Mr. Reeves?

13    A    Yes, sir.

14    Q    Did you know Reggie Hill?

15    A    Yes, sir.

16    Q    How did you know those two men?

17    A    They were assistant managers.

18    Q    Could you tell the ladies and gentlemen of the

19         jury, did you ever work any other shift besides

20         the night shift back in June before that?

21    A    No, sir.

22    Q    Had you ever been in the store during daylight; in

23         other words, during eight to five when you weren't

24         working when you had a day off?  Had you been in

25         there to see how many employees were working at
```

```
 1              that time?
 2     A   No, sir.
 3     Q   Would there be more employees in the nighttime or
 4              daytime?
 5     A   More.
 6     Q   In the daytime, correct?
 7     A   Yes, sir.
 8     Q   Before June 7, 2001, were you ever robbed before?
 9     A   No, sir.
10     Q   That night -- you were married, correct?
11     A   Yes, sir.
12     Q   And you were working?
13     A   Yes, sir.
14     Q   Now, I want to go particularly sometime did you
15              know Betty Prescott?
16     A   Yes, sir.
17     Q   How did you know Ms. Prescott?
18     A   They worked in the back checking in vendors.
19     Q   Could you tell the ladies and gentlemen of the
20              jury, sometime that night around four o'clock, do
21              you remember where you were positioned in the
22              store just before the robbery?
23     A   Yes, sir.  I was behind the cigarette counter.
24     Q   What were you doing at that time in the morning?
25     A   Stocking cigarettes and doing inventory.
```

```
 1     Q    Did you have a lot of customers come in at that

 2          time?

 3     A    No, sir, I did not.

 4     Q    Were there any other cashiers on the front part

 5          down the line to wait on customers if they came in

 6          at that time?

 7     A    Yes, sir.

 8     Q    What other cashiers were working the cash --

 9     A    No, sir.  I'm sorry.

10     Q    Who was responsible if a customer came in, please,

11          ma'am?

12     A    I was.

13     Q    How tall are you?

14     A    About five four or five five.

15     Q    And I don't want to be personal, let's go back to

16          June 7 of 2001, and ask how much did you weigh

17          then?

18     A    Gosh, I guess around one thirty maybe.

19     Q    Your physical strength, were you super strong,

20          medium, kind of weak?  Could you describe your

21          physical strength?

22     A    Kind of weak.

23     Q    How long had you worked at the Winn Dixie?

24     A    About three years.

25     Q    Let's go to around four o'clock and ask, did you
```

1       ever have the occasion to see anybody at the

2       counter that you were working at when you were

3       stocking at the service desk or I refer to it

4       where the cigarettes are?  Did you see somebody?

5   A   Yes, sir.

6   Q   White male or black male?

7   A   Black male.

8   Q   Did he say anything to you?

9   A   Yes, sir.

10  Q   Tell the jury what he said to you specifically.

11  A   He came in and asked to speak to Ron Reeves.

12  Q   Kind of go back, and if you could tell this jury

13      before June 7th of 2001, working nighttime at four

14      o'clock, how many customers had you had at that

15      point that had come in at four o'clock and asked

16      to speak to Mr. Ron Reeves, knew his name right

17      out of the blocks?

18  A   None.

19  Q   Now, at that time did he give you any kind of

20      facial expressions; other words, gee, I don't

21      know, a smile or any kind of expression on his

22      face when he talked with you?

23  A   No, sir.

24  Q   Did that get your attention?

25  A   Yes, sir.

```
 1    Q    Tell the jury why.

 2    A    I just thought that it was kind of rude.

 3    Q    Tell the ladies and gentlemen of the jury, did you

 4         call for Mr. Reeves?

 5    A    Yes, sir.

 6    Q    How did you do that?

 7    A    There was a phone behind the counter.  I picked it

 8         up and paged him.

 9    Q    And did you hear the voice yourself over the page

10         through the speaker system?

11    A    Yes, sir.

12    Q    And did you continue to look at this man in the

13         face then?

14    A    No, sir, I did not.

15    Q    What did you do next?  Tell the jury.

16    A    I turned my back and continued counting and doing

17         inventory on cigarettes.

18    Q    There were some picture introduced I want to show

19         you real quick.  Showing you real quickly State's

20         Exhibit 15, what is 15?  You recognize that?

21    A    That's the front of the store.

22    Q    I want to show you particularly State's 21.  You

23         said 15 was the front of the store.  What about

24         21?  What's that?

25    A    It's a picture of the doors.
```

```
1    Q    Those doors, what I want to ask you about, you
2         been in the store working at four o'clock before
3         this occasion and somebody came in and out of
4         those doors, at four o'clock when you didn't have
5         any customers, could you hear the doors?
6    A    Yes, sir.
7    Q    Now, before you turned around and someone said
8         something to you and you turned around and saw the
9         man, who asked for Mr. Reeves, white male or black
10        male?
11   A    Black male.
12   Q    Did you hear him walk in any manner or fashion
13        after you heard the doors open?
14   A    No, sir.
15   Q    What is the floor made of?
16   A    Concrete.
17   Q    Would you tell the ladies and gentlemen of the
18        jury, did you ever get to look at his shoes later
19        on that night?
20   A    Yes, sir.
21   Q    What kind of shoes did he have?
22   A    They were wearing tennis shoes.
23   Q    And you used the term they.  Help me.  I'm asking
24        when you first standing there.  As we go through
25        what occurred there, the robbery, did you see
```

```
1              another person?
2      A       Yes, sir.
3      Q       Male or female?
4      A       It was a male.
5      Q       White male or black male?
6      A       Black male.
7      Q       Now, tell the ladies and gentlemen of the jury, as
8              Mr. Reeves approached, could you hear him coming?
9      A       No, sir.
10     Q       As he got closer, did you hear his voice?
11     A       Yes, sir.
12     Q       Did you still have your back towards him and the
13             black male?
14     A       Yes, sir.
15     Q       What did you hear Mr. Reeves say to him?
16     A       I heard Mr. Reeves ask McNabb could he help him.
17     Q       And what did -- you used the term McNabb, the
18             black male, what did he say to Mr. Reeves that you
19             heard?
20     A       He said, guess what, this is your lucky day.  And
21             he pulled out the gun out of his jacket and told
22             us to come on.
23     Q       Did that get your attention when you saw the gun?
24     A       Yes, sir, it did.
25     Q       Were you afraid?
```

```
1    A    Yes, sir.

2    Q    Had you ever been robbed before?

3    A    No, sir.

4    Q    Tell the jury why you were afraid.

5    A    Because I have two small children that I was -- I

6         was afraid that they were going to grow up without

7         a mama.

8    Q    Would you tell the ladies and gentlemen of the

9         jury that the man that you saw that you used the

10        term McNabb, was he taller or smaller or heavier

11        than you?

12   A    He was taller.

13   Q    Do you know approximately what his height was,

14        your best judgment?

15   A    Around six feet.

16   Q    His weight?  Could I ask you, could you tell the

17        ladies and gentlemen of the jury back on June 7,

18        2001, was it light, medium, or heavy if I could

19        refer to it that way?

20   A    Medium.

21   Q    His skin complexion, light, medium or dark?

22   A    Dark.

23   Q    Did you see what kind of clothing he was wearing?

24   A    Yes, sir.

25   Q    What kind of clothing?
```

```
 1    A    I want to say it was a blue-jean-type material.
 2         It was heavy.
 3    Q    Would you tell the ladies and gentlemen of the
 4         jury, June 7th, was it forty or thirty degrees or
 5         cold at that time?
 6    A    No, sir.
 7    Q    Who went first in the office at McNabb's
 8         instructions with the gun?
 9    A    Mr. Reeves.
10    Q    Who went second?
11    A    I did.
12    Q    Would you tell the ladies and gentlemen of the
13         jury, did the gun ever touch your body?
14    A    Yes, sir, it did.
15    Q    What part of your body did McNabb touch you with
16         the gun?
17    A    The middle of my back.
18    Q    What did he say to you?
19    A    I was all crying and upset, and he called me baby
20         girl and said that I was going to be all right as
21         long as I done what I was told.
22    Q    Now, would you tell the ladies and gentlemen of
23         the jury, when you got into the office with Mr.
24         Reeves and McNabb you said, did you see any other
25         men right then, any other black males?
```

```
 1   A    No, sir, not at that time.

 2   Q    You get in the office.  Reeves, yourselves, and

 3        McNabb, what was said or done?  Tell the jury.

 4   A    Excuse me?

 5   Q    What happened in the office?  What was said when

 6        you got in the office with you, Mr. Reeves, and

 7        McNabb?

 8   A    They -- Mr. Reeves was opening up the safe.

 9        McNabb told him --

10             MR. BAXLEY:  Your Honor, I object.  Using the

11        term McNabb.  She has not identified my client in

12        any way.

13             THE COURT:  I sustain the objection unless

14        you do that.

15   Q    Ma'am, do you see the man in the courtroom that

16        put a gun in your back?

17   A    Yes, sir, I do.

18   Q    Do you see the man in the courtroom that called

19        you baby doll?

20   A    Yes, I do.

21   Q    Do you see the man at the counter that came up to

22        you?

23   A    Yes, sir.

24   Q    Point him out and tell the jury.

25   A    (Witness complied.)
```

```
 1              He's sitting right there.
 2              MR. VALESKA:  Let the Record reflect she
 3         pointed out the Defendant McNabb.
 4     Q    Tell the ladies and gentlemen of the jury when
 5         you used the terminology earlier you described as
 6         McNabb, is that the man you're referring to at the
 7         table you've identified?
 8     A    Yes.
 9     Q    Tell us what McNabb said in your presence with
10         yourself and Reeves, Mr. Reeves, in the office.
11     A    What he said to me?
12     Q    And/or Mr. Reeves about the money or safe.  What
13         was said?
14     A    Told us to hurry up.
15     Q    Could you observe whether Mr. Reeves if he was
16         real calm?
17     A    He was nervous.
18     Q    What did you tell the ladies and gentlemen, was
19         the safe opened in your presence?
20     A    Yes.
21     Q    What was taken out of the safe?
22     A    Money.
23     Q    When I say money, if I use the term paper money,
24         United States currency, paper bills, any other
25         kind of money taken?
```

```
 1    A    Yes, sir.

 2    Q    What other kind of money taken?

 3    A    Coins.  Bills.

 4    Q    Did you see what McNabb put the paper money or the

 5         coins in, please, ma'am, or the box?  Whatever?

 6    A    I saw a glimpse.  It was, like, a backpack or some

 7         type of heavy sack.

 8    Q    Would you tell the ladies and gentlemen of the

 9         jury, please, ma'am, were you ever tied up?

10    A    Yes, sir.

11    Q    Who tied you up?

12    A    McNabb.

13    Q    Was anybody else tied up before you were?

14    A    Yes, sir.

15    Q    Who was that?

16    A    Mr. Reeves.

17    Q    And how did Mr. Reeves get tied up?  At whose

18         instruction?

19    A    He was tied up with a, like, a speaker-type wire,

20         and McNabb told me to pull the wire out of this

21         little black mesh bag that he had.  Told me to tie

22         Mr. Reeves up.

23    Q    Would you tell the ladies and gentlemen of the

24         jury, who had that black bag that had the wire?

