COURT OF CRIMINAL APPEALS No. CR-03-1141

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ___Houston___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC2002-225  Volume II___

CIRCUIT JUDGE ___Jerry M. White___

Type of Conviction / Order Appealed From: ___ROBBERY I___

Sentence Imposed: ___LIfe w/o Parole, and costs___

Defendant Indigent: [xx] YES  [ ] NO

Ruben McNabb

Hon. David Hogg          334-794-8559                    **NAME OF APPELLANT**
(Appellant's Attorney)                    (Telephone No.)
188 N. Foster St. Ste 200
(Address)
Dothan, Al.  36303
(City)              (State)              (Zip Code)

V.

**STATE OF ALABAMA**

(State represented by Attorney General)                    **NAME OF APPELLEE**
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

*Carla*

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R.App.P.) | Criminal Appeal Number<br><br>_____ - _____ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☑ CIRCUIT COURT    ☐ DISTRICT COURT    ☐ JUVENILE COURT OF  Houston                        COUNTY

*Ruben McNabb*                                                                    , Appellant

V.    ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number<br>CC 02-225 | Date of Judgment/Sentence/Order<br>3-24-04 |
| Date of Notice of Appeal<br>Oral: 3-30-04    Written: | Indigent Status Granted:<br>☑ Yes    ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

Signature _____    Date _____    Print or Type Name _____

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

COURT REPORTER(S)

A. ☑ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence    *Carla Woodall*
proceedings, a transcript of the organization of the jury and arguments of counsel must    *c/o Hon. Larry Anderson*
be designated separately    *Dothan, AL*

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and    _____
challenges for cause.  Note that in noncapital cases the voir dire of the jury will not be    _____
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will    _____
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)    _____

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. _____ | _____ | **FILED** |
| E. _____ | _____ | |
| F. _____ | _____ | **APR 23 2004** |
| G. _____ | _____ | *Jislyn Byrd* |

JUDY BYRD, CLERK
HOUSTON

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must review this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

Signature _____    Date 4-23-04    Print or Type Name *David K. Hogg*

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals.    (2) the District Attorney. (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

IN THE CIRCUIT COURT OF HOUSTON COUNTY

STATE OF ALABAMA

STATE OF ALABAMA,               *
                               *
v.                             *      Case No. CC-02-225
                               *
RUBEN COREY MCNABB,            *
                               *
        Defendant.             *


REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL


Before:

        The Honorable Jerry M. White and jury

            February 10, 2004


APPEARANCES:

        For the State

            Douglas Albert Valeska, Esquire
            District Attorney

            Denise Bates, Esquire
            Assistant District Attorney

        For the Defendant

            M. Hampton Baxley, Esquire
            Dothan, Alabama


Carla H. Woodall
Court Reporter

I N D E X

State of Alabama  v.  Ruben Corey McNabb
Case No. CC-02-225

|                                        | PAGE |
|----------------------------------------|------|
| REPORTER'S TRANSCRIPT ORDER            | 1    |
| TITLE PAGE                             | 2    |
| INDEX                                  | 3    |
| INDEX OF STATE'S TRIAL EXHIBITS        | 9    |
| INDEX OF DEFENDANT'S TRIAL EXHIBITS    | 11   |
| INDEX OF STATE'S SENTENCING EXHIBITS   | 12   |
| COLLOQUY                               | 13   |
| ROLL OF JURY VENIRE CALLED             | 13   |
| VOIR DIRE BY THE COURT                 | 14   |
| VOIR DIRE BY MR. VALESKA               | 16   |
| VOIR DIRE BY MR. BAXLEY                | 16   |
| COLLOQUY                               | 16   |
| JURY STRUCK                            | 18   |
| JURY IMPANELED                         | 18   |
| ROLL OF JURY CALLED                    | 19   |
| JURY SWORN                             | 19   |
| COLLOQUY                               | 19   |
| JURY VENIRE EXCUSED                    | 20   |
| COLLOQUY                               | 20   |
| OPENING STATEMENTS BY MR. VALESKA      | 21   |
| OPENING STATEMENTS BY MR. BAXLEY       | 21   |

1                    I N D E X   (Continued)

2

3    OBJECTION BY MR. VALESKA                              21

4    OPENING STATEMENTS CONTINUED BY MR. BAXLEY            22

5                 STATE'S TESTAMENTARY EVIDENCE

6    WITNESSES:

7        RONALD REEVES

8            Direct Examination by Mr. Valeska           22
             Cross Examination by Mr. Baxley             75
9            Redirect Examination by Mr. Valeska         95
             Recross Examination by Mr. Baxley           98
10           Further Redirect Examination
                 by Mr. Valeska                          99
11

12       PATSY ROACH

13           Direct Examination by Mr. Valeska          100
             Cross Examination by Mr. Baxley            122
14

15       BETTY PRESCOTT

16           Direct Examination by Mr. Valeska          129
             Cross Examination by Mr. Baxley            134
17           Redirect Examination by Mr. Valeska        140
             Recross Examination by Mr. Baxley          141
18

19       REGGIE HILL

20           Direct Examination by Mr. Valeska          141
             Cross Examination by Mr. Baxley            155
21

22   COLLOQUY                                           170

23   PROCEEDINGS FOR FEBRUARY 10, 2004 ENDED            172

24   TITLE PAGE                                         173

25   PROCEEDINGS FOR FEBRUARY 11, 2004, BEGAN           174

1                    I N D E X   (Continued)

2

3    ADOPTION OF SUPPRESSION HEARING OF FEB. 13, 2003    174

4
          STATE'S TESTAMENTARY EVIDENCE CONTINUED
5
     WITNESSES:
6
         JIMMY SINGLETON
7
              Direct Examination by Mr. Valeska      174
8             Cross Examination by Mr. Baxley        206

9
     STATE RESTS                                      221
10
     MOTION FOR JUDGEMENT OF ACQUITTAL               221
11
     RULING BY THE COURT                             222
12

13              DEFENDANT'S TESTAMENTARY EVIDENCE

14   WITNESSES:

15       RUBEN COREY MCNABB

16            Direct Examination by Mr. Baxley       222
              Voir Dire Examination by Mr. Valeska   228
17            Direct Examination Continued
                 by Mr. Baxley                       229
18            Cross Examination by Mr. Valeska       235
              Redirect Examination by Mr. Baxley     266
19

20       YVETTE MCNABB

21            Direct Examination by Mr. Baxley       271
              Cross Examination by Mr. Valeska       278
22

23       RUBEN COREY MCNABB  (Recalled)

24            Direct Examination by Mr. Baxley       302
              Cross Examination by Mr. Valeska       303
25

1          I N D E X   (Continued)

2

3     RONALD REEVES (Recalled)

4          Direct Examination by Mr. Baxley          304
           Cross Examination by Mr. Valeska          304
5
    DEFENSE RESTS                                    306
6

7          STATE'S REBUTTAL TESTAMENTARY EVIDENCE

8     WITNESSES:

9      SHERRY WISDOM

10         Direct Examination by Mr. Valeska          307
           Cross Examination by Mr. Baxley           310
11

12     STEPHANIE REEVES

13         Direct Examination by Mr. Valeska          311
           Cross Examination by Mr. Baxley           314
14         Redirect Examination by Mr. Valeska       314

15
       MARY BESSIE
16
           Direct Examination by Mr. Valeska          315
17         Cross Examination by Mr. Baxley           321
           Redirect Examination by Mr. Valeska       322
18

19     GREG BRYSON

20         Direct Examination by Mr. Valeska          323
           Cross Examination by Mr. Baxley           327
21         Redirect Examination by Mr. Valeska       329
           Recross Examination by Mr. Baxley         332
22

23     WILLIE WILLIAMSON

24         Direct Examination by Mr. Valeska          333
           Cross Examination by Mr. Baxley           335
25         Redirect Examination by Mr. Valeska       335

1              I N D E X  (Continued)

2

3    STATE RESTS                                     336

4    CLOSING ARGUMENTS BY MR. VALESKA                337

5    OBJECTION BY MR. BAXLEY                          337

6    CLOSING ARGUMENTS CONTINUED BY MR. VALESKA      338

7    CLOSING ARGUMENTS BY MR. BAXLEY                 338

8    OBJECTION BY MR. VALESKA                         338

9    CLOSING ARGUMENTS CONTINUED BY MR. BAXLEY       338

10   REBUTTAL ARGUMENTS BY MR. VALESKA               338

11   OBJECTION BY MR. BAXLEY                          338

12   REBUTTAL ARGUMENTS CONTINUED BY MR. VALESKA     339

13   JURY CHARGE                                     339

14   ALTERNATE JURORS EXCUSED                         356

15   JURY DELIBERATIONS                              356

16   VERDICT                                          356

17   JURY POLLED                                      356

18   JURY EXCUSED                                     357

19   ADJUDICATION                                     357

20   SENTENCING DATE SET                             357

21   BOND                                             358

22   PROCEEDINGS FOR FEBRUARY 11, 2004 ENDED         358

23   TITLE PAGE                                       359

24   PROCEEDINGS FOR MARCH 18, 2004 BEGAN            360

25   COLLOQUY                                         360

1                      I N D E X   (Continued)

2

3    PROCEEDINGS FOR MARCH 18, 2004 ENDED              363

4    TITLE PAGE                                        364

5    PROCEEDINGS FOR MARCH 24, 2004 BEGAN              365

6    COLLOQUY                                          365

7    SENTENCING                                        373

8    PROCEEDINGS FOR MARCH 24, 2004 ENDED              373

9    REPORTER'S CERTIFICATE                            374

10   CERTIFICATE OF COMPLETION                         376

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF STATE'S TRIAL EXHIBITS

| EXHIBIT NO. | PAGE MARKED | PAGE ADMITTED | PAGE DENIED | PAGE WITHDRAWN |
|---|---|---|---|---|
| State's 1 | 24 | | | |
| State's 2 | 24 | 193 | | |
| State's 3 | 24 | 199 | | |
| State's 4 | 24 | 191 | | |
| State's 5 | 24 | 194 | | |
| State's 6 | 24 | 197 | | |
| State's 7 | 24 | | | |
| State's 8 | 24 | | | |
| State's 9 | 24 | 195 | | |
| State's 10 | 24 | 204 | | |
| State's 11 | 24 | | | |
| State's 12 | 24 | | | |
| State's 13 | 24 | | | |
| State's 14 | 24 | | | |
| State's 15 | 53 | 64 | | |
| State's 16 | 53 | 66 | | |
| State's 17 | 53 | 67 | | |
| State's 18 | 53 | 73 | | |
| State's 19 | 53 | 73 | | |
| State's 20 | 53 | 73 | | |
| State's 21 | 53 | 70 | | |
| State's 22 | 53 | 69 | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
1              INDEX OF STATE'S TRIAL EXHIBITS CONTINUED

2

3     State's 23        53            72

4     State's 24        53            71

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>INDEX OF DEFENDANT'S TRIAL EXHIBITS</u>

| EXHIBIT NO. | PAGE MARKED | PAGE ADMITTED | PAGE DENIED | PAGE WITHDRAWN |
|-------------|-------------|---------------|-------------|----------------|
| Defendant's 1 | 228 | 303 | | |

| | |
|---|---|
| 1 | <u>INDEX OF STATE'S SENTENCING EXHIBITS</u> |
| 2 | |
| 3 | |

| EXHIBIT NO. | PAGE MARKED | PAGE ADMITTED | PAGE DENIED | PAGE WITHDRAWN |
|---|---|---|---|---|
| State's 1 | 365 | 373 | | |

PROCEEDINGS

(Jury venire present.)