25    A    McNabb.
```

```
 1    Q    Would you tell the ladies and gentlemen of the
 2         jury, you mentioned there was another black male
 3         that you saw.  Was he in the office at that time
 4         or shortly after that?
 5    A    Yes, sir.
 6    Q    Was he -- how did he look?  Describe his
 7         appearance, in other words.  What was on his head?
 8    A    He had a toboggan on.
 9    Q    Did McNabb have anything on his head?
10    A    Yes, sir, he did.
11    Q    What kind of clothing was the other black male
12         wearing, if you recall?
13    A    About the same type of clothing.  They were
14         dressed warm.
15    Q    Help me with their heights and weights.  In other
16         words, who was taller, McNabb or the other black
17         male?
18    A    McNabb was taller.
19    Q    Who was heavier weight-wise?
20    A    The second guy.
21    Q    Skin complexion, was McNabb's skin that you
22         referred to, was it lighter or darker or the same
23         as the other black male?
24    A    It was lighter.
25    Q    Would you tell the ladies and gentlemen of the
```

```
 1          jury, there was a clock in the office, correct?
 2    A     Yes, sir.
 3    Q     Were you watching the clock?
 4    A     No, sir.
 5    Q     Did you have a watch on?
 6    A     Yes, sir.
 7    Q     What kind of watch did you have on?
 8    A     Just a little small watch.
 9    Q     Why didn't you watch the watch to see how long
10          this took place?
11    A     Because I was scared.
12    Q     And how did you get tied up?  What manner or
13          fashion?  Show me or tell me as you're standing
14          there.
15    A     He -- McNabb, there was a neck tie hanging on the
16          wall.  And he got the neck tie down off the wall
17          and tied my hands up behind my back.
18    Q     And Mr. Reeves, how was he tied?  Hands in front
19          or back?
20    A     In the back.
21    Q     Would you tell the ladies and gentlemen of the
22          jury, was there any speaker wire inside the office
23          itself when you first went in with McNabb and Mr.
24          Reeves that you saw lying around anywhere that
25          belonged to the store?
```

```
 1    A    No, sir.

 2    Q    Any sounds being made after Mr. Reeves was put

 3         down on the floor on his knees?  Any sounds inside

 4         the office itself that were occurring?

 5    A    Yes, sir.

 6    Q    What sounds?

 7    A    The sounds of the tills hitting the floor.

 8    Q    Every time the till hit the floor, were you afraid?

 9    A    Yes, sir.

10    Q    Would you tell the ladies and gentlemen of the

11         jury, did the other man have a gun if you know,

12         the other black male?

13    A    Yes, sir.

14    Q    What did the gun look like?  Could you tell us?

15    A    It was a dark color.

16    Q    What about McNabb's gun?

17    A    It was a silver -- looked like a nine millimeter.

18    Q    Would you tell the ladies and gentlemen of the

19         jury, when Mr. Reeves was tied up, was he put in a

20         certain part of the office?

21    A    Yes, sir.

22    Q    Use the door that you go in and out with the safe

23         to the right, which part of the office was he put

24         in?

25    A    The left side.
```

```
1    Q    And up in the left upper side?

2    A    Yes, sir.

3    Q    And I use reference to the jury kind of over there

4         in the corner when you see the pillar in the

5         corner of the wall, was it about that width?

6    A    Yes, sir.

7    Q    What about the length?  If I could, let me just

8         kind of say this is the actual wall that Mr.

9         Reeves was put against with furniture or whatever

10        in there, if I turn this way and go back, tell me

11        when to stop.

12   A    About right there.

13   Q    Somewhere in here?

14   A    Yes, sir.

15   Q    Was there enough for two human beings to get up in

16        that area?

17   A    Yes, sir.

18   Q    Who was the second human being that was put up

19        there?

20   A    Me.

21   Q    And how were you instructed to get in that

22        position?  Who told you to do that?

23   A    McNabb.

24   Q    And what did he tell you to do?

25   A    He told me to kneel down behind Mr. Reeves.
```

```
1    Q    Did he still have the gun?
2    A    Yes, sir.
3    Q    Were you afraid at that time?
4    A    Yes, sir, I was.
5    Q    In your mind what you felt what was going to
6         happen to you then?
7    A    I didn't know if they were going to shoot me in
8         the back of the head.
9    Q    Or something else?
10   A    Yes, sir.
11   Q    Now, was Mr. Reeves making any sounds as he was in
12        front of you or say anything or try to help in any
13        way at that time that he could do anything?
14   A    No, sir.
15   Q    Can you tell the ladies and gentlemen of the jury,
16        in that position you were in then kneeling down,
17        did you ever hear the door open a second or third
18        time?
19   A    Yes, sir.
20   Q    Did you ever look when you heard the door open on
21        one of those second or third times?
22   A    Yes, sir.
23   Q    Tell this jury, McNabb had a gun on you, threats
24        made to you, correct?
25   A    Yes, sir.
```

```
 1    Q    Mr. Reeves?

 2    A    Yes, sir.

 3    Q    Why would you look if there had been threats made

 4         to you unless people had guns?  Tell the jury.

 5    A    When I heard the door open and close, I thought

 6         that they had gone.  And when I turned back

 7         around, that second man was standing there.

 8    Q    That was not McNabb, correct?

 9    A    It was not McNabb.

10    Q    And what did that second man that had the gun say

11         to you?  Words to the effect what you remember.

12    A    He said, yeah, I'm still here, bitch, and I'm not

13         afraid to pop you, don't do anything stupid.

14    Q    Did you continue to look at him?

15    A    No, sir, I did not.

16    Q    Tell the jury why you didn't keep looking at him

17         to get a better description of how he looked.

18    A    I was scared he was going to shoot me.

19    Q    Did you hear anything that happened to the door

20         after that?

21    A    Yes, sir.

22    Q    It shut?

23    A    Yes, sir.

24    Q    And this time it shut immediately, did you look

25         right away?
```

| | | |
|---|---|---|
| 1 | A | No, sir, I did not. |
| 2 | Q | Why didn't you look if you had already looked? |
| 3 | A | Because I was afraid he was still there. |
| 4 | Q | Now, you're inside the store with Mr. Reeves.  Can |
| 5 | | you tell the ladies and gentlemen of the jury how |
| 6 | | long you were inside with Mr. Reeves until |
| 7 | | somebody moved inside the office? |
| 8 | A | I don't know. |
| 9 | Q | Short time?  Long time? |
| 10 | A | It seemed like a long time. |
| 11 | Q | Who first moved inside the office then? |
| 12 | A | Mr. Reeves. |
| 13 | Q | And how did he move? |
| 14 | A | He kind of stepped over me. |
| 15 | Q | Were you still tied up? |
| 16 | A | Yes, sir. |
| 17 | Q | Was he still tied up? |
| 18 | A | Yes, sir. |
| 19 | Q | Were you crying? |
| 20 | A | Yes, sir. |
| 21 | Q | Did he leave you in the office? |
| 22 | A | Yes, sir. |
| 23 | Q | Did you hear the door? |
| 24 | A | Yes, sir. |
| 25 | Q | Now, Ms. Roach, please tell the jury, in other |

```
 1          words, you were still tied up on your knees,

 2          correct?

 3     A    Yes, sir.

 4     Q    Did you get up and use the phone to call 911?

 5     A    No, sir.

 6     Q    Why not?

 7     A    Because I was scared.

 8     Q    Now, at some point in time did someone come back

 9          to the office where you were left in the office?

10     A    Yes, sir.

11     Q    Did you even move out of the position until

12          someone came back?

13     A    No, sir.

14     Q    Tell the jury again why you didn't move.

15     A    Because I was afraid to move because I was scared

16          that they were still around.

17     Q    Now, who came back to the office next?

18     A    Mr. Reeves and Reggie Hill.

19     Q    Now, you had worked there with Reggie Hill for a

20          period of time also, correct?

21     A    Yes, sir.

22     Q    And Mr. Reeves?

23     A    Yes, sir.

24     Q    And when they came back this time, Mr. Reeves and

25          Mr. Hill, had someone used the phone?  Do you
```

1          know?  Or called 911 while you were present?

2    A   No, sir.

3    Q   Did you leave the office?

4    A   No, sir.

5    Q   Did the police come shortly after that?

6    A   Yes, sir.

7    Q   Now, could you tell the ladies and gentlemen of

8          the ▮▮▮▮ who untied you?

9    A   ▮▮▮▮▮

10   Q   And what were you tied up with?

11   A   A neck tie.

12   Q   Now, pictures I would like to show you if I could,

13         I've showed you 15 and 21.  23, what's 23?

14   A   It's pictures of tills.

15   Q   That the position in 16 where the tills were empty

16         with the metal trays and the money envelopes on

17         the floor when you finally got up?

18   A   Yes, sir.

19   Q   24 show you the doorways and the hall?

20   A   Yes, sir.

21   Q   Which one is the office?  First, second, or third

22         as you're looking at it?

23   A   The first one.

24   Q   Were you wearing tennis shoes that night?  Do you

25         recall?

```
1    A    Yes, sir.

2    Q    Did you step on the tills?

3    A    No, sir.

4    Q    The safe, did you have access to the safe

5         yourself, the combination?

6    A    No, sir.

7    Q    Now, customers -- the store was still open shortly

8         after that.  The store was still open, correct?

9    A    Yes, sir.

10   Q    Did you even have money to open up for the

11        customers?

12   A    No, sir.

13   Q    You yourself know how much money was taken?

14   A    No, sir.

15   Q    Now, I want to ask you, would you tell the ladies

16        and gentlemen of the jury your best judgment, can

17        you tell us from the time you first saw McNabb

18        that you've identified that was in the store until

19        the time he went out the door and you lost sight

20        of him, do you have an opinion as how long that

21        lasted?

22   A    No --

23   Q    I'm talking about minutes.

24   A    Not long.

25   Q    Why did you look at McNabb's face after, if
```

```
 1            anytime, that you were at the counter after that?
 2            Why did you look at his face again?  You saw the
 3            face, correct?
 4    A       Yes, sir.
 5    Q       You saw the face of the other black male, correct?
 6    A       Yes, sir.
 7    Q       Tell the ladies and gentlemen of the jury --
 8                 MR. VALESKA:  That's all I have.  Pass the
 9            witness.  Thank you very much.
10                 THE COURT:  Mr. Baxley.
11                         CROSS EXAMINATION
12    BY MR. BAXLEY:
13    Q       Ms. Roach, what was the amount of the time between
14            the time you heard him walk up and when you first
15            laid eyes on the robber?
16    A       Not long.  Just a couple of minutes maybe.  I
17            don't know.
18    Q       Couple of minutes?  Be a couple of seconds?
19    A       I don't know.
20    Q       Don't know.
21                 And what kind of look did you get at this
22            person who robbed you?
23    A       A pretty good look.
24    Q       Would your recollection of the robber be better
25            now or at that time?
```

```
1    A    Now.

2    Q    So your memory improves over time?

3    A    Uh-huh.

4    Q    Have you seen a picture of Mr. McNabb shown to you

5         by the D.A. or anybody else during the course of

6         preparing for this trial?

7    A    No, sir.

8    Q    No, you haven't seen a picture at all of anybody?

9    A    (Witness nodded.)

10   Q    Were you ever taken to the police station and

11        shown a photo lineup?

12   A    No, sir.

13   Q    You were never taken to the police station?

14   A    I was.

15   Q    Were you ever shown a photo lineup at any point?

16   A    They went through the computer and showed me

17        different pictures.

18   Q    So if an officer testifies that they took you down

19        and showed you a lineup, that officer would be

20        lying?

21            THE COURT:  Do you know what a lineup is?

22            MR. BAXLEY:  Sir?

23            THE COURT:  She said she saw some pictures on

24        a computer.  And then you said if an officer said

25        he showed you a lineup, would he be lying.  I'm
```

```
 1              not sure she's got it together as to -- I mean, a

 2              group of pictures together is what a lineup is.

 3         Q    Do you recall Investigator Singleton?

 4         A    Yes, sir.

 5         Q    Do you remember that man?

 6         A    Yes, sir.

 7         Q    Did you ever go to the police station with him?

 8         A    Yes, sir.

 9         Q    And you looked at different pictures, and was it

10              done on a sheet or was it done otherwise?  Did

11              they show you things like this, or was it some

12              other format?

13         A    It was on a computer, but Singleton and another

14              officer came to my house not long after that and

15              they had a picture like that.

16         Q    Did they show you something that looked like this?

17         A    Yes, sir.

18         Q    Is this the one they showed you?

19         A    I don't know.

20         Q    You don't recall.

21                   If Singleton says this is the one that was

22              shown to you, would he be correct?