THE COURT:  Ladies and gentlemen of the jury panel, I'm going to ask the clerk to call the roll of those of you who are serving on this particular panel at this time.  And I'm going to ask a favor of you right here at the beginning.  And, that is, that this one time when she calls your name, if you would stand there where you are and answer so that the attorneys can see you.  And then once you've stood and answered, you can have your seat back.

(At which time the roll of the jury venire was called by the clerk.)

THE COURT:  Thank you very much, ladies and gentlemen.

Now, at this time I'm going to qualify you as to the case of the State of Alabama versus Ruben Corey McNabb.  This is Mr. McNabb sitting here in the suit.  If you'll stand up.

THE DEFENDANT:  (Complied.)

THE COURT:  And Ruben Corey -- you can take your seat back.

THE DEFENDANT:  (Complied.)

THE COURT:  Ruben Corey McNabb is charged by

1       an indictment returned by the grand jury of

2       Houston County, Alabama, back on August 16, 2001,

3       and he's charged by that indictment with robbery

4       in the first degree.  Mr. McNabb is represented by

5       Mr. Hamp Baxley.  This is Mr. Baxley right here.

6       And the State is being represented by Mr. Valeska,

7       the district attorney, and his assistant, Ms.

8       Denise Bates.

9             Now, I have certain questions that I

10      need to ask you in qualifying you on this

11      particular case.

12            Now, is either of you related by blood

13      or by marriage to this Defendant here, Ruben Corey

14      McNabb?

15            (No response.)

16      THE COURT:  Or is either of you related by

17      blood or by marriage to Ron Reeves?  Mr. Reeves

18      works at the Winn Dixie on Westgate Parkway.

19            (No response.)

20      THE COURT:  Or is either of you related by

21      blood or by marriage to Patsy Lynn Roach, who also

22      works at the Winn Dixie on Westgate Parkway?

23            (No response.)

24      THE COURT:  Or is either of you an agent,

25      stockholder, director, or an employee of the Winn

1   Dixie Company?

2               (No response.)

3        THE COURT:   Is either of you a witness in

4   this case either for the State of Alabama or for

5   this Defendant here, Ruben Corey McNabb?

6               (No response.)

7        THE COURT:   Or is either of you on the

8   appearance bond of this Defendant, Ruben Corey

9   McNabb?

10              (No response.)

11       THE COURT:   Was either of you on the grand

12   jury of Houston County, Alabama, which returned

13   this indictment against Mr. McNabb charging him

14   with robbery in the first degree, that being the

15   August 16, 2001, grand jury where Mr. Emmanuel --

16   if I can read Mr. -- it looks like Mr. Emmanuel

17   Williams was the foreperson?

18              (No response.)

19       THE COURT:   Has either of you ladies and

20   gentlemen read anything about the facts in this

21   case or have you heard or seen anything about the

22   facts in this case that would bias your minds and

23   prejudice your verdict and prevent you from giving

24   a fair and impartial trial, both to the State and

25   to the Defendant, if you were selected as a juror

```
 1        to try this case?
 2                   (No response.)
 3             THE COURT:  Does either of you have a fixed
 4        opinion as to the guilt or the innocence of this
 5        Defendant that would prevent you from giving a
 6        fair and impartial trial to both the State and to
 7        the Defendant if you were selected as a juror to
 8        try this case?
 9                   (No response.)
10             THE COURT:  Or does either of you have any
11        interest in either the conviction or the acquittal
12        of this Defendant?
13                   (No response.)
14             THE COURT:  Or has either of you made any
15        promise or given any assurance that you would
16        either convict or acquit this Defendant if you
17        were selected as a juror to try this case?
18                   (No response.)
19             THE COURT:  Questions for the State, Mr.
20        Valeska?
21                   (At which time Mr. Valeska further
22                   qualified the jury venire.)
23             THE COURT:  Mr. Baxley.
24                   (At which time Mr. Baxley further
25                   qualified the jury venire.)
```

1    THE COURT:  Does anybody need to tell me

2  anything in answer to any of the questions that

3  were asked?  Let's take the first row first here.

4  Anybody on the first row need to come up and tell

5  me anything?

6     (No response.)

7    THE COURT:  What about the second row?

8     (No response.)

9    THE COURT:  The third?  Anybody on the third

10  row?

11     (No response.)

12    THE COURT:  What about the fourth?  Anybody?

13     (No response.)

14    THE COURT:  Or the fifth?

15     (No response.)

16    THE COURT:  With that, then, I hereby declare

17  these jurors to be qualified.  And it's a quarter

18  till eleven.

19     Approach the bench, gentlemen, if you

20  will.

21     (At which time a bench conference was

22     held off the Record.)

23     (Off the Record.)

24     (At which time the following proceedings

25     were held in open court:)

1           THE COURT:  Ladies and gentlemen, it's going

2      to take some time for the attorneys to get their

3      notes together and strike this jury, and there's

4      no reason on earth why you ought to have to sit

5      here and be bored to death while that's being

6      done.  So I'm going to let you go at this time.

7      If you will, just be back here at one o'clock.  At

8      one o'clock we'll seat the jury and get started on

9      the testimony.  Just be sure everybody is back

10     here at one o'clock.  And thank you very much.

11              (Jury venire not present.)

12          THE COURT:  Yes, ma'am?

13          A JUROR:  I just have a question.  It dawned

14     on me when Mr. Valeska was saying something.  If

15     we're held every day and it gets close to dark, is

16     there a way to provide --

17          THE COURT:  We're not going to go until after

18     dark.  If we have to, the sheriff will help you

19     out.

20                  (At which time the attorneys and the

21                  clerk struck the jury off the Record.)

22                  (Off the Record.)

23                  (Jury venire present.)

24          THE CLERK:  As I call your name, if you will,

25     please go and have a seat in the jury box.

1     Sharon Sizemore. Joey Smith. Kenneth

2    Smith. Ida Sullivan. Rose Taylor. Mildred

3    Thomas. Chrystal Tran. Martha Watford. Mary

4    Frances Welch. Ira Wesley. Susan Wilkinson.

5    Deborah Williams. Robert Willis. Milton Wood.

6             (At which time the roll of the jury was

7             called by the clerk.)

8             (At which time the jury sworn by the

9             clerk.)

10        THE COURT: Ladies and gentlemen, you're the

11    trial jury in this case of the State of Alabama

12    versus Ruben Corey McNabb. And during the course

13    of this trial and until all of the evidence is in

14    and the case has been submitted to you for your

15    verdict, you should not discuss the case among

16    yourselves, nor should you discuss it with anyone

17    else, nor should you allow anyone to discuss it

18    with you or even to discuss it in your presence.

19    If anyone approaches you at any time and attempts

20    to discuss this case with you or even to discuss

21    it in your presence, then you should let the Court

22    know immediately.

23             Now, are you gentlemen ready to get

24    started?

25        MR. VALESKA: Yes, sir.

```
1          THE COURT:  Mr. Baxley?
2          MR. BAXLEY:  Yes, sir.
3          THE COURT:  The remainder of you are
4     discharged, and you may go.  And just come back at
5     nine o'clock in the morning to the jury assembly
6     room.
7               (At which time the jury venire was
8               excused.)
9          MR. BAXLEY:  I have a suppression motion.
10         THE COURT:  I usually hear those when that
11    part of the trial comes.
12         MR. VALESKA:  Could we approach the bench
13    before you rule?
14         THE COURT:  I haven't ruled --
15         MR. VALESKA:  I think we could solve it if I
16    could come up to the bench, Judge White.
17              (At which time the following proceedings
18              were held at the bench outside of the
19              hearing of the jury:)
20         MR. VALESKA:  Judge, if I could remind the
21    Court, you tried this case.  It would be the same
22    evidence.  You've already made a ruling so I don't
23    know why you couldn't adopt your previous ruling
24    because nothing has changed.
25         MR. BAXLEY:  If you want to do it that way,
```

1   that's fine.  It's just for the appeal.

2       THE COURT:  Let's just wait until that part

3   of the time comes when it's introduced, and then

4   we'll do it then.

5       MR. BAXLEY:  That's fine.  Just to get it

6   over with.

7       THE COURT:  I just assume not do it -- I

8   mean, that is not the way I generally do it.

9       MR. VALESKA:  That's fine.

10          (At which time the following proceedings

11          were held in open court:)

12      THE COURT:  You gentlemen may state your case

13  to the jury.

14          (At which time opening statements were

15          made by Mr. Valeska.)

16      THE COURT:  Mr. Baxley?

17          (At which time opening statements were

18          made by Mr. Baxley.)

19      MR. VALESKA:  Objection.  Objection.  If I

20  could approach the bench if I could.

21      THE COURT:  Okay.

22          (At which time the following proceedings

23          were held at the bench outside of the

24          hearing of the jury:)

25      MR. VALESKA:  Mr. Baxley wants to tell the

```
1        jury he's been waiting in jail for this trial.

2        That's not relevant.  It has nothing to do with

3        this.  I object.

4             MR. BAXLEY:  That's fine, Your Honor.

5             THE COURT:  I sustain the objection.

6                  (At which time the following proceedings

7                  were held in open court:)

8                  (At which time opening statements were

9                  continued by Mr. Baxley.)

10            THE COURT:  Who will the State's first

11       witness be?

12            MR. VALESKA:  Ronald Reeves, Your Honor.

13                      ~~RONALD REEVES~~

14       having first been duly sworn, was examined and

15       testified as follows:

16                      DIRECT EXAMINATION

17  BY MR. VALESKA:

18  Q    Tell me your name, please, sir.

19  A    Ronald Reeves.

20  Q    Mr. Reeves, how old are you?

21  A    I'm thirty-five.

22  Q    Tell the jury where you are employed today.  Which

23       business?

24  A    Winn Dixie.

25  Q    Now, if I could, let's go back to on or about June
```

1      7, 2001, I ask them for you to tell the jury

2      where you're employed then.

3  A   Winn-Dixie.

4  Q   What position did you have with them, please, sir?

5  A   Manager, assistant manager.

6  Q   This is a big courtroom, and I don't hear real

7      good.  Make sure everybody else can hear.

8          How long had you been an assistant manager

9      working at the Westgate Winn Dixie there?

10 A   Four years.

11 Q   Now, let me ask you something.  In cashing food

12     stamps or if large amounts of money were counted

13     being a manager, what happens to the money when it

14     went from the cash registers into the office?

15 A   It was in a safe, got put in a safe.

16 Q   Does it just go in there in bulk?  Ones, fives,

17     and ten all together?  How does it go?

18 A   No, sir.  It was separated.

19 Q   When it was separated, what was it separated with?

20 A   Wraps of a thousands, five hundred dollars, and a

21     hundred dollar wrap.