23         A    I don't know.

24         Q    You say you don't recall seeing this before?

25         A    I remember them showing me something, but I don't
```

```
 1            know if it was that one.  I don't remember.
 2    Q    But you don't remember looking at this one and
 3            selecting someone out of this one?
 4    A    I remember selecting somebody out.
 5    Q    If it was this one, do you remember which one you
 6            selected?
 7    A    No, sir.
 8    Q    What facial features or other discernible features
 9            made this robber stand out to you?
10    A    Both of them had a light mustache.
11    Q    Both had light mustaches?
12    A    Uh-huh.
13    Q    Anything else?
14    A    No, sir.
15    Q    Nothing else.
16            When you say someone was heavy, what do you
17            call heavy?  What do you call light, medium, all
18            the words Mr. Valeska used?  What are you using to
19            come up with those terminologies?
20    A    Talking about weight?
21    Q    Yes, ma'am.
22    A    I don't know.  I guess around maybe one eighty --
23            two hundred.
24    Q    What would you call one eighty?  Is that light,
25            medium, or heavy?
```

```
1    A    That would be medium.
2    Q    What would you describe the robbers as being?
3         Light, heavy, or medium based on that recollection?
4    A    Medium.
5    Q    A hundred and eighty pounds.
6             Now, you also claim that one of the robbers
7         was wearing a blue-jean-type coat?
8    A    Yes, sir.
9    Q    Did you recognize anything else about the clothing
10        on either individual?
11   A    Yes, sir.
12   Q    What else did you notice?
13   A    They were wearing toboggans.
14   Q    Other than toboggan -- we got toboggans and a jean
15        coat.  Anything else?
16   A    They were wearing tennis shoes.
17   Q    Tennis shoes.  Do you recall what type of tennis
18        shoes?
19   A    No, sir.  Just tennis shoes.
20   Q    Just tennis shoes.
21            How long did it take for Mr. Reeves to get
22        up front after you paged him?
23   A    Not long.  Just a few seconds.
24   Q    Just a few seconds.
25            And how long would you say the entire robbery
```

```
 1          took place?

 2     A    I don't know.  I wasn't timing it.

 3     Q    Weren't timing it?

 4     A    No, sir.

 5     Q    What time did you arrive at work that night?

 6     A    I guess around ten p.m.

 7     Q    Ten o'clock.

 8          Did you work the exact same hours as Mr.

 9     Reeves?

10     A    No, sir.

11     Q    What time would you have gotten off the next

12     morning?

13     A    Around six.

14     Q    Around six.

15          So he testified he came in at ten and left at

16     seven.  So you came in at ten and left at six?

17     A    Yes, sir.

18     Q    Was that your -- did you always work that shift?

19     A    Had I always?

20     Q    Yes, ma'am.

21     A    No.  I used to work the evening -- like, second

22     shift.  But then I got moved to third shift.

23     Q    And how long had you been working at the Winn

24     Dixie?

25     A    About three years.
```

```
 1    Q    Three years?

 2    A    Yes, sir.

 3    Q    What was your entire time period of working at

 4         Winn Dixie?  When did you first start?

 5    A    Well, I used to work at south side.  Counting that

 6         all off and on, I worked with the company about

 7         eight years.

 8    Q    How about the Westgate Parkway location, how long

 9         had you worked there?

10    A    About three.

11    Q    So how many years before the accident -- the

12         incident?  I'm sorry.

13    A    About five, I guess.

14    Q    Westgate Parkway, when did you first start working

15         at that particular store?

16    A    I don't remember the exact date.

17    Q    When did you quit working for that store?  Or are

18         you still working for them?

19    A    No, sir.

20    Q    When did you quit working for them?

21    A    Probably I guess about a month after the robbery.

22    Q    After the robbery you quit.

23             When you left the office, did you see any

24         cars or anything out in the parking lot that

25         belonged to these robbers, or did you see the
```

1           robbers again?

2    A      No, sir.

3    Q      You saw nothing else about them?

4    A      No, sir.

5    Q      And the speaker wire, are you familiar with what

6           that speaker wire looked like?

7    A      Yes, sir.

8    Q      So you would be able to identify speaker wire or

9           identify the speaker wire that was used?

10   A      Yes, sir.

11          MR. BAXLEY:  Nothing further at this time.

12          Reserve the right to recall.

13          THE COURT:  Anything else, Mr. Valeska?

14          MR. VALESKA:  No.  Ask that she could step

15          down.

16          THE COURT:  You may step down.

17               Who will you have next?

18          MR. VALESKA:  Reggie Hill.  No.  Betty

19          Prescott.  I'm sorry.

20                        BETTY PRESCOTT

21          having first been duly sworn, was examined and

22          testified as follows:

23                       DIRECT EXAMINATION

24   BY MR. VALESKA:

25   Q      Tell us your name, please, ma'am.

```
 1    A    Betty Jean Prescott.

 2    Q    Ms. Prescott, do you still work for Winn Dixie?

 3    A    Yes, I do.

 4    Q    How many years have you worked for them?

 5    A    Around nine.

 6    Q    Let's go back on or about June 7th of 2001 and ask

 7         were you working at Winn Dixie that morning a.m.

 8         hours?

 9    A    Yes, I was.

10    Q    What time do you recall approximately getting to

11         work?

12    A    Approximately about -- probably three-twenty

13         because I usually clocked in about three-thirty.

14    Q    On June 7, 2001, did you in fact come off the

15         Montgomery Highway, or did you come off Westgate

16         to turn into Winn Dixie?  Which way did you turn

17         into?

18    A    I came across Westgate, across 231, down on

19         Westgate again and then turned into Winn Dixie

20         parking lot.

21    Q    When you pulled in, the general conditions, was

22         the sun up or was it dark?

23    A    It was dark.

24    Q    As you pulled in, did you see immediately the

25         first time you made the turn any immediate
```

131

```
 1            vehicles or did you pull up into the lot before
 2            you then saw some vehicles that were moving?
 3    A       I was probably about midway in the lot.
 4    Q       And did some vehicle get your attention?
 5    A       Yes, it did.
 6    Q       Why did one vehicle at this time in the morning
 7            get your attention?  Tell us.
 8    A       It was coming from the back of the store at a
 9            pretty good rate of speed.
10    Q       Was it a car?
11    A       No.  It was a van.
12    Q       Would you tell the ladies and gentlemen of the
13            jury, did it come close to you?
14    A       Yes, he did.
15    Q       How close did he come?
16    A       Oh, about like that (indicating).
17    Q       And would you tell the ladies and gentlemen of the
18            jury the description of the van, did you notice
19            any type of distinctive marks on the van as it was
20            in that distance close to you?
21    A       It had a wood grain paneling down the sides.
22    Q       I'm not a car expert, did you have an opinion the
23            model, the year it was in your opinion?
24    A       I'm not good at models, but I would say '89 to a
25            '92.
```

```
 1    Q    As it went by, did you get a tag at that time?

 2    A    No, sir.

 3    Q    Now, what did you do next, Ms. Prescott, then,

 4         after that?

 5    A    I pulled on down to my parking space I normally

 6         parked in every morning, parked, got out, went in

 7         the front door, went to the produce room, and

 8         clocked in.

 9    Q    And who were the managers working that night --

10         the two if you know?

11    A    Ron Reeves and Reggie Hill.

12    Q    Now, and then after you clocked in, did you start

13         working that morning in the store?

14    A    Yes, I did.

15    Q    At some point in time later that morning, some

16         time after four o'clock a.m., did you come to see

17         Mr. Reeves or hear Mr. Reeves?

18    A    Mr. Reeves came -- yeah, to the back room where we

19         were.

20    Q    Did he tell you what happened?

21    A    He said he had been held up.

22    Q    Would you tell the ladies and gentlemen of the

23         jury, did you go to the front with him right then

24         immediately?

25    A    No, I did not.
```

```
 1    Q    Tell the jury why you didn't go to the front.

 2    A    Well, I didn't much want to.

 3    Q    Why?

 4    A    I was afraid to go.

 5    Q    Would you tell the ladies and gentlemen of the

 6         jury, did any other store personnel go with Mr.

 7         Reeves back up to the front?

 8    A    Mr. Hill did.

 9    Q    And at a later point in time, did you go back up

10         to the front?

11    A    Yes, I did.

12    Q    Was it a short time or a good while later?

13    A    Five to -- about five to ten minutes probably.

14    Q    Were you satisfied in your own mind or safety

15         that the police were up there at that time?

16    A    Well, I thought so.  I thought they had had time.

17    Q    All right.  Now, did you yourself after the police

18         arrived talk to them?

19    A    Yes, I did.

20    Q    Before you talked to the police, were you present

21         when Reggie Hill was present and either you or

22         someone was asking you what had happened that

23         night?

24    A    Yes.

25    Q    Up by the front cash registers?
```

1    A    Yes.

2    Q    In Reggie Hill's presence --

3    A    Yes, sir --

4    Q    -- I'm asking what you said, did you make any

5         statements to Reggie Hill about what had happened

6         to you in the parking lot?

7    A    I made the statement that that might have been

8         them on the van that run over me, in a jokingly

9         way.

10   Q    And would you tell the ladies and gentlemen of the

11        jury, what did Reggie Hill do or say then that you

12        saw?

13   A    He went outside and got the policeman to talk to

14        me.

15   Q    Did he bring the police, and did they come back

16        and talk to you about what happened?

17   A    Yes, they did.

18   Q    And then did you tell the police?

19   A    Yes, I did.

20            MR. VALESKA:  That's all.  Pass the witness.

21        Thank you very much.

22                    CROSS EXAMINATION

23   BY MR. BAXLEY:

24   Q    Ms. Prescott, you claim you got to work at about

25        three-forty-five a.m. or is that three-thirty a.m?

```
 1    A    I usually clocked in about three-thirty.  I
 2         usually get to work about three-twenty at that
 3         time.
 4    Q    And you say this speeding van came from around the
 5         side of the building --
 6    A    The back.
 7    Q    -- when you were arriving at three-thirty?
 8    A    There about.
 9    Q    There about.
10              I'm going to show you a picture.  You've
11         seen this before, haven't you?
12    A    Yes.
13    Q    I want to show you -- if you'll come down here for
14         a moment.  I'm sorry.  If you'll show --
15    A    (Witness complied.)
16    Q    -- the jury where you're talking about the van
17         speeding around.
18    A    I come in this driveway right here.  Right here.
19         I go around this way, all the way.  I saw the van
20         coming from around here about the time I got
21         here.  We met.  There was a light post right in
22         here.  And we met right in there about like that
23         (indicating).  And he came over.
24    Q    Came by right there.  But this was before the
25         robbery occurred, right?
```

```
1    A    Right.

2    Q    So this van -- you see where the van went?

3    A    No, I did not.

4    Q    So it was -- you can get back up.  I'm sorry.

5    A    (Witness complied.)

6    Q    So this van after you -- it came near you right

7         there, and you parked; is that correct?

8    A    Uh-huh.

9    Q    Where did the van go after it passed right by you?

10   A    I don't know.

11   Q    Don't know.

12        Did it stop in the front --

13   A    It wasn't in the front parking lot when I got out

14        and went around because I looked to see if I could

15        see it.

16   Q    So did you see if it exited the parking lot

17        anywhere?

18   A    No.

19   Q    But it obviously wasn't in the parking lot?

20   A    I don't think so.

21   Q    And this was over half an hour before the robbery

22        took place, at least to the best of your knowledge?

23   A    Close.  It wouldn't have been that long.

24   Q    Do you recall about when the robbery took place

25        that night?
```

1    A    Not for sure.

2    Q    But if someone else testified it happened around

3         four o'clock --

4    A    That would be close.

5    Q    So using those times we can say this van was

6         speeding around the side of the building a half

7         hour before the robbery, then?  And, once again,

8         what was the color of that van?

9    A    I don't know.

10   Q    No idea what the color was?

11   A    I don't know anything except I recognized that

12        wood grain going down the side.

13   Q    Was this a common-type van?

14   A    It was -- it wasn't the biggest van.  It wasn't

15        the smallest van.  It was about a middle size van.

16   Q    Is it one --

17   A    I don't know what model.

18   Q    Is it a type of van you would see on the road all

19        the time?

20   A    No.

21   Q    So there could be hundreds or thousands of them

22        possibly?

23   A    No.

24   Q    What was distinctive about it?

25   A    That wood grain paneling going down the side.