22 Q   Any type of identification marks put on a food

23     stamp that is canceled to be turned in for money

24     to be exchanged or those wraps you're talking

25     about to identify your store?

```
 1    A    Yes, sir.
 2    Q    What stamp would have been placed on the food
 3         stamp number from your store or the currency
 4         wrappers?
 5    A    Four twenty-six.  Store number four twenty-six.
 6    Q    Now, would any other Winn Dixie have your four
 7         twenty-six store?
 8    A    No, sir.
 9    Q    Now, tell the ladies and gentlemen of the jury, in
10         an average week would your Winn Dixie do a large
11         amount of business in cash?
12    A    Yes, sir.
13    Q    Now, when cashiers needed change working out there
14         on the teller lines, how would they get it?
15    A    They would get it in wraps, and they would get the
16         coins in a roll.
17              (State's Exhibits No. 1 through 14 were
18                   premarked for identification.)
19    Q    Would you tell the ladies and gentlemen of the
20         jury how often there would be a pick up for money
21         to be taken to the bank; in other words, the cash
22         collected day or night?  Who would make a bank
23         deposit, or who came by to pick up the cash?
24    A    The manager would take it to the bank.
25    Q    Let's go to June 7 of 2001.  I ask you, what was
```

```
 1              kept in the safe in the inner office that night?
 2       A      Well, we had stamps -- postage stamps.  And we had
 3              large amount of bills, and also we had food stamps
 4              there, and we had coins there kept in a box and
 5              some was outside the box -- some outside the box.
 6       Q      Could you tell the ladies and gentlemen of the
 7              jury if a teller needed let's just say fifty
 8              dollars in quarters, would she have gotten that in
 9              a huge box taken out there?
10       A      No, sir.
11       Q      How would it have been taken out?
12       A      It would have been taken out in a roll.  Like
13              fifty dollars we would have had -- we would have
14              had -- if it's ten dollars in quarters, or dimes,
15              either one is five dollars, so if you would have
16              said ten dollars, it would be -- you said fifty
17              dollars, it would be five rolls of the quarters
18              there.
19       Q      Now, I noticed you're wearing a jacket today, and
20              I'm not going to ask you to take off your jacket.
21              Could you tell the ladies and gentlemen of the
22              jury your biceps, your arms, are they thin like
23              mine?
24       A      No, sir.
25       Q      Are they muscular?
```

```
1    A    Yes, sir.

2    Q    How tall are you?

3    A    Six six.

4    Q    And how much do you weigh?

5    A    Probably around about two twenty or two thirty.

6    Q    Would you consider yourself a very strong man or

7         medium or weak?

8    A    Very strong man.

9    Q    Tell the ladies and gentlemen of the jury,

10        nighttime at the Winn Dixie, would there have been

11        more employees and managers versus the daytime or

12        less?

13   A    It will be less.

14   Q    Go to June 7, 2001.  Tell the ladies and gentlemen

15        of the jury, the employees that you recall were

16        working that shift that night after ten o'clock or

17        after midnight, who were the ones actually

18        working?

19   A    Patsy Roach, Reggie Hill, and there was a guy

20        named John Stack, and there was a guy named Steven

21        Woodham.  They were stocking the aisles, and

22        Patsy was on the front.

23   Q    What position did she have?  Was she a manager?

24   A    She's a cashier.

25   Q    Anybody else working the store?
```

```
 1    A    Reggie Hill.

 2    Q    Reggie Hill, what was his position?  Tell the jury.

 3    A    Same as mine was.  Assistant manager.

 4    Q    And would Mr. Hill have access to the safe?

 5    A    Yes, sir.

 6    Q    Who else had access that was working that night?

 7    A    I would.

 8    Q    Now, would you tell the ladies and gentlemen of

 9         the jury, when you come in the front doors of the

10         Winn Dixie on June 7 that night after midnight,

11         what kind of doors were they?  Are they push doors?

12    A    No, sir.  They was automatic doors.

13    Q    Did they make any kind of sound, in other words,

14         when you come in and out when they open or close?

15    A    Yes, sir.

16    Q    Now, when you actually came inside the store and

17         walked in the store from the doors off whatever it

18         is the rubber on the thing when you step on the

19         door, what kind of floor did you immediately step

20         on?

21    A    Tile floor.

22    Q    Had you walked on that tile floor before?

23    A    Yes, sir.

24    Q    Did you ever wear hard-type shoes?

25    A    No, sir.
```

```
1   Q   Did you wear soft shoes?

2   A   Yes, sir.

3   Q   Would it make any sound?

4   A   No, sir.  Not the soft.

5   Q   Now, tell the ladies and gentlemen of the jury,

6       Ms. Prescott, do you know where she was working

7       just prior to you leaving and going up to the

8       front where Ms. Roach was when you got robbed?

9   A   She was in the back.

10  Q   Do you know where Reggie Hill was?

11  A   He was in the back.

12  Q   Now, tell the ladies and gentlemen of the jury,

13      was the Winn Dixie, did it have currency in the

14      safe, correct?

15  A   Yes, sir.

16  Q   Anything else?  What else would have been in the

17      safe?

18  A   Postage stamps.

19  Q   And how would the postage stamps, would they have

20      been the kind you lick?  Or little rolls?  How

21      were they?

22  A   They were straight in a bundle like.

23  Q   Let me show you a couple of exhibits, if I could.

24      Showing you State's Exhibit No. 9, State's Exhibit

25      No. 5 for identification purposes.  I refer to
```

```
 1              them as State's Exhibit 9 and State's Exhibit 5.

 2              Do you recognize those items, please?

 3    A    Yes, sir.

 4    Q    How do you recognize them?

 5    A    Our store number.

 6    Q    How do you know those belong to your store or they

 7              were ever in your store?

 8    A    The store stamp on it.

 9    Q    What number?

10    A    Four twenty-six.

11    Q    Is that on 5 or 9?

12    A    That's on 5 here.

13    Q    What is on 9?

14    A    9 is the same thing.

15    Q    5 is what?  Tell us what that is.

16    A    That's a food stamp.

17    Q    And 9 is what?

18    A    Wrap -- money wrap.

19    Q    Once again, help me with money wrap.  What do you

20              mean money wrap?  Tell the jury.  They didn't work

21              in the store.  What was it?

22    A    It's a thousand dollar money wrap.  This wraps the

23              dollar bills -- not the dollar bills, but the

24              twenty or the fifty dollar bills -- hundred dollar

25              bills.  It wraps the paper money.
```

```
 1    Q    And where when it was wrapped and put stamps
 2         around it, in other words, the wrapper and stamp
 3         with the store, tell the jury where it or the food
 4         stamps would have been kept when business was
 5         conducted at that day.  In other words, where was
 6         that kept?
 7    A    In the safe.
 8    Q    How many safes did you have in that Winn Dixie?
 9    A    Two.
10    Q    Who had combinations or access to the safe?
11    A    The managers.  Reggie and myself.
12    Q    Would Ms. Roach have had access to that safe?
13    A    No, sir.
14    Q    Can you tell the ladies and gentlemen of the jury,
15         did you know Ms. Roach's voice?  Had you heard it
16         before June 7th?
17    A    Yes, sir.
18    Q    Now, the store that you worked in that night, was
19         it in Dothan, Alabama, Houston County?
20    A    Dothan.
21    Q    Was it located in Dothan, Alabama, Houston County?
22    A    Yes, sir.
23    Q    The Winn Dixie itself, did Ruben Corey McNabb, the
24         man right over here at the table with the tie on,
25         did he work for you?
```

```
 1    A    No, sir.

 2    Q    Had you ever seen him in the store yourself?

 3    A    No, sir.

 4    Q    Now, can you tell the ladies and gentlemen of the

 5         jury, sometime around four o'clock a.m. on June 7

 6         of 2001, can you tell the ladies and gentlemen of

 7         the jury, did someone call you to go to any

 8         particular part of the store?

 9    A    Yes, sir.

10    Q    Whose voice?

11    A    Patsy Roach.

12    Q    Any doubt in your mind it was Patsy's?

13    A    It was Patsy Roach.

14    Q    And where were you in the store?  Tell the jury.

15    A    I was stocking aisle one.

16    Q    Now, help me.  If I walk in the doors the first

17         aisle, cash register aisle, all the way down,

18         there's many of them, correct?

19    A    Yes, sir.

20    Q    The aisle, would they be to the extreme left is

21         one or extreme right where the produce was?

22    A    Extreme right where the produce was.

23    Q    Aisle one, do they come across like two, three,

24         four, five, all the way down?  Many aisles?

25    A    Yes.
```

```
 1    Q    Has the store changed since then today?  Has it
 2         been re-arranged and things changed?
 3    A    A little bit.
 4    Q    What I want to ask you, when you came around the
 5         aisle or at some point in time, could you see
 6         where Ms. Roach was?
 7    A    Yes, sir.
 8    Q    What part of the store was she in?
 9    A    She was where the cigarettes was behind the
10         counter, service desk.
11    Q    As you walked towards the service desk and where
12         the cigarettes were, could you observe and see
13         what she was actually doing while she was walking
14         towards you?
15    A    She was stocking cigarettes.
16    Q    As you walked towards her, was her back to you?
17    A    Yes, sir.
18    Q    Could you see any other people up there at the
19         service desk or the counter?
20    A    Yes, sir.
21    Q    Man or woman?
22    A    Man.
23    Q    How many?
24    A    One.
25    Q    White male or black male?
```

```
 1    A    Black male.

 2    Q    See him in the courtroom?

 3    A    Yes, sir.

 4    Q    Point him out.

 5    A    (Witness complied.)

 6         MR. VALESKA:   Let the Record reflect he

 7         pointed out McNabb.

 8    Q    Would you tell the ladies and gentlemen of the

 9         jury, is that how he had his hair that day?

10    A    No, sir.

11    Q    Now, was he wearing a tie and coat today like he

12         was then?

13    A    No, sir.

14    Q    Now, when you got up there as you approached him,

15         did he say something to you?

16    A    Yes, sir.

17    Q    Tell the ladies and gentlemen of the jury what

18         McNabb said to you as you got close to the service

19         desk with Ms. Roach's back to you-all.

20    A    I asked him could I help him first.  And then he

21         said -- he didn't say anything.  And he said,

22         guess what, today is your lucky day.

23    Q    Now, tell the ladies and gentlemen of the jury,

24         was it daytime or nighttime?

25    A    Nighttime.
```

```
1    Q    Did that get your attention?

2    A    Yes, sir.

3    Q    What did he say or do next?

4    A    He said, he ordered Patsy out from around the

5         counter and said, don't do anything crazy.

6    Q    What did he --

7    A    He said, let's go to the office.

8    Q    Did he show you anything in his hands?

9    A    Yes, sir.

10   Q    What was it?

11   A    It was like a silver nine millimeter.  As a

12        matter of fact, it was automatic.

13   Q    Is there a difference between automatic and

14        revolver?  Can you help me?

15   A    Yes, sir, it's different.  Revolver is around --

16        it's got a round thing, and automatic you load

17        from the butt end up there.

18   Q    Tell the ladies and gentlemen of the jury, you

19        were six feet what?

20   A    Six.

21   Q    How many pounds again?

22   A    About two thirty or two forty.

23   Q    Ms. Roach, her size, was she bigger or smaller

24        than you?

25   A    Smaller.
```

```
 1    Q    Now, McNabb, do you have an opinion approximately
 2         how tall he was your best judgment?
 3    A    Probably about six foot.
 4    Q    What about his weight?  Skinny?  Medium?  Heavy?
 5         I don't want to stay fat, but use that
 6         distinction.
 7    A    Medium.
 8    Q    His skin complexion?  Light?  Medium?  Dark?
 9    A    Dark.
10    Q    Would you tell the ladies and gentlemen of the
11         jury, do you remember what type of clothing he was
12         wearing?
13    A    Yes, sir.  He had on like a toboggan-type cap with
14         a bib on it.
15    Q    What color?
16    A    Black.
17    Q    Show you if I could -- showing you State's Exhibit
18         2 for identification purposes.  Do you recognize
19         that?
20    A    Yes, sir.
21    Q    Who was wearing this cap, this toboggan?
22    A    The robber, Corey McNabb.
23    Q    Now, can you tell the ladies and gentlemen of the
24         jury, being six foot five, six six, six seven, two
25         hundred and something pounds, why didn't you grab
```

```
 1           the gun and fight him?
 2    A      Sir, I was frightened.
 3    Q      Had you ever been robbed before?
 4    A      No, sir.
 5    Q      Were any other employees you concerned about their
 6           safety besides yourself?
 7    A      Patsy Roach.
 8    Q      Would you tell the ladies and gentlemen of the
 9           jury, did you yell out for help?  Did you scream?
10    A      No, sir.
11    Q      Tell the jury why you didn't scream.
12    A      Because I was scared that he would shoot me.
13    Q      Now, the location from where you were with McNabb
14           and the gun and Ms. Roach, and I ask about the
15           entrance or exit doors customers going in and out
16           of the Winn Dixie, let's just say it was eight
17           o'clock in the morning or later, who would
18           normally come in and out that door?
19    A      Customers.
20    Q      Did you ever have any customers that you can
21           recall around four o'clock generally in the
22           morning?  Was that normal?
23    A      No, sir.  We didn't have any customers.
24    Q      Were you concerned about any customers also coming
25           through that door with McNabb with an armed gun
```

```
 1              and someone could walk in?

 2      A       Yes, sir.

 3      Q       Where did McNabb tell you to go?

 4      A       He told me to go to the office.

 5      Q       Now, tell the ladies and gentlemen of the jury, if

 6              you're standing there, you first walk in the

 7              store, you go to the right by the glass windows or

 8              you go to the counters, do you immediately know

 9              where the office is?  Can you immediately see the

10              office real easily?

11      A       Where the counter is?

12      Q       Yes, sir.

13      A       No, sir, you can't see it.

14      Q       When you went to the office, would you tell the

15              ladies and gentlemen of the jury, how many doors

16              are in that hallway?

17      A       Two doors.

18      Q       Who went first?  In other words, why don't you

19              tell the jury, as you got to the office door, who

20              was first in line to the door in relationship to

21              McNabb and the pistol?  What was the order of

22              people?

23      A       Well, I was first and Patsy behind me and he was

24              behind Patsy.

25      Q       Was there any way you could go out that hallway or
```