```
 1    Q    Was it a specialized wood grain paneling?
 2    A    I don't know.  All I know it was wood grain
 3         paneling.
 4    Q    What was the demeanor of Mr. Hill and Mr. Reeves
 5         after the robbery?  What were they acting like?
 6    A    Ron was scared.  Mr. Hill, I wasn't around him
 7         enough to really notice that much.  The only thing
 8         I mentioned the van almost hit me out front.
 9    Q    What was Mr. Hill doing at the time of the robbery?
10    A    He was back in the receiving room with me.  We
11         were pushing out buggies to the dumpster.
12    Q    Pushing buggies to the dumpster.
13              Isn't it also true that Sergeant Williamson,
14         one of the police officers in this case, took you
15         over to Barstone Apartments to look at automobiles?
16    A    Yes.
17    Q    And did you identify an automobile?
18    A    No, I did not identify it.
19    Q    You didn't?
20    A    Not specifically.  I said it looked familiar.
21    Q    Looked familiar, but you couldn't say if it was
22         exact thing --
23    A    No, I cannot.  Cannot.
24    Q    The wood grain didn't look the exact, it was
25         possible but not all the way?
```

```
 1    A    It was right size, wood grain was in the right
 2         place, but I cannot tell you if that was the van.
 3    Q    So you weren't sure that was the van or not there?
 4    A    No, I cannot.
 5    Q    And that parking lot outside the Winn Dixie, is
 6         that a very well lighted place or kind of a dark
 7         place?
 8    A    It's medium lit.
 9    Q    And when that van came real close to you, did you
10         see any of the occupants inside of it?
11    A    I couldn't -- I couldn't see or tell.  I looked,
12         but I couldn't tell.
13    Q    Could you tell if they were black or white?
14    A    No.
15    Q    Couldn't tell if they were male or female?
16    A    No.
17    Q    Could you tell if there were one or two?
18    A    No.
19    Q    Did it have tinted windows or anything?
20    A    I don't know.  All I know I couldn't see who was
21         in the van.
22    Q    Once again, this van was thirty minutes before the
23         robbery took place?
24              MR. VALESKA:  Judge, asked and answered.  He
25         said it wasn't about thirty minutes.  It was
```

```
 1            shorter.  He's asked her about three times.
 2                 THE COURT:  I sustain.
 3                 MR. BAXLEY:  Nothing further at this time.
 4                 MR. VALESKA:  If I could, Judge.
 5                      REDIRECT EXAMINATION
 6      BY MR. VALESKA:
 7      Q    Ms. Prescott, would you tell -- do you recall -- I
 8           know it's been a while -- when Sergeant Williamson
 9           and Sergeant Singleton picked you up and took you
10           to look at Barstone where a vehicle was, was that
11           a week or two after the robbery or the same day,
12           ma'am?
13      A    It was that very night after it happened that
14           night before.
15      Q    And I want you to tell the ladies and gentlemen of
16           the jury, I would like to ask you, did you tell
17           the detective, is this correct, the van looked
18           like the one you saw in the parking lot that
19           night, but you could not be sure about the color,
20           but that that wood grain was the right color and
21           the van looked like the right year model in
22           reference to the '89 to '92?  Is that true?
23      A    That's exactly what I told them.
24      Q    Could you tell the ladies and gentlemen of the
25           jury, since then, since that day of the robbery,
```

1  when you looked that night, did you see any other

2  vans just like that one the entire time since you

3  lived in Dothan?

4  A   No, I haven't.

5  MR. VALESKA:  That's all.

6  RECROSS EXAMINATION

7  BY MR. BAXLEY:

8  Q   But once again, as you sit there, you can't

9  testify one way or the other whether or not that

10  van at Barstone was the exact van?

11  A   No, I can't.

12  MR. BAXLEY:  Thank you.

13  THE COURT:  Ms. Prescott, you may step down.

14  MR. VALESKA:  Could she be excused?  She

15  needs to go back to work.

16  THE COURT:  Do you have any objection?

17  MR. BAXLEY:  No, Your Honor.

18  THE COURT:  You're excused, Ms. Prescott.

19  You may leave.

20  ~~REGGIE HILL~~

21  having first been duly sworn, was examined and

22  testified as follows:

23  DIRECT EXAMINATION

24  BY MR. VALESKA:

25  Q   Tell us your name.

```
1    A    Reginald Marcus Hill.

2    Q    Mr. Hill, let's go back to around June 7th of

3         2001. Tell the jury where you worked.

4    A    I was at work at Winn Dixie.

5    Q    What store?

6    A    Winn Dixie on Westgate Parkway.

7    Q    How long had you worked for Winn Dixie from that

8         point of June 7, 2001, going backwards?  How many

9         months or years?

10   A    I been working for Winn Dixie for approximately

11        five years.

12   Q    Now, tell the ladies and gentlemen of the jury, do

13        you know Ronald Reeves?

14   A    Yes, sir, I did.

15   Q    Did you know the lady just coming out, Ms.

16        Prescott, as you were coming in?

17   A    Sir?

18   Q    As you were coming in, did you see the lady

19        getting off the stand, or did you see her?

20   A    I didn't see her.

21   Q    Did you know Ms. Prescott?

22   A    Yes.

23   Q    How did you know her?

24   A    She worked receiving at the grocery store.

25   Q    Do you know Ms. Roach?
```

143

1    A    Yes, sir.

2    Q    How did you know her?

3    A    She was the night cashier.

4    Q    Would you tell the ladies and gentlemen of the

5         jury, as one of the managers on or about June 7,

6         2001, what was the currency kept, the paper money,

7         the coin money that was collected that day before

8         the manager would go to the bank and make a

9         deposit the next morning?  Where was it kept?

10   A    In a safe in the front office.

11   Q    Did you have access to the safe?

12   A    Yes, sir, I did.

13   Q    Did you know the combination?

14   A    Yes, sir, I did.

15   Q    Did Mr. Reeves know the combination?

16   A    Yes, sir, he did.

17   Q    Would you tell the ladies and gentlemen of the

18        jury, please, do you know a man by the name of

19        Ruben Corey McNabb?

20   A    Yes, sir, I did.

21   Q    Before June 7th of 2001, tell the ladies and

22        gentlemen of the jury how you knew McNabb.

23   A    He stayed in my apartment complex.

24   Q    And what apartment complex was that?

25   A    Barstone Apartments.

1 Q Can you tell the ladies and gentlemen of the jury,

2    had you ever talked with him before June 7th of

3    2001?

4 A Yes, sir.

5 Q Had you ever played any type of sports activities

6    with him?

7 A Basketball.

8 Q Had you ever been to his apartment?

9 A Yes, sir.

10 Q Had you ever been into the bedrooms of his

11    apartment?

12 A No, sir.

13 Q The time you were in his apartment, who was

14    present?

15 A He was, if I'm not mistaken.  Maybe his wife was

16    home.

17 Q Were you ever in his apartment by yourself at any

18    time ever?

19 A No, sir.

20 Q Can you tell the ladies and gentlemen of the jury,

21    before June 7, 2001, you were working at Winn

22    Dixie, correct?

23 A Yes, sir.

24 Q Did McNabb ever have any conversations with you in

25    the month of April, May, up until June in

1          reference to where you worked?

2     A    He knew where I worked, yes, sir.

3     Q    Did he ask you about where you worked?

4     A    Yes, sir.

5     Q    Tell the jury over a period of time what he asked

6          about you working at Winn Dixie.  What questions

7          did he ask you?

8     A    We talked about how many people at -- worked the

9          night shift because he knew I worked the night

10         shift.

11    Q    Did you tell him?

12    A    Yes, sir.

13    Q    Were more people working the night shift or day

14         shift?

15    A    Night shift.

16    Q    And did he ask you any questions about the money,

17         the currency, how much money you made a week?

18    A    Yes, sir.

19    Q    What did you tell him?

20    A    I told him probably about two fifty -- three

21         hundred thousand if I'm not mistaken.

22    Q    And would you tell the ladies and gentlemen of the

23         jury, did he ever ask you at any time specifically

24         about any of the night managers, their names or

25         description of those managers excluding yourself?

146

1   A   Big black guy with the big arms.  I told him Ron.

2   Q   Ron who?

3   A   Ron Reeves.

4   Q   And do you see Mr. Reeves in the courtroom today?

5   A   Yes, sir.

6   Q   Is that who you're referring to?

7   A   Yes, sir.

8   Q   And he has big muscular arms, correct?

9   A   Yes, sir.

10  Q   Now, did you play basketball with other people in

11      the complex with Mr. McNabb and yourself and

12      others?

13  A   Not all the time --

14  Q   But some of the time?

15  A   Yes, sir.

16  Q   Any other person, man or woman, ever ask you the

17      questions that Mr. McNabb asked you about the

18      money, the employees, how many people there at

19      nighttime, or what the managers were named?

20      Nobody did, did they?

21  A   No, sir.

22  Q   He was the only one, correct?

23  A   Yes, sir.

24  Q   Now, would you tell the ladies and gentlemen of

25      the jury, on June 7, 2001, were you working that

```
 1            night?
 2     A      Yes, sir, I was.
 3     Q      Did you come to learn if the store was robbed?
 4     A      Yes, sir.
 5     Q      Who -- how was the first way you knew the store
 6            was robbed that night?  Who did you see?
 7     A      Ron was walking to the back untying his arms.
 8     Q      Would you tell the ladies and gentlemen of the
 9            jury, was he calm or was he excited?  Was he
10            nervous?  How did he act that you saw?
11     A      He was pretty excited.
12     Q      Would you tell the ladies and gentlemen of the
13            jury, did you inquire about any other employees in
14            reference that worked in the store at that time to
15            him or did he say anything about any other
16            employees?
17     A      I asked where was Patsy.
18     Q      And Patsy was who in this courtroom?
19     A      The night cashier.
20     Q      Ms. Roach refer to, correct?
21     A      Yes, sir.
22     Q      And did he tell you where she was?
23     A      Yes, sir.
24     Q      And where did you go next?
25     A      To the front office.
```

```
1    Q    And who did you go to check on?

2    A    Patsy.

3    Q    And when you got to the front office, did you see

4         Ms. Roach?

5    A    Yes, sir.

6    Q    Was she calm?

7    A    She was -- no, sir, she wasn't calm.

8    Q    And where was she?

9    A    In the corner tied up.

10   Q    Who untied her?

11   A    If I'm not mistaken, I did.

12   Q    Would you tell the ladies and gentlemen of the

13        jury, were there any phones in the back part of

14        the office of Winn Dixie -- not the office, but

15        the back part where the back door loading --

16        intercom systems, correct, to call?

17   A    (Witness nodded.)

18   Q    When you got to the office and untied Ms. Roach

19        and assisted her, was 911 then called in your

20        presence?

21   A    Yes, sir, I believe so.

22   Q    Who called them?

23   A    Ron.

24   Q    Would you tell the ladies and gentlemen of the

25        jury, did the police arrive shortly after that?
```

```
1    A    Yes, sir.

2    Q    Now, would you tell them at a later point in time

3         that morning, did you come to see Ms. Betty

4         Prescott up front?

5    A    Yes, sir.

6    Q    When I say up front, I'm referring by the cash

7         registers the aisles you go through down from the

8         produce closer towards the front where the office

9         is and the entrance or exit door, correct?  Did

10        you see her in that general area?

11   A    Yes, sir.

12   Q    And talk to her?

13   A    Yes, sir.

14   Q    Here's what I want to ask you.  If you could tell

15        the ladies and gentlemen of the jury, did she tell

16        you in your presence anything about seeing a van

17        outside just before she came in to work?

18   A    She said a brown -- a brown and white station

19        wagon.

20   Q    Station wagon or van?

21   A    At the time she said a station wagon.

22   Q    Did she ever tell you it was a van?

23   A    It came to my -- later on I found that out, yes,

24        sir.