1          get assistance in any way or escape?

2     A    No, sir.

3     Q    Was there a phone inside the office?

4     A    Yes, sir.

5     Q    Tell the jury why you didn't pick up the phone and

6          call 911 right away.

7     A    Because he had a gun to me.

8     Q    The office door itself, what was the door made of

9          when you opened it?  What's it made of, that door?

10    A    It's a wood door.

11    Q    Solid wood?

12    A    Solid wood.

13    Q    Glass on it?

14    A    Yes, sir, there's glass on it.

15    Q    Who had the key to lock or unlock it?

16    A    I did.

17    Q    Did you unlock it to gain admittance?

18    A    Yes, sir.

19    Q    Who came into the office with you at that point in

20         time?

21    A    After me it was Patsy, and after Patsy then

22         McNabb.

23    Q    Did he continue to have the gun?

24    A    Yes, sir.

25    Q    Can you tell the ladies and gentlemen of the jury

```
 1            when you first got inside the office why you
 2            didn't pull the door shut and it would have locked
 3            and you could have called the police?  Why didn't
 4            you do that then?
 5    A       I was frightened, and I was looking for Patsy's
 6            safety, too.
 7    Q       The office, describe and tell the ladies and
 8            gentlemen of the jury, is the office as big as
 9            where you're sitting?  And I'm going to stand over
10            here and we go over to where -- is it that big or
11            smaller than that area?
12    A       Where --
13    Q       The jury box?
14    A       Yeah, it's about that size there.
15    Q       Now, there are other windows besides the door in
16            the office?
17    A       Yes, sir.
18    Q       If you go in the door right here, in other words,
19            this is the door and you step into the door and
20            you're looking this way, where is the safe?  To my
21            right or left?  Right or left?
22    A       To your right.
23    Q       And where are the windows inside the office
24            besides the door?  Right or left?
25    A       They be to your right.
```

1    Q    This way, correct?

2    A    Yes, sir.

3    Q    Now, you're inside with Ms. Roach.  McNabb, what

4         did he say about the safe?

5    A    He said -- he ordered me to open the safe up.

6         And --

7    Q    Did he describe or tell you as he told you to open

8         up -- the manner or the way that you were doing

9         it, faster, or quicker?

10   A    He said, do it quicker.  He said, hurry up and

11        open the safe.  And he didn't tell me once, he

12        told me twice.  He said if I don't open the safe,

13        he would bust me.

14   Q    Help me if you can.  The terminology, what is bust

15        me if you know?

16   A    He going to pop me, cap me, or shoot me.  Either

17        one.

18   Q    Would you tell the ladies and gentlemen of the

19        jury, were you looking at his face the whole

20        time?  In other words, look him straight in the

21        face?  Is that what you were doing?

22   A    No, sir.  I was trying to open the safe.

23   Q    Help me a little bit, Mr. Reeves.  You're six foot

24        seven -- six six, two hundred and something

25        pounds, tell me why you're not looking at Corey

```
1        McNabb straight in the face while he's got a gun
2        while this is going on?
3    A   Because I was frightened.  I was scared I would
4        get shot or Patsy get shot.
5    Q   His tone and his voice inflection, his demeanor,
6        was he talking like I'm talking or was he loud,
7        threatening?
8    A   He was loud and threatening.
9    Q   Did you get the safe open real easy real quickly
10       the first time?
11   A   No, sir.  It took me a while to open it.
12   Q   Tell the jury, you had opened that safe how many
13       times before, correct?
14   A   Yes, sir.
15   Q   You knew the combination?
16   A   Correct.
17   Q   Why was it difficult this time to get it open?
18   A   Because I had a gun to me and I was scared.
19   Q   Could you hear Patsy making any sounds or shortly
20       after that?
21   A   Yes, sir.  She was crying.
22   Q   Now, would you tell the ladies and gentlemen of
23       the jury, at that point in time, did you see any
24       other black males right then?
25   A   When I was opening the safe?
```

```
 1    Q    Yes, sir.  Right then did you see anybody?

 2    A    No, sir.

 3    Q    Did you hear the door close when you went in?  In

 4         other words, you went in and Patsy went in and

 5         McNabb went in.

 6    A    Yes.

 7    Q    Now, I want to ask you, did you have a watch on?

 8    A    No, sir.

 9    Q    Well, did you take out a pencil and paper and

10         write down his description?  Did you do that?

11    A    No, sir.

12    Q    Did you try to count to determine how many seconds

13         he was in there?  Did you do that?

14    A    No, sir.

15    Q    What was your mind focused on, tell this jury,

16         during this time?

17    A    I was afraid I would be shot.

18    Q    Would you tell the ladies and gentlemen of the

19         jury, the safe, after you opened the first safe,

20         what was inside the first safe?

21    A    It was coins.  Mostly coins and box coins and the

22         other one was -- it's in a tray.

23    Q    How many safes are there total?

24    A    Two.

25    Q    I want to ask you about after you opened the first
```

```
 1        safe.  Did McNabb say anything to you about
 2        opening up the second safe?
 3     A  Yes, sir.  He told me to open up the second one.
 4     Q  Tell the jury, where was most of the currency and
 5        the cash?  In the second safe or first safe?
 6     A  Second safe.
 7     Q  I asked you about the wrappers.  I believe it's
 8        State's Exhibit No. 9.  9 itself with the money
 9        wrapper and the stamps, was that where the
10        currency was with those kind of stamps?
11     A  Yes, sir.
12     Q  Could you tell the ladies and gentlemen of the
13        jury, any sounds being made as you were standing
14        there and after you opened the safe?  Both safes,
15        what sounds were you hearing?
16     A  Well, he ordered me to -- first of all, he ordered
17        me to get on my knees --
18     Q  Hold on.  Get on your knees?
19     A  Yes.
20     Q  Is the safe a real big area?  The room itself?
21     A  No, it's not that big.
22     Q  Why did you get down on your knees?  Tell the jury.
23     A  Because he ordered me to get on my knees.
24     Q  What did he have in his hand?
25     A  He had a gun pointed at me.
```

```
1    Q    Did you believe the gun was loaded?
2    A    Yes, sir.
3    Q    I don't mean to be personal, but I want to ask
4         you, your size, you being a man, why didn't you
5         try to take the gun away from him then?
6    A    Sir, I was frightened.  I was scared I would get
7         shot.  I was looking out for Patsy, too.
8    Q    In the area of the office if the gun went off if
9         it would have been fired, would there have been
10        anything it could have struck or hurt anybody else
11        if it went through and reflected or hit something?
12   A    It would of hit Patsy.
13   Q    Tell the ladies and gentlemen of the jury, did you
14        get down on your knees?
15   A    Yes, sir.
16   Q    Tell the jury what was going through your mind
17        right then when he told you to get down on your
18        knees.
19   A    What was going through my mind, I was afraid he
20        was going to shoot me in my head.
21   Q    Did he instruct Patsy to do anything at that time?
22   A    He told her to tie me up.
23   Q    I don't mean to be personal, have you ever been
24        tied up before when somebody had a gun on you?
25   A    No, sir.
```

```
1    Q    Did that cause you concern for your safety?

2    A    Yes, sir.

3    Q    And how were you tied up by Patsy with his

4         instructions?

5    A    I was on my knees, and I was tied with my hands

6         tied behind my back.

7    Q    So if I got up here on this table and I put my

8         knees down and feet behind me and put my hand

9         behind me, that's how it occurred, correct?

10   A    Yes, sir.

11   Q    During this time could you see McNabb's face the

12        whole time while she was tying you up?  Were you

13        watching his face?

14   A    No, sir.

15   Q    What were you tied up with?  Can you tell --

16   A    Speaker wire.

17   Q    If it was behind you, how can you see or know what

18        you were being tied up with?

19   A    It was speaker wire.

20   Q    Did the office of Winn Dixie have speaker wire in

21        it?

22   A    No, sir.

23   Q    Did you have a tie on that night?

24   A    Yes, sir.

25   Q    Any other ties inside the office itself that night
```

```
 1            when you went in with McNabb with the gun on you
 2            and Ms. Roach?
 3       A    Yes, sir.
 4       Q    Where was the other tie located?
 5       A    It was hanging on the wall.
 6       Q    Now, when you were down, if I could use the jury
 7            box, use this corner you see where it's indented
 8            over there, is that about the width in that
 9            corner?
10       A    Yes, sir.
11       Q    And if I could just kind of use this wall, if this
12            was the extreme wall and you're in this corner and
13            I walk away, it much wider or longer than this?
14       A    That's about --
15       Q    About this area?
16       A    Yes, sir.
17       Q    Is it fair to say if I use as one wall, you tell
18            me when to stop as I slide this way so the jury
19            will know how wide this little indention is.
20       A    About right there.
21       Q    Somewhere in here?
22       A    Yes, sir.
23       Q    Anything against the wall here on the sides as
24            you're put up in that area, what items of
25            furniture or files --
```