25   Q    She described what was on the vehicle, what it
```

```
 1            looked like, any kind of paneling?
 2    A    Not to me.  I told it to the officer.
 3    Q    That's what I want to ask you about.  Did she give
 4            you a description, though, of what she saw?
 5    A    Yes, sir.
 6    Q    And then when she did that, did you go get a
 7            police officer and bring them back so she could
 8            tell the police officers what she saw?
 9    A    Yes, sir.
10    Q    Now, if I could, can I ask you, let me show you
11            some exhibits if I could.  First of all, tell me,
12            currency in the safe itself, the two safes, metal
13            money, how would you get metal money to give to
14            the cashiers?  How would it come in from the bank?
15    A    It comes in boxes.
16    Q    Let me show you an exhibit if I could.  State's
17            Exhibit No. 3.  Do you recognize State's 3?
18    A    Yes, sir.  That's the box.
19    Q    The type box, did you stamp the boxes and put Winn
20            Dixie on them or if they were opened up stamp the
21            individual penny rolls?  Did you-all do that?
22            Those weren't stamped, were they?
23    A    No, sir.
24    Q    What was stamped inside the office of any kind of
25            identification store number on there?
```

```
 1    A    Money straps, food stamps, checks if I'm not
 2         mistaken.
 3    Q    You see this box of pennies over here?  You see it
 4         on the floor?  See any kind of stamps you can
 5         notice from that side about identification marks
 6         on there that you can see from that far away?
 7    A    No, sir.
 8    Q    Now, if I could, please tell the ladies and
 9         gentlemen of the jury, you worked there for how
10         many years before the robbery?
11    A    About five years.
12    Q    At any time was there ever a shortage of any cash
13         or currency or money or produce or when I say
14         produce, I mean, you know, boxes of stuff gone
15         missing when they had inventory while you were
16         working there?
17    A    No, sir.
18    Q    Now, can you tell the ladies and gentlemen of the
19         jury, before the robbery happened, did you see any
20         of the robbers at the time the robbery was taking
21         place?
22    A    No, sir.
23    Q    Did you yourself know whether they were black or
24         white when the robbery was actually happening?
25    A    No, sir.
```

```
1    Q    Did you know if they were men or women?

2    A    No, sir.

3    Q    Did you know if they had weapons or not?

4    A    No, sir.

5    Q    Now, can you tell the ladies and gentlemen of the

6         jury, after June 7th of 2001, did you ever see

7         McNabb -- excuse me, Ruben Corey McNabb, the man

8         you identified at the table, ask you those

9         questions, did you see those vehicles at the

10        apartment complex that you recall?

11   A    I believe I saw his Cadillac that was there.

12   Q    What about the van?

13   A    The van?  I don't remember seeing the van.

14   Q    From where you live in the apartment complex to

15        where McNabb lived, the defendant at the table,

16        could you see his apartment from your apartment?

17   A    No, sir.

18   Q    Driving in the front of Barstone and go right or

19        left, correct?

20   A    Yes, sir.

21   Q    If you go left and go all the way down to the end

22        and dead end and turn right, would it be down by

23        your apartment?

24   A    Yes, sir.

25   Q    If you came in the front of Barstone and took a
```

```
 1         right and went around the first building and went
 2         down to the second or third section right in
 3         there, would his apartment have been in that
 4         general area right there?
 5   A     Yes, sir.
 6   Q     Now, had you ever had any problems with McNabb
 7         before June 7th of 2001 in any way?
 8   A     No, sir.
 9   Q     No fights --
10              MR. BAXLEY:  Objection, Your Honor.  He never
11         said he had any problem with Mr. McNabb on June
12         7th.
13              THE COURT:  Pardon me?
14              MR. BAXLEY:  He never said he had any problem
15         with McNabb and --
16              MR. VALESKA:  I asked him before that date of
17         June 7th.
18              THE COURT:  He asked if he had had any
19         problem with him before that date.
20   Q     Before the date, did you have any fights or words
21         with him in my manner or fashion before June 7th
22         of 2001?
23   A     No, sir.
24   Q     Would you tell the ladies and gentlemen of the
25         jury, when I asked you about Ruben Corey McNabb
```

154

```
 1           asked you about the things at the Winn Dixie, who
 2           did you tell that to that he had asked you
 3           about --
 4    A      Police.
 5    Q      Police; is that fair to say?
 6    A      (Witness nodded.)
 7    Q      Did you know McNabb's wife?
 8    A      Yes, sir.
 9    Q      Back in May, periods of May and up until June, do
10           you know if his wife was getting ready or had a
11           baby sometime in May, if you knew?
12    A      Yes, sir.  She had a baby.
13    Q      Did you know where she worked?
14    A      Yes, sir.
15    Q      Where did she work?
16    A      Chick-fil-a.
17    Q      Do you know where McNabb worked at some point in
18           time?  If you do.
19    A      Yes, sir.
20    Q      Where had he been working, if you know?
21    A      I don't know the name of the place.  He built I
22           believe church furniture.
23              MR. VALESKA:  That's all.  Pass the witness.
24           Thank you very much.
25              THE COURT:  Mr. Baxley.
```

155

CROSS EXAMINATION

BY MR. BAXLEY:

1

2

3      Q    Mr. Hill, when was the first time you ever had

4           contact with Corey McNabb?

5      A    I guess it was about around September of 2001, I

6           guess.

7      Q    September of 2001?

8      A    2000 or 2001.  I'm not exactly sure of the year.

9           Whenever I moved to Alabama.

10     Q    So you don't recall --

11     A    2000, I believe.

12     Q    September of 2000?

13     A    Yes, sir.

14     Q    Where did you move from?

15     A    Panama City, Florida.

16     Q    Panama City.

17          And how would you describe your relationship

18          with Mr. McNabb?

19     A    We hang out.  Like I say, we might have shot some

20          at the basketball court here and there.

21     Q    Would you consider yourself friends?

22     A    Yes, sir.

23     Q    What would be the frequency of your contact with

24          Mr. McNabb?

25     A    A couple of times a week I guess.

```
 1    Q    So you saw him quite often, then?
 2    A    Not very often because our work schedules.  I
 3         guess so, yes, sir.
 4    Q    Did he know when you worked?
 5    A    Yes, sir.
 6    Q    He knew when you worked?
 7    A    Yes, sir.
 8    Q    And you say you saw him possibly a couple of times
 9         a week from September of 2000 until when?
10    A    Until -- well, I don't know the last time I saw
11         him if that's what you're asking.
12    Q    You have no idea the last time you saw Mr. McNabb?
13    A    No, sir.
14    Q    Do you recall the last time you saw Mr. McNabb
15         prior to June 7, 2001?
16    A    I hadn't saw him in a while.
17    Q    Had not seen him in a while.
18              Had you seen his cars in the apartment
19         complex during that time period?
20    A    I only saw his Cadillac.
21    Q    But he had another car; is that correct?
22    A    Yes, sir.
23    Q    What kind of other car did he have?
24    A    LaSabre.
25    Q    LaSabre.
```

1          And he also had a white van?

2    A    Yes, sir.

3    Q    When you entered the complex, did you drive by Mr.

4         McNabb's apartment, or did you enter the other way?

5    A    I drove -- I swap up ways.

6    Q    So you go both ways?

7    A    Yes, sir.

8    Q    Would you ever glance at his apartment to see if

9         Corey was home?

10   A    Sometimes I probably looked through the parking

11        lot and see, yes, sir.

12   Q    So -- but you are testifying right now you did not

13        see his Buick or his van at that apartment complex

14        for some time?

15   A    Not to my knowledge.  I mean, what is some time?

16   Q    You tell me.  What do you consider some time?

17        Unless you use June 7, 2001, as the point date.

18        Before June 7, 2001, obviously June 7th sticks out

19        in your mind; is that correct?  Is that fair to

20        say?

21   A    Yes, sir.

22   Q    About how long before that is the last time you

23        had seen somebody at Corey's apartment or had seen

24        his car there?

25   A    Honestly I don't know.  I hadn't seen Corey in a

158

```
 1        while.

 2   Q    You had not seen him around?

 3   A    No, I hadn't seen Corey in a while.

 4   Q    Is it possible that he had -- was gone at that

 5        time?

 6   A    It's possible.

 7   Q    With your job at the Winn Dixie, would you have

 8        access to the money and the stamp that you stamped

 9        things with there we keep talking about?

10   A    Yes, sir.

11   Q    And by the way, do you still work for Winn Dixie?

12   A    No, sir.

13   Q    When did you leave Winn Dixie, or were you

14        terminated from Winn Dixie?

15             MR. VALESKA:  Object.

16             THE COURT:  Overruled.

17   A    About July 2001 if I'm not mistaken.

18   Q    Were you terminated, or did you quit?

19   A    I was asked to resign.

20   Q    You were asked to resign?

21   A    Yes, sir.

22   Q    What was the reason you were asked to resign?

23             MR. VALESKA:  Object.

24             MR. BAXLEY:  Your Honor, this is pertinent.

25             THE COURT:  Approach the bench.
```

```
1                    (At which time the following proceedings
2                    were held at the bench outside of the
3                    hearing of the jury:)
4            THE COURT:  What are you trying to prove?
5            MR. BAXLEY:  The jury has a right to know.
6            THE COURT:  Well, I don't think they do.  If
7    it has something to do with this trial, they do.
8    But it it's irrelevant, they don't.
9            MR. BAXLEY:  I don't know if it's irrelevant
10   until I ask him.  The potential exist --
11           MR. VALESKA:  I object.
12           MR. BAXLEY:  If he was terminated for some
13   sort of theft or anything of that nature --
14           THE COURT:  That's what I call possibly
15   digging up a snake if you don't know what the
16   answer is going to be.
17                   (At which time the following
18                   proceedings were held in open court:)
19           THE COURT:  I overrule.  Go ahead.
20   Q    Did you ever drive one of Mr. McNabb's cars?
21   A    Once.
22   Q    Once.
23           So you had access to his keys at some point
24        during your interaction with him?
25   A    I guess when I drove the car, yes, sir, his car
```

```
1          keys.
2     Q    Was it just a car key, or did he hand you his set
3          of keys?  Everyone has --
4     A    The car key.  I helped him go pick his car up from
5          the shop.
6     Q    Any other car keys from the key chain?
7     A    No, sir.  I was following him.
8     Q    You were following him.
9               Have you ever gone on a trip with Mr. McNabb?
10    A    Yes, sir.  Once.
11    Q    Where did you go?
12    A    Went to Orlando.
13    Q    Went to Orlando with him.
14              So if you're going on trips with him and help
15         him with his car and stuff, the two of you must
16         have been pretty close?
17    A    Yes, sir.  We were friends.
18    Q    You still consider Mr. McNabb a friend?
19    A    Yes, sir.  As far as I know.
20    Q    You also claim that Mr. McNabb asked you specific
21         questions about how many people worked at the Winn
22         Dixie, what kind of cash was kept there, how much
23         cash was kept there; is that correct?
24    A    Yes, sir.
25    Q    Did he ever ask you anything about the layout of
```

```
1              the office?

2    A    No, sir.

3    Q    He didn't ask you where the safe was?

4    A    No, sir.

5    Q    Did he ever ask you if there was a security system?

6    A    No, sir.

7    Q    Did he ever ask you if there was cameras in the

8         place?

9    A    No, sir.

10   Q    Did he ever ask you if there were guards there?

11   A    No, sir.

12   Q    Assuming he did ask you those things, would those

13        things be -- would you be suspicious of him

14        otherwise?

15   A    If he asked me those things?

16   Q    Yes, sir.

17   A    Yes, sir.

18   Q    So is it suspicious for someone to ask you how

19        much business your store does in a week?

20   A    No, sir.

21   Q    But you're saying -- you thought it was

22        significant enough to tell the police about it?