| | | |
|---|---|---|
| 1 | A | It's a desk and a filing cabinet there. |
| 2 | Q | So you're in this location in the corner up like |
| 3 | | this down on your knees? |
| 4 | A | Yes. |
| 5 | Q | What happened to Patsy? |
| 6 | A | Patsy was then -- after I was tied up, he take the |
| 7 | | neck tie down from the thing -- |
| 8 | Q | The neck tie, when it was jerked down, how were |
| 9 | | you in a position to see that if he was behind |
| 10 | | you?  Tell us where the neck tie was. |
| 11 | A | It was on the wall. |
| 12 | Q | And my example was if this was the end of the wall |
| 13 | | and you're facing this way down, where was the |
| 14 | | neck tie? |
| 15 | A | It was on the wall right there (indicating). |
| 16 | Q | Now, so what happened to Patsy and the neck tie, |
| 17 | | if you know? |
| 18 | A | He jerked it down and tied her up with it. |
| 19 | Q | And what position did she get in if you know |
| 20 | | because you were facing straight ahead? |
| 21 | A | She was right behind me in the same position I was |
| 22 | | in. |
| 23 | Q | If you rocked or moved and I know you're kind of |
| 24 | | tall but leaned way back, do you think in that |
| 25 | | location you could have touched Patsy? |

```
 1    A    Yes, sir.

 2    Q    Or bumped her?

 3    A    Yes, sir.

 4    Q    What sounds was she making?

 5    A    She was crying.  She was really scared.

 6    Q    Do you remember what language they were saying to

 7         her or how they described her or what words of

 8         profanity or slang terms they used towards her?

 9    A    Yes, sir.

10    Q    What did they say?

11    A    That's right, bitch, I'm still here, at the door

12         here.

13    Q    You were first, Patsy was second, and the

14         demonstration you've shown us.  Did you yourself

15         ever see another black male?

16    A    Yes, sir.

17    Q    Tell the ladies and gentlemen of the jury when you

18         saw or knew there was another black male besides

19         McNabb there.

20    A    When -- like I said, after I had opened the safe

21         and they was ordering me to come in, he then

22         opened the door.

23    Q    Who opened the door?

24    A    Mr. McNabb opened the door.

25    Q    And then who came in?
```

1    A    Let the other guy come in.

2    Q    White male or black male?

3    A    Black male.

4    Q    Was he hearing anything that you recall?

5    A    Yes, sir.

6    Q    He have a hat on?

7    A    He had a toboggan.

8    Q    This is June 7th.  Did you wear a hat or cap or

9         toboggan to work that day?

10   A    No, sir.

11   Q    Now, the other black male, could you tell if he

12        was taller or shorter if you could?

13   A    He was shorter.

14   Q    And his skin complexion, light, medium, or dark

15        compared to McNabb?  Can you tell us?

16   A    A little lighter than McNabb.

17   Q    Tell us about his physical size.  I'm asking about

18        height, in other words, six feet.  Was he tall?

19        About the same?  Smaller?  What you could tell.

20   A    About the same height.

21   Q    What about his body weight?  In other words, I use

22        light, medium, heavy.

23   A    He was a little bit heavier than McNabb.

24   Q    And you heard his voice?

25   A    Yes, sir.

```
1    Q    And you heard McNabb's voice?
2    A    Yes, sir.
3    Q    Now, could you tell the ladies and gentlemen of
4         the jury, when the door shuts to the office, does
5         it make a sound when it catches?
6    A    Yes, sir.
7    Q    Now, let me show you these exhibits.  I wanted to
8         ask you if I could -- first of all, the boxes with
9         the money, the coin money, would you stamp them
10        Winn Dixie or put your store stamp on those?
11   A    No, sir.
12   Q    Why not?
13   A    Because they just come straight from the bank.  We
14        wouldn't stamp them.
15   Q    Let me show you these two exhibits if I could.
16        State's Exhibit No. 3.  Just let you hold it.
17        What was it?
18   A    It's pennies.
19   Q    You can set it right there.
20   A    (Witness complied.)
21   Q    Do you know how many pennies?
22   A    Twenty-five dollars.
23   Q    Let me ask you, State's Exhibit 3, is that the
24        kind of box or pennies you kept in the safe that
25        night on June 7th?
```

```
1              MR. BAXLEY:  Your Honor, I object.  There's
2         no distinctive characteristics on that box.
3              THE COURT:  He said was the kind.
4              MR. VALESKA:  The kind or similar.
5              THE COURT:  I overrule you.
6    Q    Now, if I could, let me show you State's Exhibit
7         No. 6 for identification purposes.  I realize it's
8         in a plastic bag now with State's 6.  But I asked
9         you about books of stamps or how stamps were kept
10        in the Winn Dixie that night for customers.  Were
11        they kept in that plastic bag in the -- is that
12        how they were kept?
13   A    No, sir.
14   Q    How were they kept?
15   A    They were kept without -- in a bag.  They were
16        just -- they were kept in a book like.  It was
17        stacked up in the safe.
18   Q    Loose?  Is that a fair term?
19   A    Yes, sir.
20   Q    I asked you about the stamps whether it was a
21        roll, lick-on kind, and then you said they were
22        stick-em type, correct?
23   A    Stick-em.
24   Q    Looking at those stamps, which is State's Exhibit
25        No. 9, is that the size or the approximate type of
```

```
 1              stamps, the self-address stamps?  State's Exhibit
 2              6.  I'm sorry.  I said 9.  6.  Would you tell the
 3              ladies and gentlemen of the jury, is that the type
 4              of stamps, in other words, flower stamps you kept
 5              on June 7th?
 6      A       Yes, sir.
 7      Q       In the safe that you know and seen them earlier
 8              that night?
 9      A       Yes.
10      Q       Now, did you give McNabb permission to take any
11              metal money, boxes, pennies, coins, currency,
12              stamps, or checks in any manner or fashion out of
13              the Winn Dixie?
14      A       No, sir.
15      Q       Now, tell the ladies and gentlemen of the jury,
16              the other man, did he have a gun?  Do you recall?
17      A       Yes, sir.
18      Q       Do you remember what it looked like, if you can?
19      A       It was about like a -- it was three eighty.  It
20              was black.
21      Q       Darker?
22      A       Darker, yes, sir.
23      Q       Do you know much about three eighties or nine
24              millimeters?
25      A       Yes.
```

```
1    Q    Ever fired them?

2    A    Yes.

3    Q    Ever put bullets in them?

4    A    Yes.

5    Q    Can you put three eighty bullets in a nine

6         millimeter?

7    A    Yes, sir.

8    Q    Can you put nine millimeter bullets in a three

9         eighty pistol?

10   A    Yes, sir.

11   Q    Can you tell the ladies and gentlemen of the jury,

12        the office itself, what was being dropped on the

13        floor?

14   A    It was tills that was already made up for the next

15        morning and for them to open up and it was --

16        still already made up.  Tills, or registers.

17   Q    What color are the tills?

18   A    Black.

19   Q    What are they made of?  Are they made of wood?

20   A    Steel.

21             (State's Exhibits No. 15 through 24 were

22              marked for identification.)

23   Q    Can you tell the ladies and gentlemen of the jury

24        how many times you heard that door open or close

25        from the first time you went in -- the office door
```

54

```
 1        is what I'm talking about -- while McNabb was

 2        there and the other gun man?  Your best

 3        recollection how many times the door opened or

 4        closed.

 5   A    That time and other time.

 6   Q    You went in the first time?

 7   A    Yes, sir.

 8   Q    Closed?

 9   A    Yes, sir.

10   Q    Then it opened?

11   A    Yes, sir.

12   Q    Who came in?

13   A    The other.

14   Q    That's the second time?

15   A    Yes, sir.

16   Q    And did they leave the office with you and Ms.

17        Roach inside?

18   A    Yes, sir.

19   Q    So that's how many times?

20   A    That's three times.

21   Q    Now, after the third time, the minute the door

22        shut the third time or just before it shut, did

23        you hear any conversation from the second black

24        male that you described that had the black gun

25        make any comments towards Ms. Roach?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | What did he say? |
| 3 | A | That's right, bitch, I'm still here. |
| 4 | Q | Could you see the position of the door if anybody |
| 5 | | was standing in the door because of the location |
| 6 | | you were in? |
| 7 | A | No, sir. |
| 8 | Q | Ms. Roach being behind you, once again, you got up |
| 9 | | and moved where she was still in that position a |
| 10 | | little bit later? |
| 11 | A | Yes, sir. |
| 12 | Q | And when you got up and moved while she was still |
| 13 | | in the position kneeled down from that location |
| 14 | | stepping over here, could you see the door that |
| 15 | | you go in and out with the glass door? |
| 16 | A | No, sir. |
| 17 | Q | You got around the little edge, could you see it? |
| 18 | A | Yes. |
| 19 | Q | Now, tell the ladies and gentlemen of the jury, |
| 20 | | you were tied up, Ms. Roach was tied up, how long |
| 21 | | can you tell the panel from the time you first saw |
| 22 | | McNabb until you left the office yourself with Ms. |
| 23 | | Roach still inside, how many seconds, minutes did |
| 24 | | it last? |
| 25 | A | It seemed like a long time, sir.  About -- I say |

```
 1            at least --
 2    Q    Short time or long time?
 3    A    Long time.
 4    Q    Now, would you tell the ladies and gentlemen of
 5            the jury, during that time from the time you first
 6            walked up and saw McNabb, had the conversation
 7            with him, until you left, he left, and you go out
 8            the door, approximately how much of that time can
 9            you tell the jury did you see his face?  Some?
10            Part?  None?  Or all?
11    A    I didn't see it at all after he tied me up.
12    Q    After you were tied up, then, at that point in
13            time, you couldn't really see his face?
14    A    No, sir.
15    Q    Now, if I could, when Ms. Roach was behind you and
16            the comment was made to her -- and I won't ask it
17            again, you told us what was said -- did you
18            immediately try to jump up and get away then?
19    A    No, sir.
20    Q    Why not?
21    A    I was afraid.
22    Q    What were you afraid of?
23    A    I was afraid he would hurt both of us.
24    Q    When you were kneeling down in that position
25            looking straight ahead, did you know for sure they
```

| | | |
|---|---|---|
| 1 | | were inside the store, outside the store, still |
| 2 | | looking in the window, or outside? |
| 3 | A | I never -- no, sir. |
| 4 | Q | Could you hear any cars when you were inside the |
| 5 | | office coming or going outside? |
| 6 | A | No, sir. |
| 7 | Q | At some point in time did you get up? |
| 8 | A | Yes, sir, I did. |
| 9 | Q | Where was Ms. Roach? |
| 10 | A | She was still on her knees. |
| 11 | Q | And how did you get by her? |
| 12 | A | I just sort of, like, crossed over her. |
| 13 | Q | And when you got up and crossed over her, you |
| 14 | | could see the door to the office with the glass, |
| 15 | | correct? |
| 16 | A | Yes, sir. |
| 17 | Q | Did you see McNabb or the other robber? |
| 18 | A | No, sir. |
| 19 | Q | Did you call 911 right then? |
| 20 | A | No, sir, I didn't. |
| 21 | Q | There's a phone in there, right? |
| 22 | A | Yes, sir. |
| 23 | Q | Tell the jury why you didn't call right away. |
| 24 | A | Because I was afraid, and, like I said, I didn't |
| 25 | | know if they were still in the store or not.  So I |