23   A    I was asked.

24   Q    So you were asked.  This is something they

25        solicited from you that you didn't offer to them?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | You say it was some words the police put in your |
| 3 | | mouth? |
| 4 | A | No, sir. |
| 5 | Q | But he never asked you anything else about |
| 6 | | specifics? |
| 7 | A | The officer -- who you talking about? |
| 8 | Q | I'm talking about Mr. McNabb. You're claiming he |
| 9 | | asked you all these things -- |
| 10 | A | Right. |
| 11 | Q | -- about the inner working of your store, and |
| 12 | | you're saying he didn't ask you about other things |
| 13 | | that in my opinion would be important to a |
| 14 | | robber. But you're saying he didn't ask you |
| 15 | | things about security measures. Did he ask you |
| 16 | | you about bait money? |
| 17 | A | No, sir. |
| 18 | Q | Did you have bait money there? |
| 19 | A | Yes, sir. |
| 20 | Q | I'm assuming you know what bait money is? |
| 21 | A | Yes, sir. |
| 22 | Q | Could you explain to the Judge and jury what bait |
| 23 | | money is? |
| 24 | A | Bait money is set up in the register where |
| 25 | | somebody robs it, you intentionally give them that |

```
 1           money and it will either leave an ink spot on you
 2           or it depends on the bait money or it could have a
 3           honing device to locate them or whatever.
 4      Q    And it's also my understanding that this is --
 5           this wasn't the first robbery that occurred there?
 6      A    That's right.
 7      Q    And you were present for the robbery that occurred
 8           several months prior to that?
 9      A    Yes, sir.
10      Q    About what -- when did that robbery occur?
11      A    It was around October.  October the -- I don't
12           remember the date.
13      Q    That's October of perhaps --
14      A    2000.
15      Q    -- 2000?
16      A    Yes, sir.
17      Q    And did you see the robber at that time?
18      A    No, sir, not -- well, yes, sir.
19      Q    You did see the robber in 2000?
20      A    Yes, sir.
21      Q    Did you ever recognize that robber?
22      A    No, sir.
23      Q    Do you recall what the robber looked like?
24      A    No, sir.
25      Q    Was the robber -- did the robber have any
```

```
 1            obscurity on the face or have his face hidden in
 2            any way?
 3       A    He had a toboggan-type cap pulled down over his
 4            face kind of like with his head down.
 5       Q    And you made a statement to the police; is that
 6            correct?  And that was on June 25th of 2001?
 7       A    Yes, sir.
 8       Q    Is that correct?
 9       A    Yes, sir, I believe so.
10       Q    Now, as you sit here today, are you claiming that
11            Corey McNabb was also the man who robbed the store
12            in October of 2000?
13       A    I'm not claiming anything, no, sir.
14       Q    You're not saying that?
15       A    No, sir.
16       Q    In your statement you seem to say that.  Let me
17            read your statement here.  Do you recall giving
18            that statement?
19       A    I have to know what the statement says.
20       Q    This is the statement you gave in -- on June 27,
21            2001.  Obviously that's roughly twenty days after
22            the robbery.
23       A    Okay.  Yes, sir.
24       Q    And do you recall going there with an officer
25            named Dennis Owens?
```

165

```
1    A    I believe so, yes, sir.

2    Q    That's right.

3              And this is a person -- this is an officer

4         who asked you about all these things that Corey

5         had -- you allege Corey asked you about in the

6         robbery -- well, about the store, all those things

7         about the money and such and the employees.  And

8         at one point this Officer Owens says, okay,

9         during the course of that robbery -- and correct

10        me if I'm wrong -- the robber came up to one of

11        the cashiers and apparently requested that she

12        call a manager.  She called you, and you went to

13        the front, stood by the cashier.  The black male

14        then showed the gun and took you and her back to

15        the office at gun point and committed the robbery.

16        You said, yes, sir.  All right.  Did you recognize

17        the robber at that time.  No, sir.  Did you

18        suspect who the robber was at that time.  At that

19        time, no, sir.  Very soon after that robbery, did

20        you have a suspicion of who that robber was.  You

21        answered, yes, sir.

22              Who was your suspicion of who that robber

23        was?

24   A    Ruben McNabb, Corey.

25   Q    You thought it was him?
```

1   A   (Witness nodded.)

2   Q   But this is someone you say you met and had

3       played basketball with and was around several

4       times a week from September of 2000.  This robbery

5       happened in October of 2000.  And you're going to

6       sit here and tell this Judge and jury that you

7       couldn't -- you didn't recognize a man who you had

8       done things with who lived near you whose

9       apartment you had been to and gone on trips with

10      when he came to your store?  Is that what you're

11      telling us?

12  A   Yes, sir.  I never said I was a hundred percent

13      sure.

14  Q   But I'm saying this is someone you're around a

15      good bit.  I'm curious how you can be sure.

16  A   At the time of the first robbery, I didn't know

17      him that well.

18  Q   But you told me you had seen him after the fact,

19      though.

20  A   Yes, sir.

21  Q   But you still didn't know?

22  A   No, sir.  There was nothing that led to -- to lead

23      me to believe that.

24  Q   Nothing led there.

25          And that robbery -- let's go back to that

1    robbery then.  Did that robbery and the October
2    robbery specifically tell you any instructions
3    about not -- don't give me the bait money?
4  A    No, sir.
5  Q    Never said anything like that?  You're absolutely
6    sure?
7  A    Yeah.  He took the money and threw it down and
8    said -- I can't remember exactly what he said.
9  Q    So you tried to put the bait money on him, and he
10    knew bait money was there, didn't he?
11  A    Yes, sir.
12  Q    And threw that bait money down?
13  A    Yes, sir.
14  Q    And this other robbery as far as everyone knows,
15    that wasn't done, correct?
16        MR. VALESKA:  I object.  I object.
17        THE COURT:  Wait a minute.  I don't
18    understand the question.  What was the question?
19            And before you answer, give me a chance
20    to rule.
21            What was the question?
22        MR. BAXLEY:  I'm sorry, Your Honor.  I was
23    asking him if he knew that bait money had anything
24    to do with this last robbery.
25        MR. VALESKA:  The question was as far as

168

```
 1        anyone else knows, did bait money.  And he can't
 2        testify what other people know, Judge.  He wasn't
 3        the one that was robbed --
 4            THE COURT:  Yeah.  I sustain the objection.
 5        Because that would have to be hearsay.  It would
 6        have to be something somebody else told him.
 7    Q   But to the best of your knowledge, you're saying
 8        right here right now you think Corey McNabb also
 9        robbed the Winn Dixie in October of 2000; is that
10        correct?
11    A   What am I basing it on?
12    Q   I'm basing it on your testimony here.  You claimed
13        back on this statement you made in June of 2001 --
14    A   Because of what the officer showed me, yes, sir.
15    Q   -- that you weren't sure, and then all of a
16        sudden you came up with this -- you know, a couple
17        of weeks after that robbery you decided it was
18        Corey.
19    A   I never fully decided it was Corey.
20    Q   Never fully decided about it.
21            But the same things happened during those
22        two robberies?
23            MR. VALESKA:  Objection.  He can't --
24            MR. BAXLEY:  Withdrawn, Your Honor.
25            THE COURT:  He can tell what happened the one
```

169

```
 1              that he was involved in.
 2                   MR. BAXLEY:  Yes, sir.
 3      Q    What type of person would you consider Corey to be?
 4      A    He was a fairly nice person.
 5      Q    Would you think he's capable of robbery?
 6      A    Yes, sir.
 7      Q    You think he's capable of robbery?
 8      A    Yes, sir.
 9      Q    And what leads you to that conclusion?
10      A    We talk about each other's backgrounds before.
11      Q    And what was in your background?
12      A    What was in my background?
13      Q    You talking about you talked about each other's
14           backgrounds.  What was in each other's
15           backgrounds?
16      A    Just things that we done.
17      Q    Even though this was your friend, you think he was
18           capable of robbing someone?
19                   MR. VALESKA:  Objection.  Asked and
20           answered.  He said he was capable of robbing in
21           his opinion.
22                   THE COURT:  He said he thought he was.
23      Q    Would you still consider Corey your friend?
24      A    Yeah.  I hadn't talked to him in a long time.  I
25           hadn't had any dealings with him.
```

170

1   Q   Did you ever have any contact with his wife after
2       this robbery took place?
3   A   No, sir.
4   Q   You didn't.
5       Did you ever make any phone calls to her?
6   A   No, sir.
7   Q   Did you ever go to their apartment after that
8       robbery?
9   A   No, sir.
10      MR. BAXLEY:  I have got no further questions
11      right now, Your Honor.  Reserve the right to
12      recall.
13      THE COURT:  Anything on redirect?
14      MR. VALESKA:  No, sir.  That's it.
15      THE COURT:  You may step down.
16      Have you got a short witness?
17      MR. VALESKA:  Judge, I don't think I do.  Can
18      I look one second?  I think I have law
19      enforcement.  I think you're aware of that.
20      No, sir, I don't.  Law enforcement
21      next.
22      THE COURT:  You don't have a short one.
23      Okay.  Let's recess for the afternoon, then.
24      MR. VALESKA:  We're close to resting, Judge.
25      Just a couple more witnesses.

1        THE COURT:  You got just a couple more
2    witnesses?
3        MR. VALESKA:  Yes, sir.
4        THE COURT:  It's all right with you if we
5    recess for the afternoon?
6        MR. BAXLEY:  Yes, Your Honor.
7        THE COURT:  Ladies and gentlemen, we'll
8    recess for the evening, then.  And it will not be
9    necessary for you to be sequestered or kept
10    overnight.  You can go to your own homes.  But
11    while you're out of the jury box and away from the
12    courthouse, do not discuss the case among
13    yourselves.  Do not discuss it with anyone else.
14    Do not allow anyone to discuss it with you.  And
15    if anyone approaches you and attempts to discuss
16    this case with you, you should let the Court know
17    immediately.  Do not try to make any independent
18    investigation on your own concerning the facts of
19    the case.  And do not watch any television
20    broadcasts concerning the events of this trial.
21    Don't read any newspaper accounts of the events of
22    the trial nor listen to any radio broadcasts.
23    There may not be any news accounts because I
24    haven't seen any news people around.  But if there
25    should be, just ignore those.  And if you will,

1    go.  And if you'll just come back to the jury room

2    at nine o'clock in the morning.  Thank you very

3    much.

4              (Jury not present.)

5              (The proceedings for February 10, 2004,

6    were concluded.)

7              (Off the Record.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                 STATE OF ALABAMA

3  STATE OF ALABAMA,        *
                        *

4  v.                   *    Case No. CC-02-225
                        *

5  RUBEN COREY MCNABB,     *
                        *

6      Defendant.       *

7

8

9       REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

10

11

12  Before:

13         The Honorable Jerry M. White and jury

14            February 11, 2004

15

16  APPEARANCES:

17        For the State

18            Douglas Albert Valeska, Esquire
             District Attorney

19
            Denise Bates, Esquire

20           Assistant District Attorney

21        For the Defendant

22            M. Hampton Baxley, Esquire
             Dothan, Alabama

23

24
  Carla H. Woodall

25  Court Reporter

PROCEEDINGS

MR. VALESKA:  Mr. Baxley and I have talked.
He's willing to waive at this time the bringing
Mr. Singleton in outside the presence of the jury
and going into the probable cause on the search
warrant at this time in front of you because it
was already determined last time in front of you.
As long as they could use what was done last time
on the Record, I don't have a problem with that.

MR. BAXLEY:  Incorporate the arguments.

MR. VALESKA:  I will stipulate --

MR. BAXLEY:  My arguments aren't going to
change, his arguments aren't going to change, and
your rulings aren't going to change, and so there
is no need to waste the Court's time.

MR. VALESKA:  We can go straight to testimony
and we agree that they can raise the issue on
appeal if there's a conviction based on your
previous rulings on the previous trial.

THE COURT:  All right.  Bring the jury.

(Jury present.)

JIMMY SINGLETON

having first been duly sworn, was examined and
testified as follows:

DIRECT EXAMINATION

1    BY MR. VALESKA:

2    Q    Tell us your name, please, sir.

3    A    Jimmy Singleton.

4    Q    You've been put under oath, correct?

5    A    Yes, sir.

6    Q    Mr. Singleton, back on about June 7, 2001, tell

7         the jury where you worked.

8    A    Dothan Police Department.

9    Q    What position did you hold at that time, please,

10        sir?

11   A    Criminal investigator.

12   Q    How long had you been a police officer

13        approximately at that time?

14   A    Ten years.

15   Q    Now, if I could, were you assigned to work the

16        case of the robbery at the Winn Dixie on Westgate

17        Parkway that occurred on June 7, 2001, in Dothan,

18        Alabama, Houston County?

19   A    Yes, I was.

20   Q    Can you tell the ladies and gentlemen of the

21        jury, Ruben Corey McNabb, was he arrested and

22        charged with first degree robbery?