```
 1            just told her to stay right there until I go check
 2            the store out.
 3      Q     Were there other employees that you knew still
 4            working out there?
 5      A     Yes, sir.
 6      Q     Other men?
 7      A     Yes, sir.
 8      Q     Other women?
 9      A     Yes, sir.
10      Q     Now, as you came out the office door, immediately
11            come out the door and take a left --
12      A     Yes, sir.
13      Q     -- go towards the end, what's immediately to the
14            right?
15      A     The door you enter.
16      Q     Did you peek around the corner to see if anybody
17            was there then?
18      A     Yes, sir.
19      Q     Did you see anybody there then?
20      A     No, sir.
21      Q     Could you see completely around all the corners to
22            see if there was nobody out in the parking lot or
23            standing there?
24      A     No, sir, I couldn't see.
25      Q     The comment had already been made by the other
```

| | | |
|---|---|---|
| 1 | | black male, not McNabb, about still being there |
| 2 | | with Ms. Roach, correct? |
| 3 | A | Yes, sir. |
| 4 | Q | Where did you go?  Tell us. |
| 5 | A | I kept looking around.  Then I went down the aisle |
| 6 | | and I -- I eventually made myself to the back and |
| 7 | | I told Reggie, I said, guess what, man, we been |
| 8 | | robbed. |
| 9 | Q | And you were tied up you told us.  What happened |
| 10 | | to the wire? |
| 11 | A | I showed -- after I was taking off, I showed him |
| 12 | | the speaker wire right there. |
| 13 | Q | Where did you and Reggie go next? |
| 14 | A | He said, come on -- let's go check on Patsy. |
| 15 | Q | Now, Ms. Prescott, the other female that was |
| 16 | | working, did she go up front when you-all went |
| 17 | | right then?  Did she go with you? |
| 18 | A | I don't think she did. |
| 19 | Q | Why didn't you take her up there; in other words, |
| 20 | | so there would be three of you to look to see if |
| 21 | | you could see anybody?  Why did you leave her |
| 22 | | there? |
| 23 | A | I was taking Reggie because he's the other |
| 24 | | manager. |
| 25 | Q | Now, and as you walked and went back up to the |

```
 1              front, describe how you did that.  I mean, did you
 2              just walk like this or did you -- you look for
 3              somebody?
 4      A       I was still looking.
 5      Q       Looking for who?
 6      A       Mr. McNabb and the robber and the other guy.
 7      Q       How as you got to the front of the aisles and then
 8              went to the front of the store -- did you get back
 9              to the office?
10      A       Yes, sir.
11      Q       Did you go to where Patsy was?
12      A       Yes, sir.
13      Q       Did you untie her?
14      A       Yes, sir, I sure did.
15      Q       Did you then call 911?
16      A       Yes, sir.
17      Q       Tell the ladies and gentlemen of the jury, you
18              heard before, I'll phrase it this way, the
19              deposition under oath where the tape was played,
20              correct?
21      A       Yes, sir.
22      Q       My question to you is you heard the 911 operator,
23              is this a long conversation, two or three minutes,
24              or was it real short?  The conversation you heard
25              with her.
```

```
 1    A    Real short.
 2    Q    Now, did you -- did she ask you about the
 3         robbery --
 4    A    Yes, sir.
 5    Q    White males or Black males?  Or if you could
 6         identify what race they were?
 7    A    I told them I didn't know.
 8    Q    Look at the jury and tell them, you got robbed by
 9         white males or black males?
10    A    Black male.
11    Q    Why couldn't you tell the 911 operator shortly
12         after the robbery within a minute or two they were
13         white or black?
14    A    Because I was afraid.
15    Q    Now, let me -- let me go forward since then today,
16         this is now 2004, February 9 -- 10, have you still
17         had thoughts or concerns for your safety since the
18         robbery?
19    A    Yes, sir.
20    Q    Has it effected you in any way having a gun put on
21         you?
22    A    Yes, sir.
23    Q    Are you still concerned about it today?
24    A    Yes, sir.
25    Q    Now, did you see the police officers when they
```

| | | |
|---|---|---|
| 1 | | came to the Winn Dixie? |
| 2 | A | Yes, sir. |
| 3 | Q | Did you talk to them as to what had occurred and |
| 4 | | what happened? |
| 5 | A | Yes, sir. |
| 6 | Q | So you described for the police officers the best |
| 7 | | you could recall what happened, correct? |
| 8 | A | Yes. |
| 9 | Q | Tell the jury, robbed that night and the police |
| 10 | | officers talking to you, did you go down and talk |
| 11 | | to the police at a later point in time? |
| 12 | A | Yes, sir. |
| 13 | Q | Was your memory better today or back then? |
| 14 | A | When I got robbed? |
| 15 | Q | Huh? |
| 16 | A | Today. |
| 17 | Q | Could you tell the ladies and gentlemen of the |
| 18 | | jury, do you remember everything that happened |
| 19 | | during the robbery a hundred percent? |
| 20 | A | Yes, sir. |
| 21 | Q | During the robbery do you know what kind of shoes |
| 22 | | the robbers were wearing?  Do you remember? |
| 23 | A | Yes, sir. |
| 24 | Q | What were they? |
| 25 | A | They were sneaker-type shoes. |

```
 1    Q    Sneaker.  If I use the term tennis, is that the
 2         same type thing?
 3    A    Yes, sir.
 4    Q    Soft shoe versus a hard shoe?
 5    A    Yes, sir.
 6    Q    Now, could anybody, anybody come off the street
 7         and go into your safe and get the food stamps or
 8         get those money rolls from the general public walk
 9         in and get those?
10    A    No, sir.
11    Q    How much money in your best estimation, cash, was
12         taken -- United States currency from McNabb and
13         the other man?  Your best judgment?
14    A    Probably around about twenty -- about twenty
15         thousand I say.
16    Q    Checks also taken?
17    A    Yes, sir.
18    Q    Working as a manager, did you ever get or any
19         checks ever brought back and produced from
20         customers who had bought food items, did they ever
21         turn up in any way or cashed or returned to your
22         store?  They weren't, were they?
23    A    No, sir.
24    Q    State's Exhibit 15, do you recognize 15?
25    A    Yes, sir.
```

| | | |
|---|---|---|
| 1 | Q | What is 15? |
| 2 | A | Out in front of our store. |
| 3 | Q | Is that the way it looked shortly after the |
| 4 | | robbery? |
| 5 | A | Yes, sir. |
| 6 | Q | Same substantial condition? |
| 7 | A | Yes, sir. |
| 8 | Q | Not marked in any way? |
| 9 | A | No. |
| 10 | | MR. VALESKA:  Offer 15. |
| 11 | | MR. BAXLEY:  No objection. |
| 12 | | THE COURT:  Let it be admitted. |
| 13 | | (State's Exhibit No. 15 was admitted |
| 14 | | into evidence.) |
| 15 | Q | Show you State's 16 for identification purposes. |
| 16 | | What is 16?  What part of the store? |
| 17 | A | The office. |
| 18 | Q | I asked you about what items thrown on the floor |
| 19 | | by McNabb or the other robber.  Do you recognize |
| 20 | | those? |
| 21 | A | Yes, sir. |
| 22 | Q | What are they? |
| 23 | A | Registers. |
| 24 | Q | If I use the terms tills, what's a till? |
| 25 | A | It's a till that we get ready for the cashier -- |

```
 1           morning cashier.
 2     Q     I ask about what you put money in, not box money
 3           -- not loose quarters or rolled quarters, do you
 4           recognize anything in those?
 5     A     Yes, sir.  The trays.
 6     Q     The trays I'm pointing to?
 7     A     Yes, sir.
 8     Q     Is that the position of the items when you first
 9           went in the store with McNabb?  Is that how it
10           looked?
11     A     No, sir.
12     Q     After you got up from the corner and went out with
13           Ms. Patsy still there, you went out, is that the
14           position you saw those items?
15     A     Yes, sir.
16     Q     What about the items to the left I'm pointing to?
17           What are those?
18     A     You put -- cash money in the envelopes there.
19     Q     Is that the way when you got up from the corner it
20           looked before the police came?
21     A     Yes.
22     Q     Does it appear to be marked, altered, or changed
23           in any way from the time you left until the police
24           got there?
25     A     No, sir.
```

```
 1    Q    Exactly the way it looked?
 2    A    Yes, sir.
 3              MR. VALESKA:  Offer State's 16.
 4              THE COURT:  Let it be admitted.
 5                  (State's Exhibit No. 16 was admitted
 6                  into evidence.)
 7    Q    Let me show you State's 17 for identification
 8         purposes.  What is 17?
 9    A    That's the front of the safe.
10    Q    I apologize.  I should step back so you can speak
11         loud.  Which safe?  There were two safes.
12    A    That was the first safe right there.
13    Q    Is that the way it looked after the robbery?  Is
14         that how it looked?
15    A    No, sir.
16    Q    Is that how it looked before the robbery?
17    A    Before the robbery.
18    Q    Does it truly and accurately depict the safe, the
19         location, the telephone, you come in to the right,
20         in other words, from the outside in the office
21         door, the position it was in?
22    A    Yes, sir.
23    Q    Is the safe open or closed in that picture?
24    A    It's closed.
25    Q    Besides that, in other words, it was not closed
```

```
 1            after McNabb and the other robber got the items

 2            out, correct?

 3     A      Yes, sir.

 4     Q      So it is different, but it's just shut, correct?

 5     A      Yes, sir.

 6     Q      Besides that, same condition?

 7     A      Yes, sir.

 8     Q      Same location?

 9     A      Yes, sir.

10     Q      Same position that night?

11     A      Yes, sir.

12                  MR. VALESKA:  Offer 17, Judge White.

13                  MR. BAXLEY:  No objection.

14                  THE COURT:  Let it be admitted.

15                       (State's Exhibit No. 17 was admitted

16                       into evidence.)

17     Q      Let me show you State's Exhibit 22.  What is 22?

18     A      Front of the safe.

19     Q      Does it show a different position than 17?

20            Different size or view of it?

21     A      Yes, sir.

22     Q      On 22, what does it show to open it?

23     A      It shows a handle.

24     Q      And the combination?

25     A      Yes, sir.
```

```
 1   Q   Is that the way it looked on that location?
 2   A   Yes, sir.
 3   Q   Appear to be marked, altered, changed in any way
 4       that you can tell?
 5   A   No, sir.
 6   Q   I want to ask you, in the office itself, you been
 7       in that office many times, right?
 8   A   Yes, sir.
 9   Q   Is there a clock in the office?
10   A   Yes, sir.
11   Q   Now, do you remember when the robbery your best
12       recollection started -- happened?  Your best
13       opinion?  Around what time?
14   A   About around four o'clock.
15   Q   I'm not going to go through the whole robbery
16       again, but I want to go through all that, the time
17       period, the police coming and them talking to you
18       and the police coming in and talking to other
19       witnesses, and I asked you about the condition of
20       the store -- the office itself, the trays, the
21       condition of the safe, the pictures, was it open
22       or closed?
23   A   It was closed.
24   Q   So the entire time I want to ask you about, the
25       picture itself, looking at picture No. 22, was the
```

```
 1            safe open or closed?