23   A    Yes, sir, he was.

24   Q    Did you go to the scene shortly after the robbery?

25   A    Yes, sir, I did.

```
1    Q    Did you try or attempt to obtain any fingerprints
2         of any items in relationship to the office, any
3         trays, anything that was touched?
4    A    Yes, sir, we did.
5    Q    And after you took those fingerprints, did you
6         send them off?
7    A    Yes, sir, I did.
8    Q    Were you able to get a match on any of those
9         fingerprints?
10   A    No, sir.
11   Q    Now, would you tell the ladies and gentlemen of
12        the jury, before that day, had you worked other
13        robbery cases?
14   A    Yes, sir.
15   Q    Would you tell the ladies and gentlemen of the
16        jury, on those robbery cases, did you attempt to
17        look for fingerprints on those cases?
18   A    Yes, sir, I did.
19   Q    Did you work burglary cases of homes or
20        businesses before June 7th of 2001?
21   A    Yes, sir, I did.
22   Q    Tried to lift or find fingerprints on those cases?
23   A    Yes, sir.
24   Q    Is it unusual, can you tell the ladies and
25        gentlemen of the jury, the number of cases you
```

```
 1            worked as a police officer -- and let me ask you
 2            the number.  Would that have been many, many cases
 3            before June 7th of 2001 ones with burglaries or
 4            robberies or theft cases where you tried to find
 5            fingerprints and you couldn't find any?
 6      A     Yes, sir.
 7      Q     Now, would you tell the ladies and gentlemen of
 8            the jury, please, Mr. Singleton, did you also take
 9            some pictures of the crime scene?
10      A     Yes, sir.
11      Q     And when you got out there, the conditions of the
12            outside lighting; in other words, was it
13            completely light or was it still dark?  Let me
14            show you some pictures if I could.  Show you
15            State's 21 that's been admitted and State's 15
16            that's in evidence.  Using those if I could to ask
17            you, in other words, the sun up like it was twelve
18            o'clock in the daytime or still generally dark?
19      A     Generally dark.
20      Q     Now, let me show you State's Exhibit 23 and 16
21            that are in evidence if I could.  I ask you about
22            -- and 22, 17, show you those pictures as well as
23            24.  Now, I want to ask you, generally what part
24            of the store is that?  Can you tell us?
25      A     That's the office area of the store.
```

```
1    Q   Does that indicate any type of physical evidence
2        you saw inside the store that you attempted to
3        take pictures of or send off for evidence or look
4        for fingerprints?
5    A   Yes, sir.
6    Q   Did that include the trays in 16, 23, as well as
7        the safe in 17?
8    A   Yes, sir.
9    Q   And 22.
10           State's 24, is that a door that shows the
11       office in relationship where the safe was kept --
12       the two safes?
13   A   Yes, sir.
14   Q   Now, if I could, let me show you State's Exhibit
15       18, 19, and 20, Mr. Singleton, in reference to 16
16       and 23 that are already in evidence, and I asked
17       you about some trays or metal cash registers or
18       drawers or if I could use the term a till.  Do you
19       know what I'm talking about in those pictures?
20   A   Yes, sir.
21   Q   Did you yourself with your own eyes, could you see
22       any type of impressions on any part of the metal
23       tops or the tills in relationship to any
24       impressions that were on them inside the office
25       where they had been pulled out of the safe for
```

1          other money, envelopes, and metal coin holders
2          were in relationship to those metal imprints on
3          those tills?
4     A    Yes, sir.
5     Q    Now, you yourself, do you own shoes that have
6          hard-type bottoms, leather soles?
7     A    Yes, sir.
8     Q    Do you own tennis shoes?
9     A    Yes, sir.
10    Q    If I could, have you been to crime scenes before
11         June 7th of 2001 and seen impressions, once again,
12         for different types shoes or boots before?
13    A    Yes, sir.
14    Q    On burglaries or robberies or theft cases or
15         homicide cases?
16    A    Yes, sir.
17    Q    Can you always match up a shoe print with an
18         impression that's found at the crime scene?
19    A    No, sir.
20    Q    Could you tell the ladies and gentlemen of the
21         jury, after you took the pictures, collected the
22         physical evidence, and sent it off for
23         fingerprints, did you interview some of the
24         witnesses at the robbery?  Did you interview some
25         of the alleged witnesses?

```
1    A    Yes, sir.
2    Q    Did you also have another investigator, Sergeant
3         Willie Williamson, who was assigned to assist to
4         work with you because of the case load?
5    A    Yes, sir.
6    Q    Now, tell the ladies and gentlemen of the jury,
7         when the sun came up, it actually got daylight
8         hours after -- on June 7th of 2001, did you go to
9         any particular location, any apartment complex
10        here in the City of Dothan with Sergeant
11        Williamson?
12   A    Yes, sir.
13   Q    What apartment complex did you go to?
14   A    Barstone.
15   Q    When you got to Barstone, were you looking for any
16        type of car, truck, or vehicle?
17   A    Yes, sir.
18   Q    Do you recall what type of vehicle you were
19        looking for?
20   A    Looking for a van -- an older model van, late
21        eighties, early nineties with wood grain paneling
22        on the side.
23   Q    Tell the ladies and gentlemen of the jury, when
24        you went into Barstone, you went right or left or
25        however you went in and made a complete circle,
```

1   did you find any type of vehicle that fit that

2   general description?

3 A Yes, sir, I did.

4 Q Now, was that -- at that time was that forty-eight

5   -- seventy-two hours after the robbery, or a very

6   short time?

7 A Very short time.

8 Q Now, if I could, Mr. Singleton, in relationship,

9   did you see a tag on the vehicle of the van -- a

10   license tag?

11 A Yes, sir.

12 Q As a police officer doing investigative work, did

13   you run the tag to determine who owned the van or

14   who it was registered to?

15 A Yes, sir.

16 Q Who was it registered to?

17 A McNabb.

18 Q Do you see that person in the courtroom today?

19 A Yes, sir.

20 Q Now, can you tell the ladies and gentlemen of the

21   jury, if I ask you about doing a photographic

22   lineup, do you know what I'm talking about?

23 A Yes, sir.

24 Q Do you know if I asked you about doing a live

25   lineup versus a photographic lineup?

1    A    Yes, sir.

2    Q    Now, can you tell the ladies and gentlemen of the

3         jury, working with Sergeant Williamson after you

4         got a description of the van and you ran the tag,

5         did you look for any other evidence as an

6         investigator in relationship to looking to obtain

7         a search warrant of anybody's residence?

8    A    Yes, sir.

9    Q    Now, let's go back to the robbery.  Did you make a

10        determination of allegedly how much cash was taken

11        -- approximately?  Just generally?  Small amount

12        or large amount?

13   A    Large amount.

14   Q    Any other items can you tell the jury in

15        relationship that you made a determination that

16        had been taken during the course of the robbery

17        from the safe at Winn Dixie in Dothan, Alabama,

18        Houston County, on June 7, 2001?

19   A    It was also food stamps taken and postage stamps

20        taken.

21   Q    Now, working other robberies, had you yourself

22        been in other businesses; in other words, food

23        stores like Winn Dixie when they collect cash in

24        the drawers, they take it to the office, do they

25        put it any type thing; in other words, to take it

```
1         to the bank?  Do they keep two hundred thousand

2         dollars cash in one little bag or is it bound in

3         some manner or fashion?

4    A    No.  It's usually, for instance, one dollar bills

5         have a roll of, like, fifties and so on.  Twenty

6         dollars bills, hundred dollars bills are

7         separated.

8              MR. BAXLEY:  Your Honor, I object unless he

9         has personal knowledge of the inner working of a

10        convenience store or food store.

11             MR. VALESKA:  I believe I just asked him if

12        he had been to other businesses, particularly

13        Winn Dixie, to determine whether or not how they

14        bound their money, and he said he had.

15             THE COURT:  Overruled.

16   Q    The term -- you said how it was bound.  Do you

17        have personal knowledge in relationship to what it

18        would be bound with, what type of thing that would

19        keep it altogether -- the money when you stack it

20        up?

21   A    It's called a money wrapper is what I call it.

22   Q    Thank you.

23             Now, if I could, did you make a

24        determination as to the employees that were inside

25        the store at the time of the robbery?
```

```
 1    A    Yes, sir.
 2    Q    And did you discuss with any of the employees
 3         about a description as to how or what the robbers
 4         looked like?
 5    A    Yes, sir.
 6    Q    Did you get a description in relationship to
 7         whether they were men -- males or females?
 8    A    Yes, sir.
 9    Q    Their race?
10    A    Males.
11    Q    Black or white?
12    A    Black.
13    Q    Now, can you tell the ladies and gentlemen of the
14         jury, did you obtain a search warrant in this case?
15    A    Yes, sir, I did.
16    Q    When you obtained the information from the search
17         warrant, did you gather information as part of the
18         investigation in relationship to what you told the
19         jury already about the robbery itself, correct?
20    A    Yes, sir.
21    Q    The vehicle that you went and determined in a
22         short period of time, correct?
23    A    Yes, sir.
24    Q    Who owned the vehicle?
25    A    Yes, sir.
```

1   Q   Did you make a determination where McNabb lived in
2       relationship to the location of the robbery -- the
3       actual residence where he was living?
4   A   Yes, sir.
5   Q   Where did he live?
6   A   Barstone Apartments.
7   Q   And did you come to find the number of the
8       apartment?
9   A   Yes, sir, I did.
10  Q   And did you determine who lived with him?
11  A   Yes, sir.
12  Q   Could you tell the ladies and gentlemen of the
13      jury, did you do investigative work in
14      relationship to city power and lights to see the
15      location; in other words, the location where he
16      lived, how the power or the lights was registered
17      in whose name?  Was that done?
18  A   Yes, sir.
19  Q   Now, did you take the information that you
20      obtained and go before a judge in this circuit to
21      obtain a search warrant?
22  A   Yes, sir, I did.
23  Q   Let me show you -- it's been marked -- if I could.
24      State's Exhibit No. 12 for identification
25      purposes, a copy, do you recognize what this is?

```
1    A    Yes, sir.

2    Q    What is that?

3    A    It's an affidavit for a search warrant.

4    Q    And who obtained the search warrant?

5    A    I did.

6    Q    And the information that was placed in the search

7         warrant, who did it come from?  What I mean, who

8         provided the information to the judge that

9         obtained the search warrant?

10   A    I did.

11   Q    And was it signed by a judge in this circuit in

12        this county?

13   A    Yes, sir.

14   Q    Which judge?

15   A    Mendheim.

16   Q    Honorable Brad Mendheim, a district judge?

17   A    Yes, sir.

18   Q    Then you obtained a search warrant from him.  When

19        you obtained the search warrant, would you tell

20        the ladies and gentlemen of the jury in the

21        probable cause that you discussed with Judge Brad

22        Mendheim he issued a search warrant for whose

23        resident and whose vehicles?

24   A    Mr. McNabb's.

25   Q    Now, after you got the search warrant, did you and
```

```
 1              Sergeant Williamson go and execute the search
 2              warrant or any other police officers at any
 3              particular location here in Houston County?
 4    A    Yes, sir, we did.
 5    Q    What -- where did you go?
 6    A    We went to Mr. McNabb's apartment at Barstone.
 7    Q    Would you tell the ladies and gentlemen of the
 8              jury, when you got to the apartment with Sergeant
 9              Williamson and/or other officers, was anybody at
10              the apartment?
11    A    No, sir.
12    Q    When you got to the door to execute the search
13              warrant, did you yourself look at the door and see
14              what the condition of the door was?
15    A    Yes.
16    Q    Was it open?  Was it locked?
17    A    When I got to the door, it was open.
18    Q    Who opened it?
19    A    The Swat team.
20    Q    That's what I want to ask about.  The Swat team.
21              When they opened it, did they use physical force
22              to open the door?
23    A    Yes, sir.
24    Q    Now, would you tell the ladies and gentlemen of
25              the jury, when you went inside, did you execute
```

```
 1          the search warrant; in other words, and leave a
 2          copy after you and Sergeant Williamson and the
 3          other officers searched McNabb's residence in
 4          Dothan, Alabama, Houston County?
 5    A     Yes, sir, we did.
 6    Q     Did you also search any of his vehicles at that
 7          time?
 8    A     No, sir.
 9    Q     Now, can you tell the ladies and gentlemen of the
10          jury, the only people present were law enforcement
11          officers, correct?
12    A     Yes, sir.
13    Q     Did you leave a copy of the search warrant after
14          you did the search on the television or in the
15          apartment?
16    A     Yes, sir, I did.
17    Q     Can you tell the ladies and gentlemen of the jury
18          what you found in the apartment?  And I want to
19          limit it if I could, Mr. Singleton, in reference
20          to any items in relationship to the alleged
21          robbery on June 7th of 2001 at the Winn Dixie.
22          Can you tell us?
23    A     There was a black toboggan in the living room on
24          the couch.  There was a safe in the bedroom closet
25          that contained food stamps with Winn Dixie stamp
```

1   on them.  There was a money wrapper in the safe

2   that contained a Winn Dixie stamp.  There was a

3   large amount of postage stamps in the safe.  There

4   was bullets to a firearm in the safe.  There was a

5   case of rolled pennies in a closet close to the

6   safe.