 2   A    Closed.

 3   Q    Did you close it for any reason after the police

 4        were there?

 5   A    No, sir.

 6   Q    Was it closed?  It was closed in the picture?

 7   A    Yes, sir.

 8   Q    Does it show the clock on the wall as to what time

 9        this picture was made?

10   A    Yes, sir.

11   Q    Four-thirty?

12   A    Yes, sir.

13            MR. VALESKA:  Offer State's 22.

14            MR. BAXLEY:  No objection, Your Honor.

15            THE COURT:  Let that be admitted.

16                (State's Exhibit No. 22 was admitted

17                 into evidence.)

18   Q    Showing you State's 21 and 24 together.  What's 21?

19   A    21 is the front of the store.  Well, it's the

20        doors you go to enter the store.

21   Q    I asked about the doors.  Is that the way it look,

22        the automatic doors?

23   A    Yes, sir.

24   Q    After the robbery?

25   A    Yes, sir.
```

1   Q   Are they closed or open?

2   A   Closed.

3   Q   Same substantial condition, though, correct?

4   A   Yes, sir.

5           MR. VALESKA:  Offer 21 into evidence, Judge

6       White.

7           MR. BAXLEY:  No objection.

8           THE COURT:  Let that be admitted.

9               (State's Exhibit No. 21 was admitted

10              into evidence.)

11  Q   Showing you State's 22 as you started down the

12      hallway, how many doors were down there?

13  A   There's three.

14  Q   Which was the first door to what part of the

15      store?

16  A   Office.

17  Q   What's next?

18  A   That's the door to the till room.

19  Q   Till room, who uses the till room?

20  A   Cashiers.

21  Q   What's the next door at the end of the hallway?

22  A   A storage room there -- storage area.

23  Q   In that picture, any other doors in that hallway?

24  A   That's it.

25  Q   Does it show the approximate length even though

```
 1           it's not the best view the size of that from the
 2           corner where the service counter and cigarettes
 3           are -- I'll withdraw that.
 4                Does it show the length of the hallway?
 5     A     Yes, sir.
 6     Q     Does it show the glass and the wood on the office
 7           door?
 8     A     Yes, sir.
 9     Q     Is that the way it looked after the robbery?
10     A     Yes, sir.
11              MR. VALESKA:  Offer 24.
12              MR. BAXLEY:  No objection, Your Honor.
13              THE COURT:  Let it be admitted.
14                  (State's Exhibit No. 24 was admitted
15                   into evidence.)
16     Q     State's 23 -- 16 is already admitted -- but 23,
17           does it show a different view in relationship to
18           the width or the depth of the office, in other
19           words, from the picture at the end of the office
20           as you walk in to the left or right?  Does it show
21           how wide or short it is on 23?
22     A     Yes, sir.
23     Q     Does it show the safe?
24     A     Yes.
25     Q     Any chairs?
```

```
 1    A    Yes, sir.

 2    Q    The chairs, which part of the store were the

 3         chairs in the picture in relationship to where you

 4         or Ms. Roach was put down and tied up with your

 5         hands by you?  By the chair or to the right or to

 6         the left?

 7    A    To the right of the chair.

 8              MR. VALESKA:  Offer State's 23.

 9              MR. BAXLEY:  No objection, Your Honor.

10              THE COURT:  Let it be admitted.

11                 (State's Exhibit No. 23 was admitted

12                  into evidence.)

13    Q    18, 19, and 20, do you yourself know what those

14         are?

15    A    Yes, sir.

16    Q    I ask you on 16 and 23 about some tills or metal

17         trays.  You described them.  You said that they

18         were metal, correct?

19    A    Yes.

20    Q    Did you say steel or metal?

21    A    Steel.

22    Q    What I want to ask you about, 18, 19, 20, do you

23         recognize what part of the store they were in?

24    A    Yes, sir.

25    Q    What are they in?
```

```
1    A    Office.

2    Q    What items are those in 18, 19, and 20?

3    A    The top of the till.

4    Q    The tills that were pulled to the floor when you

5         stepped over them -- excuse me, before that night,

6         before the robbery that night, had you seen any

7         tills that you checked when you opened the safe

8         that had any type of impressions like those did?

9    A    No, sir.

10   Q    Had you ever seen tills with impressions on them

11        and some kind of foot prints all during the time

12        you worked there?

13   A    No, sir.

14             MR. VALESKA:  Offer 18, 19, and 20.

15             MR. BAXLEY:  No objection.

16             THE COURT:  Let those be admitted.

17                 (State's Exhibits No. 18, 19, and 20

18                  were admitted into evidence.)

19   Q    I showed you the clock and it showed four-thirty,

20        right?

21   A    Yes, sir.

22   Q    And the robbery happened at four, correct?

23   A    Yes, sir.

24   Q    So you did talk with officers, they did interview

25        other people after they arrived on the scene,
```

```
 1              correct?
 2    A     Yes.
 3    Q     When you called the 911 until the police officers
 4              arrived, were they there in five or ten seconds or
 5              was it longer than that?
 6    A     Probably about five or ten seconds.
 7    Q     Five or ten seconds they got there, or minutes?
 8    A     It was minutes.  About five or ten minutes.
 9    Q     What I want to ask you about, do you know, if you
10              remember, the best you can, had you talked to the
11              police after you talked to the 911 operator, that
12              911 operator that night?  Did you talk to the
13              police that night?
14    A     Yes, sir.
15    Q     Would it have been around four-thirty or after
16              four-thirty, if you recall?
17    A     Probably around about -- a little bit after
18              four-thirty.
19    Q     Any doubt in your mind -- this is my last question
20              -- the man at the table with Mr. Baxley, McNabb,
21              the man you identified, it is the man that had the
22              gun on you that made the threats that you've
23              identified?
24    A     No doubt about it.
25              MR. VALESKA:  Pass the witness.  That's all I
```

1     have.

2          THE COURT:  Mr. Baxley.

3                    CROSS EXAMINATION

4     BY MR. BAXLEY:

5     Q    Mr. Reeves, where were you or what were you doing

6          when Ms. Roach contacted you or paged you at the

7          store?

8     A    I was stocking shelves.

9     Q    Shocking shelves?

10    A    Yes.

11    Q    Approximately where in the store were you located?

12    A    I was probably in the -- probably, like, in the

13         back part.  It was -- it's a side view of the

14         store there.

15    Q    Hold on one second.  I'm going to show you

16         something here.  This is a big schematic of the

17         Winn Dixie.  Does that accurately depict what the

18         Winn Dixie looks like for the most part?

19    A    Talking about the inside --

20    Q    No.  Just itself.  I'm going to show you something

21         on the inside in a moment.

22    A    Yes.

23    Q    Where would you say -- we'll show the jury in a

24         moment.  Where would you say the entrance is

25         located and the office is located?

1    A    It's kind of hard for me to tell you what that is

2         there.  Probably be --

3    Q    You said there's, like, a Subway here or something

4         else?

5    A    Yes.

6    Q    Where about would your store start in relationship

7         to everything else?

8    A    Start right there.  In that area there.

9    Q    Where would your entryway be?

10   A    Probably right --

11   Q    You mark it for me on there.

12   A    (Witness complied.)

13            Right here.

14   Q    That is the entryway?

15   A    Yes.

16   Q    Where is the office in relation to that, now?

17   A    It would be -- as you go in the store, it would be

18        right in this area (indicating).  It's turning

19        there.

20   Q    The entryway is here and office is about here.

21            MR. VALESKA:  Judge, I guess for purposes --

22        I have an objection.  If we're publicizing to the

23        jury, I would like with an agreement that's not to

24        scale before he publishes it.

25            MR. BAXLEY:  I'm not arguing it's scale.

```
1            Just trying to get an approximation here.
2                 THE COURT:  Maybe let him write entry and
3            office.  Or either you write it for him.
4       Q    E is entry and O is office.  Where were you in the
5            store in relation to everything when you were
6            paged stocking shelves?
7       A    This is the entrance right here.  You go about
8            right here, and it was about -- close to the back
9            about this area here.  Well, you might say side
10           rather.  Because the back would be back that way.
11      Q    Put a mark, more or less, where you were in there
12           stocking shelves.
13      A    (Witness complied.)
14               Probably about right here.
15      Q    Put an S in the middle of that.
16      A    (Witness complied.)
17      Q    About how long did it take you to get up front?
18      A    Sir, probably about four -- about four seconds I
19           would say.
20      Q    Four seconds.
21               Was anyone with you stocking at that time?
22      A    No, sir.  Nobody stocking.
23      Q    Just by yourself?
24      A    Yes, sir.  When they called me to the front.
25      Q    Where was Reggie Hill at that time?
```

```
 1    A    Reggie?  When I was called to the front, Reggie
 2         was in the back.
 3    Q    Do you know where in the back he was?
 4    A    He was back there with Ms. Prescott.
 5    Q    With Ms. Prescott.
 6              Had you seen Ms. Prescott before she got
 7         there?  I mean, at the time she arrived at the
 8         store.
 9    A    No, sir.  I sure hadn't.
10    Q    Had you seen Ms. Prescott at all that night prior
11         to the robbery?
12    A    No, sir.
13    Q    You had not seen Ms. Prescott at all?
14    A    No, sir.
15    Q    How did you know she was there?
16    A    I hear her voice when she paged Reggie to the
17         back.  On the intercom.
18    Q    I'm going to play a tape for you and give you a
19         transcript of the 911 tape.
20              MR. BAXLEY:  You got this, don't you, Doug?
21              MR. VALESKA:  Yes, sir.
22    Q    I want you to tell me if this is the 911 tape you
23         made on the night of the --
24              MR. BAXLEY:  Your Honor, can I put this up to
25         the microphone?
```

```
 1              THE COURT:  Sure.
 2                   (At which time the 911 tape was
 3                   played.)
 4    Q    And that's the 911 tape that you made; is that
 5         correct?
 6    A    Yes, sir.
 7    Q    And does that transcript you have in front of you
 8         accurately depict the words that were said in that
 9         911 conversation?
10              MR. VALESKA:  I'll stipulate that's his voice
11         on the tape, Judge White.
12              THE COURT:  I think he's --
13    A    Yes, sir.
14    Q    On that 911 tape you did claim that you could not
15         tell the race of the individuals who robbed the
16         store; is that correct?
17    A    Yes, sir.
18    Q    And you claimed earlier it was because you were
19         upset?
20    A    Yes, sir.
21    Q    But also on that tape you say you think it was the
22         same guy that did it last time?
23    A    Uh-huh.
24    Q    So you're telling this jury that you didn't know
25         the race, but you did know it was the same guy
```

| | | |
|---|---|---|
| 1 | | that did it the last time? |
| 2 | | MR. VALESKA:  I object.  I object to the form |
| 3 | | of the question. |
| 4 | | MR. BAXLEY:  Your Honor, this is cross. |
| 5 | | THE COURT:  You did say that it's -- you |
| 6 | | thought it was the same guy that did it the last |
| 7 | | time? |
| 8 | | THE WITNESS:  Yes, sir. |
| 9 | | THE COURT:  Go ahead.  If you want to restate |
| 10 | | your question.  I overrule the objection. |
| 11 | Q | In your 911 conversation, did you tell the 911 |
| 12 | | operator that you thought the robber who had just |
| 13 | | robbed the store was the same guy that robbed the |
| 14 | | store the last time? |
| 15 | A | Yes, sir. |
| 16 | Q | And what do you mean by the last time? |
| 17 | A | What I mean by the last time that -- the reason I |
| 18 | | said that because he know too much about the |
| 19 | | office. |
| 20 | Q | He knew too much about the office? |
| 21 | A | He knew too much about the office. |
| 22 | Q | And were you robbed the last time the Winn Dixie |
| 23 | | robbed? |
| 24 | A | Yes, I was robbed the last time it was robbed. |
| 25 | Q | So you were actually present for that robbery? |

```
1    A    The last time it was robbed?