7   Q   Now, let me ask you.  The victims at the robbery,

8       have you talked to them to determine in any manner

9       or fashion when the robbery occurred what happened

10      to their hands?

11  A   Yes, sir.

12  Q   Did you find anything in the apartment in

13      reference to the victims that had been robbed as

14      to what they told you happened in relationship to

15      their hands?

16  A   Yes, sir.

17  Q   Tell the jury what you found in McNabb's apartment.

18  A   There was a bag of speaker wire.

19  Q   Now, could you tell the ladies and gentlemen of

20      the jury, I want to particularly ask you about

21      specifically clothing is what I want to ask you.

22      And I want to limit the clothing to my questions

23      if I could, Mr. Singleton, to foot wear.  If I

24      could ask you about some foot wear.  Did you find

25      any type of foot wear in the residence of McNabb's

```
 1            apartment?

 2    A       Yes, sir.

 3    Q       What kind of foot wear did you find?

 4    A       We found a couple of tennis shoes, and I want to

 5            say we found some boots.

 6    Q       If I could, it's been a long time since the search

 7            warrant; in other words, today's date, would a log

 8            have been made and inventory recovered and where

 9            they were kept in the ordinary course of business

10            at the Dothan Police Department?

11    A       Yes, sir.

12    Q       In fact, you're looking at that to refresh your

13            memory as to whether there were any boots?

14    A       Yes, sir.

15    Q       Now, if I could, was Mr. McNabb's wife, was she

16            present at the time the search was executed?

17    A       No, sir.

18    Q       Let me show you some pictures, if I could -- some

19            evidence.  I'm sorry.  State's Exhibit 4 for

20            identification purposes, do you recognize State's

21            4?

22    A       Yes, sir.

23    Q       Tell the jury what 4 is.

24    A       Speaker wire.

25    Q       Where was that found?
```

1    A    In the bedroom of Mr. McNabb.

2    Q    Now, would you tell the ladies and gentlemen of

3         the jury, did you take custody of it, you or

4         Sergeant Williamson?

5    A    Yes, sir.

6    Q    Has it been marked, altered, or changed in any

7         way except it's got a court's identification

8         number today?

9    A    No, sir.

10   Q    Did you place it in this bag?  Do you recall?

11   A    I don't recall.

12   Q    Besides being in the bag, does the wire, the

13        different types or colors, look to be the same

14        type of wire?

15   A    Yes, sir.

16   Q    And does it look any different today?

17   A    No, sir.

18             MR. VALESKA:  Offer State's 4, Judge White.

19             MR. BAXLEY:  No objection, Your Honor, at

20        this time.

21             THE COURT:  Let it be admitted.

22                  (State's Exhibit No. 4 was admitted into

23                  evidence.)

24   Q    Show you State's 2 for identification purposes.

25        Took it out.  I'm holding it in my hand.  Do you

```
 1            recognize this, Mr. Singleton?
 2      A     Yes, sir.
 3      Q     What is State's 2?  Tell the jury.
 4      A     It's a bibbed toboggan.
 5      Q     And where was it found in the apartment?
 6      A     On the couch in the living room.
 7      Q     Did you take custody of it at that time when you
 8            executed the search warrant until it was brought
 9            into court today in this plastic bag, correct?
10      A     Yes, sir.
11      Q     Has it been marked or changed in any way that you
12            can tell except stuck in this identification bag
13            with a State's 2 on it and then it says a number
14            forty-one with whose initials on the back?
15      A     Those are mine.
16      Q     The forty-one, correct me if I'm wrong, does that
17            have to do with the evidence log in relationship
18            to the inventory when you recovered at the search
19            with your records?
20      A     Yes, sir.
21      Q     So it's in the same substantial condition the best
22            you can tell, correct?
23      A     Yes, sir.
24            MR. VALESKA:  Offer State's 2.
25            MR. BAXLEY:  No objection.
```

```
 1              THE COURT:  Let it be admitted.
 2                   (State's Exhibit No. 2 was admitted into
 3                   evidence.)
 4    Q    Let me show you State's Exhibit 5 for
 5         identification purposes.  5 for the Record.  Do
 6         you recognize 5, Mr. Singleton?
 7    A    Yes, sir.
 8    Q    It also has a fifty on it.  Once again, can you
 9         tell the jury what the number fifty is in black
10         marking is?
11    A    That's a number that we use in relationship to the
12         log sheet as far as keeping track of the evidence.
13    Q    Placed in the little plastic bag, State's 5 for
14         identification purposes, what is it?
15    A    It's a food stamp.
16    Q    And I ask you in relationship to the Winn Dixie to
17         your own personal knowledge in working the robbery
18         case about any kind of identification numbers that
19         would have been on anything from -- taken from the
20         safe.  Do you see anything on there in
21         relationship to what you found in the safe at
22         McNabb's house that corresponds belonging to the
23         Winn Dixie?
24    A    Yes, sir.  It's got their store stamp with their
25         store number on it.
```

1    Q    Can you tell me what the number is?

2    A    Four twenty-six.

3    Q    That the way the food stamp is -- if I'm reading

4         it wrong, it says value ten dollars this stamp

5         with this U.S. Department of Agriculture food

6         stamp having found in McNabb's safe?

7    A    Yes, sir.

8    Q    Been marked, altered, or changed except stuck in

9         the bag with the court's identification number?

10   A    No, sir.

11             MR. VALESKA:  Offer State's 5.

12             MR. BAXLEY:  No objection.

13             THE COURT:  Let it be admitted.

14                 (State's Exhibit No. 5 was admitted

15                 into evidence.)

16   Q    Go to State's 9 for identification purposes if I

17        could, Mr. Singleton.  Looking at 9, it also has a

18        forty-nine on it, correct?

19   A    Yes, sir.

20   Q    Forty-nine the identification number on your log

21        for evidence that was seized from McNabb's

22        residence you keep in the evidence log, correct?

23   A    Yes, sir.

24   Q    So State's 9, what is the item inside for

25        identification purposes?

1    A    It's a money wrapper.

2    Q    What denomination?

3    A    One thousand dollars.

4    Q    Any identification marks that you can tell that

5         indicate it came from the Winn Dixie, please, sir?

6    A    Yes, sir.  It's got their store stamp on it.

7    Q    Once again, what's the number?

8    A    Four twenty-six.

9    Q    Does it appear to be marked, altered, or changed

10        in any way except it was put in the envelope and

11        brought into court in a sealed condition?

12   A    No, sir.

13   Q    Same substantial condition?

14   A    Yes, sir.

15        MR. VALESKA:  Offer State's 9.

16        MR. BAXLEY:  No objection.

17        THE COURT:  Let it be admitted.

18            (State's Exhibit No. 9 was admitted into

19            evidence.)

20   Q    State's 6 for identification purposes has an item

21        inside, or items.  Can you tell me what the items

22        are?

23   A    Postage stamps.  There's fifty books.

24   Q    There's handwriting, correct, in black marker?

25   A    Yes, sir.

```
 1    Q    Is that your handwriting with your initials?

 2    A    Yes, sir.

 3    Q    And does it indicate the denomination, the value

 4         of the stamps, what the price of the stamps are?

 5    A    Thirty-four cents.

 6    Q    And where were these stamps found in relationship

 7         to the search of McNabb's residence?

 8    A    In the safe.

 9    Q    Did you place them in this plastic bag for

10         evidentiary purposes and put the writing of the

11         identification of the number of books and the

12         value with your initials and seal it up?

13    A    Yes, sir.

14    Q    Does it appear to be marked, altered, or changed

15         in any way, these fifty books of stamps and these

16         adhesive-type style if I could ask you that way

17         that they are in? State's 6?

18    A    No, sir.

19    Q    Same substantial condition?

20    A    Yes, sir.

21    Q    Hadn't been marked or altered in any way?

22    A    No, sir.

23              MR. VALESKA:   Offer 6.

24              MR. BAXLEY:   No objection.

25              THE COURT:   Let it be admitted.
```

1              (State's Exhibit No. 6 was admitted into

2              evidence.)

3    Q    Show you State's Exhibit No. 3 for identification

4         purposes.  Do you recognize what 3 is, Mr.

5         Singleton?

6    A    Yes, sir.  It's a case of pennies.

7    Q    Case of pennies.

8              Did you see that case of pennies anywhere in

9         relationship to McNabb's residence at Barstone, I

10        believe it's J-141 Houston County, when you

11        executed the search warrant on this case in June

12        of 2001, please, sir?

13   A    Yes, sir.

14   Q    Where was it found?

15   A    In the closet in the bedroom.

16   Q    Now, any type of stamps in relationship to

17        identification marks what I want to ask you, store

18        number four twenty-six like on the thousand dollar

19        money wrapper or this food stamp which is on 5

20        that shows four twenty-six on the box of pennies?

21   A    No, sir.

22   Q    Did you discuss with the victims in relationship

23        to the robbery as to whether or not they kept

24        currency; in other words, metal money they got in

25        any manner or fashion from any institutions to use

1       in their business in this form like this box of

2       twenty-five dollars of pennies?

3  A   Yes, sir.

4  Q   And did you make a determination as to whether

5       allegedly, and, once again, it stands to be proved

6       to a jury, that was in the safe at the time of the

7       alleged robbery and taken by the alleged robbers?

8  A   Yes, sir.

9  Q   You took custody of it, correct?

10  A   Yes, sir.

11  Q   Does it appear to be marked, altered, or changed

12       in any way except it's got a court's

13       identification number at the time you took custody

14       until looking at it in court today?

15  A   No, sir.

16  Q   Same substantial condition?

17  A   Yes, sir.

18       MR. VALESKA:  Offer State's 3.

19       MR. BAXLEY:  Same condition as it was found

20       in the apartment?

21  Q   Same condition as was found in the apartment,

22       correct?

23  A   Yes, sir.

24  Q   And it's got a forty-two in other words for your

25       evidence log is the only thing, correct?

1    A    Yes, sir.

2              MR. VALESKA:  He said he had no objection.

3              THE COURT:  Let it be admitted.

4                   (State's Exhibit No. 3 was admitted into

5                   evidence.)

6    Q    Now, you see Ms. Patsy Roach right here, Mr.

7         Singleton?

8    A    Yes, sir.

9    Q    Did you show her a photographic lineup of anybody

10        in relationship to the alleged robberies of this

11        case?

12   A    Yes, sir.

13   Q    Now, I know it's been a while.  Could you tell us

14        if you recall the best you can in reference to

15        when you did that, there's certain ways you can

16        show photographic lineups to witnesses,

17        particularly Ms. Roach in this case?

18   A    Yes, sir.

19   Q    Do you recall how you first did it?  What manner

20        or fashion or what type of equipment you used when

21        you first showed Ms. Roach a lineup of individuals?

22   A    We generate pictures out of a computer to produce

23        a photographic lineup, and the people that we put

24        in the lineup are similar in nature.

25   Q    So she looked at a photographic lineup from the