2    Q    Yes.

3    A    On June 7th.

4    Q    This is the second robbery you been involved with?

5    A    No, this is the first -- you said the last time it

6         was robbed, I was there.

7    Q    I'm talking about the last time in relation to

8         your testimony the last time.

9    A    I don't understand what you're saying.

10   Q    Maybe I'm confusing you.  I apologize for that.

11        You stated this was the same guy that robbed the

12        Winn Dixie the last time?

13   A    Yes.

14   Q    And the last time, when did the last time occur?

15   A    Well -- before I got robbed?

16   Q    Yes, sir.

17   A    That's what I'm talking about.  Before I got

18        robbed.

19   Q    When did that last robbery occur?

20   A    When I got robbed?

21             THE COURT:  No, the one before --

22   Q    The one before --

23   A    I don't remember the last time when it was.  It

24        was probably -- just probably six months apart.

25   Q    Six months apart?
```

```
 1    A    Yes, sir.
 2    Q    But you weren't a party to that other robbery that
 3         happened six months earlier?
 4    A    No, sir.
 5    Q    You claim the robbery took place in February of
 6         2001?
 7    A    Sir, I -- I -- I really don't know.
 8    Q    When did you start working for Winn Dixie?
 9    A    When did I start working for Winn Dixie?
10    Q    Yes, sir.
11    A    I started working for Winn Dixie in '96.
12    Q    In '96.
13             At that same store?
14    A    Yes, sir.
15    Q    You been -- do you still work there?
16    A    I don't work at that exact store anymore.  I work
17         at Winn Dixie.  I work at another store now.
18    Q    When did you leave the Westgate Parkway Winn Dixie?
19    A    I think it was in April.
20    Q    April?
21    A    April of last year.
22    Q    1996 -- when in 1996 did you begin working for
23         them?
24    A    October.
25    Q    October of 1996 through -- and you say
```

```
 1              approximately April of 2003?
 2    A    Yes, sir.
 3    Q    You work there consistently that entire -- seven
 4         year period?
 5    A    Yes, sir.
 6    Q    During that time period how many times had the
 7         Winn Dixie been robbed?
 8    A    During that time period?
 9    Q    Yes, sir.
10    A    Once.
11    Q    Once?
12    A    Yes, sir.  Twice in that time period.  From April
13         to October, twice.
14    Q    October of 1996 to April 2003, the Winn Dixx been
15         robbed twice?
16    A    Yes, sir.
17    Q    You claim five -- you were taken to the police
18         station how long after the robbery took place?
19         When did you go to the police station to look at a
20         photo lineup?
21    A    It was on a Tuesday is when I went.  It was
22         probably -- got robbed on a Thursday.  It was
23         Tuesday of that next week.
24    Q    Robbed on Thursday and you went on Tuesday.
25         Roughly five days?
```

```
 1    A    Yes, sir.

 2    Q    Is that your testimony?  Five days after the fact?

 3    A    Yes, sir.

 4    Q    You claim five days after the fact you had a

 5         better recollection of --

 6    A    Yes, sir.  Yes, sir.

 7    Q    -- the robbers than you did on the day of the

 8         incident?

 9    A    Yes, sir.

10    Q    What according -- what stands out in Mr. McNabb's

11         facial features that makes you claim he was the

12         one that robbed you that night?

13    A    What stands out?

14    Q    Yes, sir.

15    A    Well, he was -- he didn't have -- he didn't have

16         those -- sort of like a thin mustache then.  But

17         he don't have that now.  And like I said, still

18         see his face now.  That's the one.

19    Q    On the night that it was robbery, what

20         denominations of coins, cash, stamps, and food

21         stamps were kept in that safe?

22    A    What denominations?

23    Q    What denominations -- fives, tens, twenties,

24         hundred dollars, fifties?

25    A    Sir, I can't -- I can't really tell.  It was a
```

| | | |
|---|---|---|
| 1 | | bunch.  I don't know really definitely how much |
| 2 | | really -- |
| 3 | Q | No, you said twenty thousand dollars earlier.  You |
| 4 | | couldn't give us a round about figure how much of |
| 5 | | each kind -- |
| 6 | A | No, sir.  Because you got to realize.  It was in a |
| 7 | | -- like a bag, a bank bag.  So we kept that in a |
| 8 | | bank bag.  So it just wasn't scattered all over |
| 9 | | the safe.  Just go in there and look at it, but it |
| 10 | | was in a bank bag. |
| 11 | Q | What's a bank bag? |
| 12 | A | A deposit bag. |
| 13 | Q | Explain -- describe to the jury -- |
| 14 | A | It's a plastic bag.  The money is kept in.  Seal |
| 15 | | it and keep it there, and then you make a deposit |
| 16 | | the next day.  It wasn't just out loose.  It was |
| 17 | | in a bag.  Some was in a bag and some wasn't in a |
| 18 | | bag.  You know what I'm saying?  We got some in a |
| 19 | | deposit bag, and then we had some just in the safe |
| 20 | | like.  You understand what I'm saying? |
| 21 | Q | Yes. |
| 22 | | How about coins?  Obviously we got coins in |
| 23 | | front of you.  How many boxes or cases or however |
| 24 | | you describe that coin? |
| 25 | A | We had coins.  Pennies, dimes, nickels, and |

```
 1           quarters in the box.

 2    Q     Is that a pretty heavy coin box there?

 3    A     Yes, sir.

 4    Q     How many of those boxes were there?

 5    A     How many boxes there?

 6    Q     Yes, sir.  Typically.  You worked there several

 7          years --

 8    A     Like I said, we kept dimes, pennies --

 9    Q     You just kept one box of each, two boxes of each?

10    A     Sometimes one and sometimes two.  It just depends.

11    Q     Did you ever keep more than that?  Ten boxes?

12    A     No, sir.

13    Q     What would be the maximum number of coins you kept

14          there?

15    A     Probably like I said, one of each.

16    Q     You're saying one box of quarters, one box of

17          dimes, one box of pennies?

18    A     Yes.

19    Q     One box of nickels.

20              You're a big fella.  Could you carry one box

21          of each of those out on your own?  You claim

22          you're a big strong fella here.

23    A     Yes.

24    Q     You obviously are.  Could you carry one box of

25          each of those out with ease?
```

```
 1    A    Yes, sir.  If I had a bag I could.

 2    Q    If you had a bag?

 3    A    Yes, sir.

 4    Q    One of those -- how much do you say that weighs?

 5    A    Probably a good five -- about five or ten pounds.

 6         About five pounds at the most.

 7    Q    When you were in the office, you say you were tied

 8         up on your knees facing the wall?

 9    A    Yes, sir.

10    Q    Ms. Roach is behind you?

11    A    Yes, sir.

12    Q    You also claim you saw the other person come in?

13    A    Yes, sir.  I said -- yes, sir, I did.

14    Q    Now, how can you see the person when you said you

15         never looked at them?

16    A    I never looked at them.  Well, I had a glimpse of

17         the guy when he come in the office.  As a matter

18         of fact, I probably misunderstood your question.

19         But I heard the door open.  I'll say that.  I

20         heard the door open.  The door -- Mr. McNabb

21         opened the door.

22    Q    And that's what I'm curious about.  Explain to me

23         -- when you first walked up to the counter, you

24         say you confronted Mr. McNabb?

25    A    Yes.
```

```
 1    Q   Was he standing face-to-face like me to you here,
 2        or were you -- he was obviously outside the
 3        counter as you walked up to him face-to-face?
 4    A   I walked up to him.  And he was standing sideways.
 5        He was standing up -- like standing like this
 6        here when I came up.  He was standing like this
 7        here (indicating).
 8    Q   So I would be you.  I would be walking.  And
 9        you're Mr. McNabb.  And all you see is a side
10        profile?
11    A   Yes, sir.
12    Q   From that point, did you see a full facial profile?
13    A   Yes, sir.  Because he turned.  And when I was
14        saying, yes, sir, could I help you, he said, guess
15        what, today is your lucky day.  And he pointed the
16        gun at me.
17    Q   Did he make any -- this robber do anything to
18        obscure their face at all?
19    A   Did they coat their face?
20    Q   Did either one of the robbers do anything to
21        obscure their face?  Panty hose?  Sock?  Mask?
22    A   No, sir.
23    Q   Nothing like that.
24        And is it possible that Mr. Hill could have
25        been up front during that time period?
```

```
 1    A    It wasn't no way he was.
 2    Q    I'm not saying for him being the robber.  Excuse
 3         me, that's not what I'm indicating there.  Just
 4         because he was working there -- was that Mr.
 5         Hill's regular night work?  Was it a surprise
 6         night to work?
 7    A    No, sir, it was his regular night to work.
 8    Q    It was his regular night to work?
 9    A    Yes, sir.
10    Q    So it's possible that Mr. Hill could have been
11         anywhere in that store at any time?
12              MR. VALESKA:  Objection.  Possible is a
13         mental conclusion for Mr. Hill, not of this
14         witness.
15              MR. BAXLEY:  Your Honor, I'm speaking about
16         this man was a night manager.  He's the one that
17         was in control of where employees were.  He can
18         certainly testify where other employees were that
19         night --
20              THE COURT:  I think he said he didn't know
21         where he was.
22                   Didn't you?
23              THE WITNESS:  Mr. Hill was in the back part.
24              THE COURT:  When the public address came off
25         for you to come to come to the front, he was in
```

```
 1        the back?
 2             THE WITNESS:  Well, I'll say this right
 3        here.  Mr. Hill was called to the back.  And like
 4        I said, when I was -- when I was called to the
 5        front, Mr. Hill was somewhere in the back.  I say
 6        that because that's where I found him at when I
 7        got out -- got out of the office there.
 8    Q   What I'm saying, though, Mr. Hill wasn't assigned
 9        to a particular location that night, was he?
10    A   No, sir, he wasn't.
11    Q   So he could have been roaming anywhere in that
12        store on that particular night?  Just doing his
13        regular duties?
14    A   Yes.  Yes.
15    Q   Stocking, cleaning, supervising, whatever he does?
16    A   Yes.
17    Q   So he could have been anywhere in that store?
18    A   Yes.
19    Q   Could he have been in the office at some point?
20    A   No, sir, not in the office.  Couldn't have been in
21        the office.
22    Q   Forget the robbery even happened.  This is a
23        regular working night with Mr. Hill.  He had
24        access to that office, correct?
25    A   Yes, sir, he sure did.
```