IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RUBEN C. MCNABB,                     )
                                     )
        Petitioner,                  )
                                     )        CIVIL ACTION NO.
v.                                   )        05-0736-WS-M
                                     )
RALPH HOOKS,                         )
                                     )
        Respondent.                  )

## SUBMISSION OF EXHIBIT A

Come the Respondents, by and through the Attorney General of the State of Alabama, and submit the following exhibits in support of its Answer filed February 1, 2006.

Exhibit A -   Copy of trial transcript (3 volumes)

All other exhibits were electronically filed with this Court on today's date.

Done this 1st day of May, 2006.

Respectfully submitted,

Troy King
*Attorney General*
By:

James B. Prude (PRU005)
*Assistant Attorney General*

126939    **SCANNED**

COURT OF CRIMINAL APPEALS No. _CR-03-1141_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ___Houston___ COUNTY, ALABAMA

CIRCUIT COURT NO.   _CC2002-225_ Volume III

CIRCUIT JUDGE   _Jerry M. White_

Type of Conviction / Order Appealed From: _ROBBERY I_

Sentence Imposed: _LIfe w/o Parole, and costs_

Defendant Indigent:  ☒ YES   ☐ NO

Ruben McNabb

Hon. David Hogg          334-794-8559           **NAME OF APPELLANT**
(Appellant's Attorney)                    (Telephone No.)
188 N. Foster St. Ste 200
(Address)
Dothan, Al.  36303
(City)                    (State)                    (Zip Code)

V.

STATE OF ALABAMA

(State represented by Attorney General)          **NAME OF APPELLEE**
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

(For Court of Criminal Appeals Use Only)



```
 1            computer, correct?
 2      A     Right.
 3      Q     And did she also look at a second time, if I could
 4            use the term, you correct me, but a photographic
 5            lineup with five or six people, actual pictures in
 6            the lineup?  Did she also do that?
 7      A     Yes, sir.
 8      Q     Would you tell the ladies and gentlemen of the
 9            jury, at any time did you tell them when you did
10            that lineup that Ruben Corey McNabb, was he in
11            either one of those two lineups that Ms. Roach saw?
12      A     No, sir.
13      Q     Now, at the time you showed her that lineup, did
14            you know in fact he was one of the alleged two
15            robbers, a hundred percent sure?
16      A     No, sir.
17      Q     Now, she looked at the photographic lineups,
18            correct?
19      A     Yes, sir.
20      Q     And did she pick anybody out or identify anybody?
21      A     She picked out somebody and said that he looked
22            similar that --
23      Q     Did she -- I'm sorry, I cut you off.
24      A     Except for the mustache.
25      Q     Would you tell the ladies and gentlemen of the
```

```
 1            jury, once again, was McNabb in that photographic
 2            lineup?
 3       A    No, sir.
 4       Q    Now, if I could, Mr. Reeves, Ronald Reeves, you
 5            see him at the table, the other assistant
 6            manager?  Do you recognize him?
 7       A    Yes, sir.
 8       Q    Was he also shown a photographic lineup?
 9       A    Yes, sir.
10       Q    Did you do that or Sergeant Williamson, or do you
11            recall?  Or both of you?
12       A    Sergeant Williamson put the lineup together.
13       Q    Now, have you interviewed witnesses before that
14            have been robbed, Mr. Singleton?
15       A    Yes, sir.
16       Q    That have actually had a gun put towards them or
17            touch them or threats made toward them?
18       A    Yes, sir.
19       Q    Are all witnesses you've interviewed in
20            relationship to before June 7, 2001, are they
21            extremely calm like I'm asking you questions and
22            you're answering in front of a jury?  Is that the
23            way they are?
24       A    No, sir.
25       Q    Have you interviewed witnesses that were robbed
```

```
 1        before after the robbery a day or two or a week
 2        later and they recall more information than they
 3        did when the robbery first occurred?  Have you
 4        done that?
 5    A   Yes, sir.
 6    Q   Is that unusual?
 7    A   No, sir.
 8    Q   You're a police officer for years?
 9    A   Yes, sir.
10    Q   Ever fired your weapon?
11    A   No, sir.
12    Q   Were you present when weapons were fired in other
13        cases the Dothan police officers made?
14    A   Yes, sir.
15    Q   They make loud sound when the weapon was fired?
16    A   Yes, sir.
17    Q   Did you observe the demeanor of the police
18        officers when --
19            MR. BAXLEY:  I object.  What's the point of
20        the question?
21            MR. VALESKA:  Withdrawn.  Withdrawn.
22            THE COURT:  I agree.  Sustained.
23    Q   Now, could you tell the ladies and gentlemen of
24        the jury, did you ever go back with Sergeant
25        Williamson, you yourself, and search any of the
```

```
 1            vehicles that belonged to Ruben Corey McNabb or
 2            Yvette McNabb?
 3    A       Yes, sir.
 4    Q       Now, whose vehicle -- do you recall which vehicle
 5            you searched or looked into?
 6    A       We searched the van.
 7    Q       Now, and who had custody or who was driving the
 8            van at that time?
 9    A       Yvette McNabb.
10    Q       Now, can you tell the ladies and gentlemen of the
11            jury, did you find anything in the van that Ms.
12            McNabb was driving that you recall?
13    A       Without refreshing.  You know, I don't recall.
14            There was a lot of change scattered around in the
15            van.  But other than that, I don't recall.
16    Q       If I could ask you, do you recall if it refreshes
17            your memory finding the Defendant's driver's
18            license -- McNabb's?
19    A       I believe they were over the sun visor.
20    Q       If I could, let me show you, once again, an
21            exhibit.  I believe it's No. 10.  It is numbered
22            for identification purposes.  Looking at that, Mr.
23            Singleton, is that the driver's license that you
24            recovered with the consent for her when you
25            searched the van?
```

204

```
1    A    Yes, sir.
2    Q    Appear to be marked or changed in any way except
3         it's in a plastic bag?
4    A    No, sir.
5              MR. VALESKA:  I offer State's 10, the
6         driver's license.
7              THE COURT:  Let it be admitted.
8                   (State's Exhibit No. 10 was admitted
9                   into evidence.)
10   Q    Now, I know it's been a while.  Did you have any
11        discussions when you searched Ms. -- Mr. and Ms.
12        McNabb's van what -- what do you recall about the
13        van?  What did it look like?  Can you tell me?
14   A    It was pretty nasty.  Pretty filthy.
15   Q    Outside any distinguishing marks in relationship
16        to talking to the victims about anything in
17        relationship to the robbery?  How the van looked?
18        In other words, the make-up, the structure?  What
19        was on the van is what I'm asking.
20   A    Had wood grain paneling on the side of it.
21   Q    And the model was an '89 to '92 range?  Do you
22        recall the year model?
23   A    Yes, sir.
24   Q    Let me go back and ask you.  Shortly after the
25        robbery when the sun was up and then even later
```

```
1              that night on or about June 7th, did you take any
2              employees over there to Barstone Apartments to
3              look for a particular vehicle?
4       A      Yes, I did.
5       Q      Was that Ms. Prescott?
6       A      Yes, it is.
7       Q      And did she indicate or look at the van?
8       A      Yes, sir.
9       Q      Now, did she make any statements to you about
10             identifying the van?
11      A      She said she wasn't sure if the color of the van
12             was the same color, but that the wood grain
13             paneling was exactly the same as what she saw on
14             the van.
15      Q      And what about the relationship -- and I don't
16             know much about cars or vans, but the model or
17             year make, was that within the range or
18             description she gave you she identified what it
19             looked like?
20      A      Yes, sir.
21      Q      The search warrant you have in front of you,
22             correct?
23      A      Yes, sir.
24      Q      Or a copy of it.  Contains the information you
25             gave to Judge Mendheim when you obtained it and
```

```
 1            then you executed and left a copy, correct?
 2    A    Yes, sir.
 3    Q    Now, if I could ask you on June 7th, June 8th,
 4         June 9th -- well, I'll withdraw that.
 5              MR. VALESKA:  That's all I have.  Pass the
 6         witness.
 7                  Thank you very much, Judge White.
 8              THE COURT:  Mr. Baxley.
 9                     CROSS EXAMINATION
10    BY MR. BAXLEY:
11    Q    Back to the van questions since that's on
12         everyone's mind right now at the moment.  You say
13         you took Ms. Prescott over to see the van?
14    A    Yes, sir.
15    Q    You said Ms. Prescott said that looked exactly
16         like the wood grain?
17    A    She said it was the same type wood grain that the
18         vehicle that almost ran her over in the parking
19         lot.
20    Q    She never said the exact same.  According to your
21         report, you're saying it appeared to be the right
22         color.  That doesn't strike me as being an
23         exactness.
24              MR. VALESKA:  I'm going to object.  It
25         doesn't strike Mr. Baxley.  That's his opinion.
```

```
 1                    THE COURT:  Well, I believe he's got a right
 2            to ask him what his report says.
 3                    MR. VALESKA:  I have no objection to that --
 4                    THE COURT:  The other part is argument.
 5                    MR. VALESKA:  No objection to what he's
 6            asking what was in the report.
 7      Q     Ms. Prescott did not say this was the exact color
 8            wood grain, did she?
 9      A     She said the wood grain was the same.  She didn't
10            know about the color of the painted part of the
11            van.
12      Q     She couldn't identify that van to be the exact
13            van, could she?
14      A     No, sir.
15      Q     In your search warrant affidavit, you also state a
16            few things in there.  You state that Mr. McNabb
17            had a history of robbery.  Is that true?
18      A     Yes, sir.
19      Q     And was he ever convicted of robbery?
20                    MR. VALESKA:  I object.  I object, Your
21            Honor.  The question that was asked by Mr. Baxley,
22            the information that you put in your search
23            warrant was whether Mr. McNabb was arrested for
24            robbery.  And he's answered yes.  He didn't put in
25            the search warrant whether there was a
```

```
 1        conviction.
 2             MR. BAXLEY:  Your Honor, he says --
 3             THE COURT:  Let me just see what it says.
 4             MR. VALESKA:  I don't mind him asking about
 5        it, Judge White, but just the form.
 6             THE COURT:  I know.
 7             MR. VALESKA:  I'll just withdraw.  Let him
 8        ask.  I don't object.
 9             THE COURT:  Where are you talking about?
10             MR. BAXLEY:  This part right here.
11             THE COURT:  McNabb has a history of carrying
12        concealed weapons, robbery, and driving.
13             MR. BAXLEY:  Right.
14             THE COURT:  Go ahead.
15   Q    That's really not true, is it?
16   A    Yes, sir.
17   Q    How is that true?
18   A    He was arrested for robbery according to the rap
19        sheet that we pulled on him in Florida.
20   Q    There had never been any conviction for robbery,
21        had there?
22   A    I believe it was reduced to larceny.  I'm not
23        sure.
24   Q    You're not sure.  That was something you put in
25        there, but weren't actually sure about it, even
```

```
1            though you claim it was actually a robbery?
2      A     He was actually charged with a robbery, yes, sir.
3      Q     Never convicted of a robbery?
4      A     I don't believe so.  That was in Florida.  I think
5            it was reduced.
6      Q     You also claim Ms. Roach picked out another person
7            in the lineup; is that true?
8      A     Yes, sir.
9      Q     Now, was she ever shown a lineup with Mr. McNabb
10           in it?
11     A     I didn't show her one with Mr. McNabb in it.
12     Q     Why not?
13     A     I just didn't, sir.
14     Q     You just didn't show her one?
15     A     No, sir.
16     Q     But you still were talking to her, still got
17           statements from her?
18     A     I had statements from her, and I had talked to
19           her, yes, sir.
20     Q     Did you ever get her to sign a statement?
21     A     I don't recall without refreshing back through the
22           notes, sir.  It's been so long.
23     Q     You're welcome to look at the notes.
24     A     I don't see anything she signed.  I'm not saying
25           she didn't sign anything.  I don't remember.  But
```

```
 1              I don't see anything in this book I have that she
 2         signed.
 3    Q    I'll move on from this, then.
 4              Isn't it true there were no fingerprints or
 5         anything else found at the scene that connect Mr.
 6         McNabb with that crime scene?
 7    A    That's true.
 8    Q    And you looked everywhere to find these
 9         fingerprints; is that correct?
10    A    Yes, sir.
11    Q    Now, on the photographs that are --
12              MR. BAXLEY:  May I approach, Your Honor?
13              THE COURT:  Sure.
14    Q    The photographs that are in evidence, there's some
15         pretty discernible fingerprints on things.  Would
16         that be true?
17    A    Yes, sir, there's foot prints.
18    Q    Now, would it be possible for an analysis to be
19         done on a foot print such as that to determine the
20         shoe it came from, the type shoe, size shoe,
21         something of that nature?
22    A    I'm sure it might be possible, yes, sir.
23    Q    Do you send off for those analysis?
24    A    No, sir, I didn't.
25    Q    Even though you had the evidence right there?
```

```
 1    A    Well --

 2    Q    You claimed a moment ago you sent off for those

 3         analysis on things, and now you're saying you

 4         didn't?

 5    A    Not on shoe prints.  On fingerprints.

 6    Q    Fingerprints.

 7             Anything else, though?  You just looked at

 8         fingerprints?

 9    A    No, sir.  We looked at the shoe prints and took

10         photographs, but we --

11    Q    Were you able to match up the shoes from any shoes

12         you confiscated from Mr. McNabb?

13    A    I didn't match any up, no, sir.

14    Q    As far as the fingerprints go, was there any

15         evidence or any statements from either of the

16         victims here that the robbers wore gloves?

17    A    No, sir.

18    Q    In fact, they didn't wear gloves as far as you

19         know; is that correct?

20    A    That's correct.

21    Q    Was it your opinion from the beginning that this

22         was an inside job?

23             MR. VALESKA:  I object.

24    Q    Did you ever formulate that opinion?

25             MR. VALESKA:  I object, Judge White, to what
```

```
 1            this officer's opinion is in relationship to his
 2            job.
 3                 MR. BAXLEY:  Your Honor, he's investigating
 4            this robbery and had to theorize what went on at
 5            this robbery to conduct his investigation.  He's
 6            familiar with these things --
 7                 THE COURT:  Was it your opinion -- do you
 8            mean was there any evidence?
 9                 MR. BAXLEY:  Yes, sir.  Yes, sir.  I'll
10            rephrase the question.
11                 MR. VALESKA:  That's fine.
12                 THE COURT:  I overrule.
13      Q     Was there any evidence that this was an inside job?
14      A     No, sir.
15      Q     No evidence at all?
16      A     No, sir.
17      Q     Did you not state in an early deposition that you
18            considered this to be an inside job at one point?
19      A     Yes, sir.
20      Q     So why the difference in your testimony now?
21      A     I didn't have enough evidence to arrest anybody
22            for the inside job.  It was in my opinion at that
23            point that, you know, I thought somebody inside
24            was involved in it, but I didn't have the evidence
25            to arrest anybody that worked at the scene.  And
```

```
 1          there was two people involved in the robbery.  And
 2          I had enough evidence to arrest Mr. McNabb.
 3     Q    Well, there was some consideration that this was
 4          an inside job?
 5     A    Yes, sir.
 6     Q    But you just couldn't -- didn't have enough
 7          evidence to pin it on someone inside, so to speak?
 8     A    That's true.
 9     Q    You also claimed that you went to Barstone
10          Apartments on a hunch.  I want you to tell the
11          jury how you ended up at Barstone Apartments over
12          anywhere else in the entire city.
13               MR. VALESKA:  I object to the form.  I don't
14          believe there was any testimony from this officer
15          that he went to Barstone --
16               THE COURT:  Yeah, he did.  He testified he
17          took a witness to Barstone --
18               MR. VALESKA:  I'll -- I'll withdraw.  Go
19          ahead.
20               THE COURT:  I think he's asking --
21               MR. VALESKA:  I'll withdraw.  I'll withdraw.
22          Mr. Baxley, I apologize.  Go ahead.
23     Q    On the night of the investigation, I'm assuming
24          you went to the Winn Dixie?
25     A    That's right.
```

```
1     Q    You went to Barstone at some point.  What was the

2          time period between the beginning of your

3          investigation when you went to Barstone Apartments

4          and how did you come to go to Barstone Apartments?

5     A    I can refresh my notes.  I'm not sure.  I want to

6          say that we went to Barstone the following day

7          after the robbery, but I can look back and see

8          exactly when.  I didn't go the night that I went

9          to Winn Dixie.  I know that.

10    Q    I'm just curious.  What dragged you to Barstone

11         Apartments out of everywhere in the City of

12         Dothan?  Why did you go to Barstone Apartments?

13         What is it about Barstone Apartments that made you

14         go to Barstone Apartments?

15    A    Can I look?

16    Q    Yes, sir.  Feel free to.

17    A    I don't know why we went to Barstone at that time.

18    Q    So it was just a hunch?

19    A    It's possible and I don't recall.  It's been so

20         long that me and Sergeant Williamson were just

21         riding around looking for the van with wood grain

22         paneling on the side and we found one at the

23         apartment complex.  I don't recall why we wound up

24         at Barstone.

25    Q    This was just a random van in a parking lot with
```

```
1            wood grain siding; is that true?
2    A       Yes, sir.
3    Q       Just all of a sudden everything falls into place?
4    A       No, sir.
5    Q       You just tell me that.  You happened upon this
6            thing -- what, we have sixty-five thousand
7            residents in Dothan and you happened upon one van
8            that you claim was the one that was used in this
9            robbery and just happened to be -- happened to
10           belong -- is this the luckiest investigation ever?
11   A       No, sir, I didn't say that.
12   Q       Well, tell us here.  I'm trying to connect --
13           there's got to be a connection between that and
14           the robbery.
15                   MR. VALESKA:  I object.  He's asked --
16                   THE COURT:  I sustain the objection.  He's
17           answered the question.  He said he didn't remember
18           why they went to Barstone.
19   Q       Did you have any conversation with Reggie Hill
20           prior to going to Barstone?
21   A       I'm sure I talked to him at the store during the
22           initial investigation of the robbery, and that was
23           prior to going to Barstone; so, yes, sir, I did.
24   Q       Is it possible you went to Barstone on a hunch to
25           find out about Reggie Hill?
```

1    A    At that point, no, sir.

2    Q    Did you know Reggie Hill lived there?

3    A    Not at that point, no, sir.

4    Q    Are you sure you didn't know at that point or are

5         you just theorizing you didn't know at that point?

6    A    I went back to the Winn Dixie the next day and got

7         a list of the employees who lived there, of the

8         employees who were at work.  But I did not know

9         that Reggie Hill lived at the apartment at that

10        point.

11   Q    How many food stamps -- not food stamps.  How much

12        money in postage stamps was taken from the Winn

13        Dixie?

14   A    I don't believe I have that information, sir.

15   Q    It's on the front of your incident sheet.

16   A    It says nine hundred and seven dollars and forty

17        cents.

18   Q    Over nine hundred dollars in postage stamps were

19        taken from the Winn Dixie; is that correct?

20   A    Yes, sir.

21   Q    And how many postage stamps were found at the

22        McNabb household?  The value of that.

23   A    Well, there's fifty books of postage stamps that

24        are thirty-four cents each.  Then there's

25        forty-eight thirty-six -- that's thirty-three

```
 1              cents each, which the value of those is eleven

 2              dollars and eighty-eight cents.  I don't know what

 3              the value of the fifty books are without --

 4    Q         Fifty books.  So there's ten on each book here.

 5    A         And they are thirty-four cents each.

 6    Q         About a hundred and eighty dollars.  Does that

 7              sound correct to you?

 8    A         Close.

 9    Q         If you do the math.

10    A         And eleven eighty-eight on some additional ones

11              that we recovered.

12    Q         So over nine hundred dollars in stamps taken but

13              the only thing you found were exactly fifty books

14              in the McNabb household?

15    A         It wasn't exactly fifty books.

16    Q         Plus the thirty-three cent stamps?

17    A         Yes, sir.

18    Q         And explain to the jury where all this stuff was

19              located in the McNabb house when you went and

20              searched it.

21    A         All of what stuff?

22    Q         All of the stuff you found.  We got a box of

23              pennies.  We got stamps.  And these food stamps

24              and money wrapper.

25    A         Those items were found in the safe in the closet.
```

| | | |
|---|---|---|
| 1 | Q | You're discussing a safe.  What kind of safe are |
| 2 | | we talking about here?  Is it a dial safe?  A big |
| 3 | | safe? |
| 4 | A | No.  It's a small like a Century safe. |
| 5 | Q | One of those little box things.  Does it have a |
| 6 | | handle on it? |
| 7 | A | Yeah.  Century safe.  It's actually called a safe. |
| 8 | Q | Big?  Or a little one? |
| 9 | A | I would say it was probably, I don't know, maybe |
| 10 | | two foot by one foot.  It was in the evidence. |
| 11 | Q | Lunchbox size or -- |
| 12 | A | Bigger than a lunchbox I would say. |
| 13 | Q | Much bigger? |
| 14 | A | Two lunchboxes. |
| 15 | Q | It wasn't a gigantic safe by any means? |
| 16 | A | No, sir. |
| 17 | Q | Was anything else in that safe? |
| 18 | A | There were some silver certificates -- two of |
| 19 | | them. |
| 20 | Q | Was any silver certificates stolen from the Winn |
| 21 | | Dixie? |
| 22 | A | I don't know, sir.  I mean, it's possible they |
| 23 | | were in with the money and Winn Dixie didn't know |
| 24 | | it.  There were thirty-one dollar food stamps. |
| 25 | Q | Any of those have Winn Dixie stamp on them? |

```
 1    A    I don't recall without refreshing my memory and
 2         looking at them, sir.  There was also three, three
 3         eighty caliber bullets in the safe.  There was --
 4         the single postage stamps were also in the safe.
 5         The Winn Dixie money wrapper was in the safe.  The
 6         ten dollar food stamp was in the safe.
 7    Q    Where in the house was this safe located?
 8    A    In a bedroom closet floor.
 9    Q    Bedroom closet floor.
10              Was it out in the open or pushed back in a
11         corner somewhere?
12    A    It was just as you walk in the closet, and it was
13         laying on the floor on the bottom.
14    Q    Was it locked?
15    A    I don't believe it was.  I don't recall.
16    Q    So it was open.
17              Out of -- I think we can all -- testimony
18         has been presented that almost twenty thousand
19         dollars in cash was taken from the Winn Dixie.  Is
20         that your recollection?
21    A    Yes, sir.
22    Q    How much cash was found in McNabb's apartment?
23    A    Well, there was the box full of pennies.  There
24         was a pink-looking piggy bank that was filled with
25         an assortment of change.
```

```
1   Q   Child's piggy bank?
2   A   Yes, sir.  And there was silver certificates that
3       were found.
4   Q   So three one dollar silver certificates and
5       twenty-five dollars in pennies; is that correct?
6       That's all the cash that was found in that
7       apartment?
8   A   Plus the bank full of change.
9   Q   Plus the piggy bank?
10  A   Yes, sir.
11  Q   Did you find a gun in that apartment?
12  A   No, sir.
13  Q   So out of all these things here, the only things
14      that physically are connected to the Winn Dixie
15      are food stamp and the money wrapper that are
16      stamped Winn Dixie; is that correct?
17  A   I would say --
18  Q   As far as physical recognition.
19  A   Yes, sir.
20  Q   And it is your testimony that you-all did consider
21      Reggie Hill at a suspect at one point?
22  A   Yes, sir.
23          MR. BAXLEY:  Nothing further right now, Your
24      Honor.  Reserve the right to recall.
25          THE COURT:  Anything else on redirect?
```

```
1          MR. VALESKA:  No.  Ask if he could be
2     excused.
3          THE COURT:  Do you have any objection?
4          MR. BAXLEY:  I'm sorry, I didn't hear.
5          THE COURT:  To his being excused?
6          MR. BAXLEY:  We might need him for recall,
7     Your Honor.  After Ms. Williamson, might possibly
8     not need him.
9          THE COURT:  You can be excused, then.
10         MR. VALESKA:  The State rests.
11         THE COURT:  Ladies and gentlemen, I'm going
12    to let you go to the jury room.  We'll take a
13    little recess because you've been here over an
14    hour.  And just recall the instructions I've given
15    you about not discussing the case among yourselves
16    or with anyone else.  And we'll call for you in
17    about fifteen minutes.
18              (Jury not present.)
19         THE COURT:  Let the Record show that this is
20    out of the presence and hearing of the trial
21    jury.  Since the State has rested, you may have a
22    motion or motions to make.
23         MR. BAXLEY:  Just a motion to dismiss.  They
24    haven't met their prima facie burden of proof to
25    hold this charge, Your Honor.
```

```
 1              THE COURT:  And motion for judgment of

 2         acquittal at the close of the State's case is

 3         denied.

 4              Let's take about fifteen minutes.

 5              MR. BAXLEY:  Thank you, Your Honor.

 6              (Off the Record.)

 7              THE COURT:  Bring the jury.

 8              (Jury present.)

 9              THE COURT:  Mr. Baxley, who will your first

10         witness be?

11              MR. BAXLEY:  First witness will be Mr. Corey

12         McNabb, Your Honor.

13                      RUBEN CORY MCNABB

14         having first been duly sworn, was examined and

15         testified as follows:

16                      DIRECT EXAMINATION

17    BY MR. BAXLEY:

18    Q    Please state your name for the Judge and jury.

19    A    Ruben Corey McNabb.

20              THE COURT:  You're going to need to get a

21         little closer.

22    Q    Mr. McNabb, you understand you've been charged

23         with a very serious crime here?

24    A    Yes, sir.

25    Q    For the sake of everyone here, did you rob the
```

| | | |
|---|---|---|
| 1 | | Winn Dixie on Westgate Parkway on June 7, 2001? |
| 2 | A | No, I didn't. |
| 3 | Q | How can you be so sure about that? |
| 4 | A | I was in Orlando, Florida, when this happened. |
| 5 | Q | And how can you be so sure you were in Orlando at |
| 6 | | that time? |
| 7 | A | Because my car broke down.  Plus my little girl |
| 8 | | got out of school that Friday. |
| 9 | Q | Do you have a regular visitation schedule with |
| 10 | | that daughter down there? |
| 11 | A | Yes, sir. |
| 12 | Q | Who is this daughter?  Tell me about this |
| 13 | | daughter. |
| 14 | A | It's my little girl, Taquasia, that I have with a |
| 15 | | previous -- with another young lady.  And she was |
| 16 | | I say about six or seven years old at the time. |
| 17 | | Every summer I go pick her up for her to spend the |
| 18 | | summer with me, my wife, and my other little girl. |
| 19 | Q | So this was a regular visitation? |
| 20 | A | Yes, sir. |
| 21 | Q | When do you typically pick up Taquasia? |
| 22 | A | At the end of each school year. |
| 23 | Q | And about when was that? |
| 24 | A | That be about the end of -- the beginning of June, |
| 25 | | the end of May. |

```
 1    Q    So it fell within that range each year?  It wasn't

 2         a certain day?

 3    A    It's been within two to three days every year.

 4    Q    I'm going to show you a calendar here.  This is

 5         just a calendar of June, 2001.  June, 2001.  I

 6         think we can all agree that -- I think we can all

 7         agree the robbery took place on June 7th; is that

 8         correct?

 9    A    Yes, sir.

10    Q    Is that your understanding of things?

11    A    Yes, sir.

12    Q    When do you say you went to Orlando?

13    A    I went to Orlando that Sunday.

14    Q    Which Sunday is that?

15    A    The 3nd.

16    Q    June 3rd?

17    A    Yes, sir.

18    Q    How can you be so sure you went on June 3rd?

19    A    Because her mother had to be at work that Monday.

20    Q    And whose mother is that?

21    A    That's Taquasia's mother.

22    Q    So when did you return from Orlando, or did you

23         return from Orlando?

24    A    No, I never did return from Orlando.

25    Q    Why didn't you come back from Orlando?
```

```
 1    A    Because I was accused of this robbery.
 2    Q    Now, you've been sitting here and there's been
 3         some testimony about Reggie Hill and your
 4         relationship with Reggie Hill.  Can you explain
 5         your relationship with Reggie Hill to this jury?
 6    A    When I met Reggie Hill around -- I say -- I moved
 7         up here in September of '99.  I met Reggie Hill
 8         shortly after on the basketball court.  We used to
 9         play basketball two to three times a week.  We
10         went out together.  We cooked on the grill.  He
11         knew my little girls.  And I say we had a pretty
12         good standing relationship.
13    Q    Did you-all ever discuss each other's lives with
14         each other?
15    A    Yes, sir.
16    Q    Did you know where each of you worked?
17    A    Yes, sir.
18    Q    Did you know about each other's families?
19    A    Yes, sir.
20    Q    So you're saying here you knew that he worked at
21         the Winn Dixie?
22    A    Yes, sir.
23    Q    Did you know when he worked at the Winn Dixie?
24    A    I just knew he had the night shift.
25    Q    Did he know when and where you worked?
```

```
 1   A    Yes, sir.

 2   Q    Did he know when and where -- and where did you

 3        work at that time?

 4   A    I worked at King Church Furniture.  He dropped me

 5        off there a couple of times.

 6   Q    What did you do at King Church Furniture?

 7   A    I'm a carpenter.

 8   Q    And what were your usual working hours there?

 9   A    From twelve to nine-thirty.

10   Q    A.m. or p.m?

11   A    From twelve noon to nine-thirty at night.

12   Q    Obviously you were in Orlando at the time of this

13        robbery according to your testimony.  You

14        mentioned a moment ago that you say your car broke

15        down?

16   A    Yes, sir.

17   Q    What happened to your automobile?

18   A    When I got down there -- well, on the way down, my

19        transmission started slipping on me.  I took it by

20        the shop and got an appraisal --

21   Q    Hold on a minute.  What shop did you take it to?

22   A    I took it to Greg's Automotive.

23   Q    And where is Greg's Automotive?

24   A    In Orlando, Florida.

25   Q    And what day did you take it -- well, what day did
```

```
 1          you arrive in Orlando?

 2    A     I arrived that Sunday.

 3    Q     That Sunday.

 4          So it was a one-day trip from Dothan to

 5          Orlando?

 6    A     Yes, sir.

 7    Q     When did you take the car to Greg's?

 8    A     I went to -- it was a couple of days -- well, when

 9          I initially got down there, it started getting

10          worser and worser.  So I took it by the shop.  It

11          would have to be like -- I want to say that

12          Tuesday or Wednesday I took it.  I took it to the

13          shop first and he told me --

14          MR. VALESKA:  I object to what he told him.

15          That's hearsay.

16          THE COURT:  I sustain the objection.

17          MR. VALESKA:  Not that was Greg's, but what

18          he said.  I'm sorry.  Go ahead.

19    Q     The automotive --

20          THE COURT:  You withdraw the objection?

21          MR. VALESKA:  No.  I withdraw the objection.

22          THE COURT:  Go ahead.

23    Q     So you say you took it to Greg's Auto?

24    A     Yeah, Greg's shop.

25    Q     On either on Tuesday or Wednesday?
```

```
1    A    Yes, sir.

2    Q    Did Greg give you a receipt or anything for that?

3    A    Yes.  One of the people at his shop gave me a

4         receipt.

5    Q    I'm going to show you what's been marked as

6         Defendant's 1.

7                   (Defendant's Exhibit No. 1 was marked

8                    for identification.)

9         MR. VALESKA:  I need to ask him a question on

10        voir dire.

11              You saying somebody else gave him the receipt

12        besides Greg?  Is that what he said?

13              THE COURT:  I don't know what he said.  Take

14        him on voir dire.

15                      VOIR DIRE EXAMINATION

16   BY MR. VALESKA:

17   Q    This piece of paper that's marked Defendant's

18        Exhibit 1, was Greg the one who gave you that?

19   A    Yes.  One of the people at Greg's shop --

20   Q    No, sir.  The question was, did Greg give you

21        that?

22   A    One of the people at Greg's shop --

23              MR. VALESKA:  Judge, I would ask you to ask

24        him to answer the question.

25   Q    Was it Greg himself or a different person, please,
```

```
 1         sir?

 2    A    Did Greg hand me the receipt himself?

 3    Q    Yes, sir.

 4    A    No, sir.

 5    Q    You're saying it's a different person?

 6    A    Yes, sir.

 7              MR. VALESKA:  Objection.  There's no

 8         foundation.  We've got a different person.

 9         There's no predicate been layed.  Judge, I move to

10         exclude because that's going to be hearsay what

11         somebody else did.

12              MR. BAXLEY:  Your Honor, we're simply -- I'm

13         simply introducing this to say he got a receipt --

14              THE COURT:  I overrule.  Go ahead.

15                     DIRECT EXAMINATION CONTINUED

16    BY MR. BAXLEY:

17    Q    So you received a receipt from Greg's Auto Shop

18         for this repair?

19    A    Yes, sir.

20    Q    Does that receipt say when the car was brought in?

21    A    It says 6-6-01.

22    Q    So car to shop on 6-6.

23              In Orlando, Florida?

24    A    Yes, sir.

25    Q    What time of day or night did you take it in?  Do
```

```
 1            you recall that?
 2     A      Not right offhand, sir.
 3     Q      They --
 4     A      It was -- it have to be in the daytime.
 5     Q      Did they tell you when you could get your car
 6            back?
 7     A      He told me --
 8                  MR. VALESKA:  I object to what somebody else
 9            told him.  That's hearsay.
10     Q      When were you promised the car --
11                  MR. VALESKA:  I object.
12                  THE COURT:  I sustain.  You can't say what
13            somebody else said.
14     Q      When did you expect the car to be back in your
15            possession?
16     A      A couple of days.
17     Q      A couple of days.
18                  What exactly had to be done to the car?
19     A      The transmission had to be tooken out of it and
20            changed over.
21     Q      So a new transmission had to be placed in the
22            automobile?
23     A      Basically, yes, sir.
24     Q      Is that something that takes a day or two days or
25            what?  Do you have any idea?
```

```
1    A    No, sir.

2    Q    Did Mr. Hill ever come to your apartment?

3    A    Frequently.

4    Q    And did you ever -- did he ever have access to

5         your keys at any time?

6    A    Yes, sir.  He drove my vehicles, and I drove his.

7    Q    Did -- now, your apartment itself, where was your

8         apartment in relation to Mr. Hill's apartment?

9    A    If you come into Barstone Apartments, you have to

10        go around to the left.  It's basically a one-way

11        around the apartments.  You come around the

12        apartment, I say thirty feet from the entrance is

13        my apartment.  You have to go all the way around

14        to the back to the corner on this side over here

15        to get to Reggie Hill's apartment.

16   Q    So they were pretty close to each other?

17   A    No.

18   Q    Not too close?

19   A    If you walk through the apartment complex, you

20        could walk right to my apartment.

21   Q    But just walking distance it definitely was?

22   A    If you went through the outside, it take you

23        longer.  My apartment sit on the inside of the

24        apartments.  But if you walk right through the

25        back, you could walk to Reggie's apartment from
```

```
 1              there.
 2    Q    You've obviously heard testimony a lot of items
 3         were found in your apartment.  That being stamps,
 4         money -- food stamps and money wrappers here and a
 5         black toboggan.  What do you know about those
 6         items?
 7    A    I know about the food -- the -- these stamps
 8         here.  And this here.
 9    Q    Do you know anything about the food --
10    A    Food stamps and that money wrapper, I have never
11         seen in my life.
12    Q    What would you have done with such a large number
13         of stamps?
14    A    I've been to prison before.  I just got out of
15         State of Florida prison September 28, 1999.  And
16         that's how me and my wife wrote each other.
17    Q    You used stamps -- you had stamps from that?
18    A    Yes, sir.
19    Q    Reggie Hill also testified that you had asked him
20         questions about how much money went through the
21         Winn Dixie, what the night manager looked like,
22         who the night manager was.  Do you recall having
23         any of those conversations with him?
24    A    Not right offhand, no, sir.
25    Q    Did you ever ask him just general things about his
```

```
1              work?

2    A    Yeah.  We talked about -- we were friends.  We

3         might talk about how was your day at work or he

4         might ask me how my day at work was.  Just general

5         talking.

6    Q    But you never asked him anything about how to rob

7         a store, then?

8    A    I had no interest in robbing no stores.  I was

9         making pretty good off my job I was working.

10   Q    We also know that your apartment was searched at

11        some point; is that correct?

12   A    Yes, sir.

13   Q    How were you notified your apartment had been

14        searched?

15   A    I was told by a friend over the phone.

16             MR. VALESKA:  I object to what a friend told

17        him.  That's hearsay.

18             THE COURT:  He's just trying to establish

19        that -- how he found out his apartment had been

20        searched.  I overrule.

21   Q    You were notified by a friend your apartment was

22        searched?

23   A    Yes, sir.

24   Q    And when was that, roughly?

25   A    13th -- 14th.  Something like that.
```

```
1    Q    Somewhere in that area?
2    A    Yes, sir.
3    Q    Found out about search in that area.
4              And there's also been some testimony you
5         contacted the Dothan -- the Dothan Police
6         Department was either contacted you or you were
7         contacting them.  Can you tell us anything about
8         that?
9    A    Yes, sir.  After I found out about this here, I
10        did call the Dothan Police Department.  And the
11        dude was very rude with me.
12   Q    What did they tell you?
13   A    He told me -- well, he cussed me out basically.
14   Q    He cussed you out?
15   A    Yes, sir.
16   Q    Do you recall what the name of this officer was?
17   A    No, I don't.
18   Q    And you're saying you contacted him?
19   A    Yes.  I called up there.
20   Q    And what was your reason for calling the Dothan
21        Police Department?
22   A    I just wanted to find out basically why they went
23        in my wife's apartment.
24   Q    Why didn't you come back up here from Orlando?
25   A    Because of the threat he made.
```

```
 1    Q    What kind of threat did he make to you?
 2    A    He told me he was going to get my mother fucking
 3         ass as soon as -- when he seen me, he was going to
 4         get my mother fucking ass.  He said it just like
 5         that.  And living here in Dothan, when I did move
 6         here, I seen six cases where -- just, you know,
 7         police brutality and things like that --
 8    Q    Don't get into that kind of stuff.
 9              But you can sit here today and absolutely
10         tell this Judge and jury, look them in the eyes,
11         and say that you did not rob that Winn Dixie; is
12         that correct?
13    A    I was in Orlando, Florida, with my little girl.
14              MR. BAXLEY:  Nothing further at this time,
15         Your Honor.
16              THE COURT:  Mr. Valeska.
17                    CROSS EXAMINATION
18    BY MR. VALESKA:
19    Q    Let me ask you, if I could, please, Mr. McNabb,
20         it's your testimony that you went down to Orlando
21         on what day?
22    A    Sunday.  It would have to be the 3rd on that
23         calendar.
24    Q    Now, where does your father live?
25    A    My father stays in Eufaula.
```

```
1    Q    Now, let me ask you something.  Mr. Baxley said it
2         takes one day to drive to Orlando, right?
3    A    No, it doesn't take one day to drive to Orlando.
4    Q    Shorter than that?
5    A    Very shorter.
6    Q    You went down on the 3rd and went to Orlando?
7    A    Yes, sir.
8    Q    That's when you left your house with your wife,
9         correct?
10   A    No, sir.
11   Q    In fact, you left before that, didn't you?  You
12        left Dothan before June 3rd, didn't you?
13   A    Yes, sir.
14   Q    In fact, you went to another town, didn't you?
15   A    Yes, sir.
16   Q    Tell the jury where you went.
17   A    Eufaula.
18   Q    So you were going down to pick up your little girl
19        because it's your testimony that she got off the
20        end of May or first of June, right?
21   A    Yes, sir.
22   Q    And you've told this jury that you left and went
23        to Orlando on June 3rd, correct?
24   A    Yes, sir.
25   Q    Now, your wife, Yvette McNabb, had just had a
```

```
 1              baby, correct?
 2      A       May 15th.
 3      Q       May 15th.
 4                   How many children were living in the house
 5              with you and her at Barstone Apartments on May
 6              16th or 17th or whenever she came home with the
 7              baby?  How many other children?
 8      A       One other child.
 9      Q       So there were two children total, correct?
10      A       Yes, sir.
11      Q       Let me ask you something.  You quit your job,
12              didn't you?
13      A       Yes, sir.
14      Q       You quit your job working for the church furniture
15              company, correct?
16      A       Yes, sir.
17      Q       And it's your testimony you were a carpenter,
18              correct?
19      A       Yes, sir.
20      Q       You weren't just a common laborer?
21      A       I was a carpenter, sir.
22      Q       Now, my question to you is, when you quit your
23              job, when did you quit your job?
24      A       I would say -- well, let me put it like this
25              here --
```

```
 1    Q    No, the question was when did you quit your job.

 2         Give me the date, please, sir.

 3    A    When was the last day I went to my job or when did

 4         I quit my job?

 5    Q    When did you quit your job?

 6    A    I never actually quit my job.

 7    Q    When is the last day you worked?

 8    A    It would have to be around the time my wife had my

 9         little boy was the last time I went to my job.

10    Q    So you had no income coming in after that, correct?

11    A    No, sir.

12    Q    And your wife was not working, correct?

13    A    No, sir.

14    Q    She had no income coming in, correct?

15    A    Yes, she did have income.

16    Q    What was the income she had coming in?

17    A    Well, she was getting maternity money from her

18         company because she had been there for a while.

19    Q    Mr. McNabb, it was your testimony that she was

20         getting money for how long, please, sir?

21    A    I can't say.

22    Q    Let me help you a little bit.  You recall when she

23         gave testimony under oath before in front of you,

24         correct?

25    A    Yes, sir.
```

239

```
 1   Q    You recall her saying she got only one week's
 2        worth of pay when she left Chick-fil-A?
 3   A    I don't recall that.
 4   Q    Do you deny that?
 5   A    I don't recall.
 6   Q    Let me ask you this.  If that was true, she only
 7        had one week and you only had one week, can you
 8        tell the jury how you were going to support your
 9        wife and two children if you had no income coming
10        in?
11   A    We had a bank account.
12   Q    Where was your bank account?
13   A    I believe it was Southeast at the time.
14   Q    Excuse me?  Southeast?  Southeast bank?
15   A    Something like that, sir.
16   Q    In Dothan?
17   A    We had one here in Dothan, and then we had an
18        account in --
19   Q    In Orlando?
20   A    Yes, sir.
21   Q    Where in Orlando?
22   A    I want to say Washington Mutual.
23   Q    Where?
24   A    Washington Mutual if I'm not mistaken.
25   Q    Washington Mutual if you're not mistaken.
```

1          Let's go to -- it is true that you owned and
2      your wife owned a van that had wood paneling,
3      correct?
4    A   Yes, sir.
5    Q   You own a Buick LaSabre, correct?
6    A   Yes, sir.
7    Q   And you also own a tan Cadillac, correct?
8    A   Yes, sir.
9    Q   And it's true you had never had a problem, any
10     words, fights, disagreements with Reggie Hill, had
11     you?
12   A   No, sir.
13   Q   Now, what I want to ask you, it's your testimony
14     that you went to Orlando on June 3rd to pick up
15     your child, correct?
16   A   Yes, sir.
17   Q   How long did you stay in Orlando?  How many days?
18   A   I ended up staying there, sir.
19   Q   Well, my question was, how many days were you
20     going to stay down there?
21   A   I was going to get my little girl.
22   Q   Were you going to stay for fourteen days?  Was
23     that your original plan?
24   A   No, sir.
25   Q   Now, you were going to get your daughter?

```
1    A    Yes, sir.

2    Q    Were you going to pick your daughter up on Monday

3         and come back?  Is that what happened?

4    A    Yes, sir.

5    Q    But your wife was here in Dothan with two children

6         and she had just had a baby, and, yet, you stayed

7         down in Orlando?

8    A    Yes, sir.

9    Q    Correct?

10   A    Yes, sir.

11   Q    Now, your wife came to Orlando on what day?

12   A    I want to say that following weekend.  Like,

13        Saturday.

14   Q    Saturday, correct?

15   A    Yes, sir.

16   Q    Now, let me ask you, if I could, you and your wife

17        weren't having any problems, were you?

18   A    Yes.  Because of me being out of town.  Frequently

19        as I was.

20   Q    So it's your testimony under oath, then, when you

21        left to go get your daughter, you and your wife

22        were having problems?

23   A    I wouldn't say problems --

24   Q    Were you split up or anything like that?

25   A    No, sir.
```

```
 1    Q    Now, my question to you is, you got to Orlando,
 2         right?
 3    A    Yes, sir.
 4    Q    And did you have communications with your wife?
 5    A    Yes.
 6    Q    How did you do that?  How would you talk to your
 7         wife?
 8    A    Over the phone.
 9    Q    Cell phone or regular phone?
10    A    Over a regular phone.
11    Q    Did you talk to her every day?
12    A    I talked to her enough that --
13    Q    What I want to ask you about.  You just had a new
14         baby in the family.  Were you concerned about your
15         child?
16    A    Most definitely.
17    Q    So the question was, would you talk to her every
18         day?
19    A    It's been three years.  I can't tell you the
20         answer to that.  But I know I had contact with her
21         over that period, yes, sir.
22    Q    You told the ladies and gentlemen of the jury a
23         friend called you and told you the police had been
24         to the house; is that correct?
25    A    Yes, sir.
```

```
 1    Q    Your wife didn't call you?
 2    A    No, sir.
 3    Q    My question to you is when your friend called and
 4         told you the police had been to your apartment,
 5         there was no arrest warrant at that time for you,
 6         was there?
 7    A    I wouldn't know, sir.
 8    Q    Did you ask the police if you were under arrest,
 9         Mr. McNabb?  You did, didn't you?
10    A    No, I didn't.
11    Q    You called them up.  Were you ugly to them?
12    A    No, I wasn't.
13    Q    They asked you to come in and talk with them about
14         what occurred, didn't they?
15    A    Yes, sir.
16    Q    And you didn't come back?
17    A    Because of the way he approached me.
18    Q    Did you come back?  You wouldn't, would you?
19    A    Not at that time, no, sir.
20    Q    And let me tell you, you never came back to
21         Dothan, Alabama, Houston County, to answer the
22         charge of robbery, did you?
23    A    Yes, I did, sir.
24    Q    Is it not true you lived in Orlando?
25    A    Yes, sir.
```

```
 1    Q    And isn't it true you never turned yourself in in
 2         Orlando?  You didn't, did you?
 3    A    Yes, I did.
 4    Q    Mr. McNabb, isn't it true they stopped on a
 5         traffic violation?  Do you recall that?
 6    A    Yes, sir.
 7    Q    You gave them your brother's name, didn't you?
 8    A    Yes, sir.
 9    Q    So, once again, Mr. McNabb, here's the Orlando
10         Police Department that were running your license
11         and asking you who you were, and you lied to those
12         police officers using your brother's name once
13         again trying to get away, correct?
14    A    Yes, sir.
15    Q    Now, you had not had problems with Orlando Police
16         Department, had you?
17    A    Yes, I have.
18    Q    I want you to tell the ladies and gentlemen of
19         the jury, you went to see your father what day?
20    A    Like I said, it would have to be that Sunday.
21    Q    You went to see your father on Sunday.
22             In Eufaula?
23    A    Yes, sir.
24    Q    So you drove from Dothan to Eufaula, right?
25    A    Yes, sir.
```

```
 1    Q    After you saw your father, you drove all the way
 2         straight down to Orlando, correct?
 3    A    Yes, sir.
 4    Q    Didn't stop to see your wife again?
 5    A    No, sir.
 6    Q    Now, you get down to Orlando, who did you stay
 7         with?
 8    A    I stayed with my sister's sister, Daniella.
 9    Q    Is it fair on or about June 17th of 2001, you're
10         about six feet tall, right?
11    A    Yes, sir.
12    Q    You're about a hundred and ninety-seven --
13         hundred and ninety pounds?  Is that approximate
14         range?
15    A    Roughly two hundred pounds.
16    Q    Is it true you had your hair short back in June
17         7th in 19 -- I mean, 2001?
18    A    Yes.
19    Q    In May and June, did you keep your hair short?
20    A    I would say probably be about like this here
21         (indicating).
22    Q    Did you ever give testimony under oath you wore
23         your hair in dreadlocks?  You didn't, didn't you?
24    A    Short dreadlocks.
25    Q    When I asked you if your hair was short, you gave
```

```
 1              testimony in a deposition before under oath that
 2              on or about June 7th you had it in a dreadlock
 3              style, correct?
 4    A         Short in dreadlocks.
 5    Q         What I want to ask you about is, you go down to
 6              Orlando, you didn't have a job, right?
 7    A         No, sir.
 8    Q         You had children in Orlando that you had financial
 9              responsibilities to, correct?
10    A         Yes, sir.
11    Q         But, yet, you quit your job up here, right?
12    A         Yes, sir.
13    Q         Now, did you ever go back and talk with the people
14              at your job and tell them you wanted to take some
15              time off to be with your baby?
16    A         Yes, sir.
17    Q         You gave testimony under oath about that, correct?
18    A         Yes, sir.
19    Q         And you heard testimony under oath that you never
20              went back and talked to Mr. King, the owner,
21              correct?
22    A         No, I did talk to Jimmy.
23    Q         And you never talked to the manager, correct?
24    A         I talked to Eddie.
25    Q         You talked to Eddie who?
```

```
 1    A    I don't know his last name.
 2    Q    Let me ask you.  Look at this jury in the face and
 3         tell them testimony under oath before that you in
 4         fact -- witnesses got on the stand in front of you
 5         said you never talked to anybody, you just quit
 6         and never showed back up?  That's true, isn't it?
 7    A    No, it's not.
 8    Q    They didn't say that in front of you?
 9    A    No, sir.
10    Q    You deny that?
11    A    Yes, sir.
12    Q    Now, let me ask you this, if I could.  Reggie --
13         do you deny that you asked Reggie about the Winn
14         Dixie makes two hundred and fifty or three hundred
15         thousand dollars in money a week?  That kind of
16         business?  Did you ask him that?
17    A    If I did, it was in just a rough conversation.
18         Just like he asked me how much money we made at
19         Jimmy King's.
20    Q    Did you also ask how many people worked at
21         nighttime?
22    A    No, sir.
23    Q    Did you ever ask Mr. Reeves' name, the man that
24         had big muscular arms?
25    A    No, sir.
```

```
 1    Q    Now, the question I want to ask you is, you told
 2         the jury you had been in prison?
 3    A    Yes, sir.
 4    Q    You have felony convictions, correct?
 5    A    Yes, sir.
 6    Q    Felony convictions for what?  Can you tell us?
 7    A    For drug charges.
 8    Q    How many?
 9    A    Roughly four or five.
10    Q    Now, tell the ladies and gentlemen of the jury,
11         when you called the police officer to inquire
12         about what was happening at your house, you had
13         not had any problems with Reggie Hill, correct?
14    A    No, sir.
15    Q    And were you and your wife on food stamps at that
16         time here in Dothan?  You weren't, were you?
17    A    No, sir.
18    Q    Now, you mentioned that you got out of prison
19         September of 1989; is what you said?
20    A    '99.
21    Q    '99?
22    A    September of '99, yes, sir.
23    Q    And then you moved to Dothan?
24    A    Yes, sir.
25    Q    The question I want to ask you, September of '99
```

| | | |
|---|---|---|
| 1 | | up through June 7th of 2001, it's your testimony |
| 2 | | that you still had stamps to this jury that your |
| 3 | | wife used or you used to write each other back and |
| 4 | | forth after all that time? |
| 5 | A | Yes, sir.  They were just in the safe. |
| 6 | Q | Now, let me ask you something.  What I want to ask |
| 7 | | you about, this is your toboggan, isn't it? |
| 8 | A | Yes, sir. |
| 9 | Q | In fact, you wore this toboggan, correct? |
| 10 | A | That's my little girl's toboggan. |
| 11 | Q | Well, I'm confused.  I just asked if it was your |
| 12 | | toboggan and you said yes.  Now you say it's your |
| 13 | | little girl's toboggan.  Which is it? |
| 14 | A | It's me and my little girl if you want to ask it |
| 15 | | like that. |
| 16 | Q | The question I want to ask you, this fifty books |
| 17 | | of stamps, was this in your safe? |
| 18 | A | I can't say precisely if these books of stamps |
| 19 | | were in the safe. |
| 20 | Q | Does it look like them? |
| 21 | A | We did have stamps in the safe.  I can't be |
| 22 | | precise and say those were in the safe. |
| 23 | Q | Let me ask you if I could, this authorized is |
| 24 | | signed Defendant's Exhibit by you, correct? |
| 25 | A | Yes, sir. |

1   Q   In other words, you signed that?

2   A   Saying that he could work on my car, yes, sir.

3   Q   And all this was filled out by the man you say

4       that gave it to you?

5   A   Yes, sir.

6   Q   Now, let's go to State's Exhibit 5, the ten dollar

7       food stamp that was found in your safe.

8   A   Yes, sir.

9   Q   And then let's look at State's 9, the money

10      wrapper of a thousand dollars with the stamp of a

11      thousand dollars found in your safe, correct?

12  A   That's what they said, sir.

13  Q   Well, let me ask you, if I could.  Do you dispute

14      those items were found in your safe in your

15      apartment here in Dothan?  You don't, do you?

16  A   Yes, I do dispute they was in my safe.  I have

17      never seen those items.

18  Q   Is it your testimony that the police planted them

19      in there?  Is that what you're telling this jury?

20  A   Somebody put them in there because me nor my wife

21      know nothing about them.

22  Q   I want you to tell the ladies and gentlemen of the

23      jury, your door at the apartment had a lock on it?

24  A   Yes, sir.

25  Q   Dead bolt, correct?

```
 1    A    Pretty raggedy.

 2    Q    You had never had anybody break into your

 3         apartment before the police came and executed the

 4         search warrant, had you?

 5    A    Well, according to Daniella --

 6    Q    According to who?

 7    A    Daniella.

 8    Q    I'm asking you.  I'm not asking anybody else.

 9         You.  Can you tell the jury that you yourself at

10         the time you lived at Barstone ever saw your door

11         with any forced marks or broken into?  You can't,

12         can you?

13    A    Daniella has told me --

14              MR. VALESKA:  Judge, would you instruct the

15         witness?  I didn't ask about Daniella.

16              THE COURT:  I sustain the objection.

17                  No, you can't tell what somebody else

18         said.  He asked you a question.  Had your door

19         ever been forced open.

20    A    Yes, sir, it has been forced open.

21    Q    You saw it forced open?

22    A    No, sir.

23    Q    And let me ask you something.  It was forced open,

24         that make marks on it?

25    A    I wouldn't know, sir.  I don't do burglaries.
```

```
 1    Q    Let me ask you something.  My question to you is,
 2         it's your door you went in and out of in May and
 3         June and unlocked it and went in and out of it,
 4         correct?  Yes or no?
 5    A    I was told it would be opened up with a --
 6              MR. VALESKA:  Judge, would you ask him to
 7         answer --
 8              THE COURT:  I sustain the objection.
 9                  I just told you you can't tell what
10         somebody else told you.
11    Q    Did you go in and out your door and unlock it
12         every time you went in and out when you lived in
13         that apartment?
14    A    Yes, I had a key.
15    Q    Did you ever make a report to yourself to the
16         manager at Barstone that anybody had jimmied,
17         forced, broken your door open in any manner or
18         fashion?  You didn't, did you, Mr. McNabb?
19    A    No, sir.
20    Q    Your wife never made a report to anybody there had
21         been any forced entry, the lock had been changed
22         or moved in any way that there were any marks,
23         correct?
24    A    Yes, sir.
25    Q    Now, my question to you is, you used a name.  What
```

1      name did you use?

2   A   What name --

3   Q   Somebody's name.  A lady's name.

4   A   Daniella.

5   Q   Tell the jury how she's related to you.

6   A   She's my sister's wife -- I mean, my wife's

7       sister.

8   Q   Now, my question to you, I want to ask you, when

9       you left on the 1st, 2nd -- you left on the 2nd or

10      the 3rd.  Which day was it?

11  A   The 3rd.

12  Q   Went to Orlando, right?

13  A   Yes, sir.

14  Q   And then you were in Orlando you say on June 7th,

15      correct?

16  A   Yes, sir.

17  Q   When you went and stayed in Orlando, who did you

18      stay with?

19  A   I stayed at Daniella's house.

20  Q   Did you stay there all the time?

21  A   Yes, sir.

22  Q   Never went anywhere else?

23  A   I went all over the place in Orlando.

24  Q   That's what I'm asking about.  On June 7th, that

25      night particularly around four o'clock a.m., where

1       were you?

2   A   I was asleep.

3   Q   Asleep.  At whose house?

4   A   Punkin's.

5           THE COURT REPORTER:  I'm sorry?

6           THE WITNESS:  Daniella's home.  The same

7       person.

8   Q   Now, let me ask you something.  You also know that

9       bullets were found inside your house, correct?

10  A   Yes, sir.

11  Q   Mr. Baxley asked some witnesses about you being

12      charged with robbery in Florida.  You were charged

13      with robbery in Florida, weren't you?

14  A   I was never convicted.

15  Q   Were you arrested for robbery is the question.

16      Yes or no?

17  A   Yes, sir.

18  Q   The case was plea bargained down to a larceny

19      charge?

20  A   No, sir.

21  Q   You didn't serve time on that?

22  A   Yes, sir.

23  Q   What was the charge?

24  A   It was dropped down to battery theft.

25  Q   Battery and theft.  And what is battery?  Tell the

```
 1            jury.
 2    A       Battery is when you get into a fight with
 3            somebody.
 4    Q       So you served time for that, correct?
 5    A       Yes, sir.
 6    Q       Now, what I want to ask you is, when you became
 7            aware that the police had gone into your house,
 8            your wife was up here with your two children,
 9            right?
10    A       Yes, sir.
11    Q       And you didn't drive back up here to check on
12            them, did you?
13    A       No, sir.
14    Q       Now, let me ask you.  Have you ever owned a gun?
15    A       No, sir.
16    Q       Ever had a gun?
17    A       Yes, sir.
18    Q       And with a gun, you had bullets in it, right?
19    A       Yes, sir.
20    Q       And the question to you, are you aware if I
21            elicited testimony bullets found inside your safe,
22            three eighty, correct?
23    A       Yes, sir.
24    Q       Those weren't yours?
25    A       Yes, sir, they were mine.
```

```
1    Q    Now -- you're sure?

2    A    Yes, sir.

3    Q    You've told us the truth today, correct?

4    A    Yes, sir.

5    Q    Just like you didn't do the robbery, right?

6    A    Yes, sir.

7    Q    Now, you recall giving deposition under oath

8         before where you were asked about those bullets?

9         Do you remember that?

10   A    No, sir.

11   Q    Let me show you and refresh your memory and ask

12        were you asked questions about the bullets under

13        oath before on page one sixty-four when you were

14        being examined by Mr. Baxley, your attorney today,

15        correct?

16   A    Yes, sir.

17   Q    Look over here and I asked you about some bullets

18        were found there.  You understand that.  And your

19        answer was yes.  You have no idea how those

20        bullets would have gotten there.  No, sir.  Could

21        those bullets have been just by accident.  I can't

22        answer that.  Do you know anything about a gun.

23             So you were asked about the bullets before,

24        right?

25   A    Yes, sir.
```

```
1    Q    At that time you denied you knew anything about
2         the bullets, right?
3    A    Yes, sir.
4    Q    So today it's a different story.  You now admit in
5         front of this jury those were your bullets,
6         correct?
7    A    Yes.  After my memory was refreshed by my wife.
8    Q    Well, I would like to ask you, your memory is
9         refreshed by your wife.  I just asked you three
10        questions ago or four questions ago about the
11        bullets.  Is your wife in the courtroom today?
12   A    No, sir.
13   Q    So when did your wife refresh your memory about
14        what you gave a deposition for under oath?  When
15        was that?
16   A    We talked about that at the last trial.
17   Q    Sir, she came up with the depositions and went
18        over them with you?  Is that what occurred?
19   A    No, sir.  I just asked about the bullets.
20   Q    Now, your wife was with you on June 7th of 2001,
21        correct?
22   A    No, sir.
23   Q    Where was your wife?
24   A    She was here in Dothan, Alabama.
25   Q    Now --
```

| | | |
|---|---|---|
| 1 | A | June 7th.  Yeah, she was here in Dothan, Alabama. |
| 2 | Q | Now, let's go to on your diagram -- did you ever |
| 3 | | have problems with your Buick before you went down |
| 4 | | to Florida? |
| 5 | A | Yes, sir. |
| 6 | Q | Did you ever work on it at the apartment complex? |
| 7 | A | Yes, sir. |
| 8 | Q | Mr. McNabb, you can tell the jury.  Deposition |
| 9 | | under oath, you're aware of other people who gave |
| 10 | | a deposition under oath in front of you in |
| 11 | | relationship to that they saw you in Dothan on a |
| 12 | | Friday or Saturday working on your Buick, correct? |
| 13 | A | No, sir, I don't recall that. |
| 14 | Q | Well, let's look at Mr. Baxley's date so if I |
| 15 | | could on June of 2001, you would agree that the |
| 16 | | 8th is a Friday and the 9th is a Saturday, |
| 17 | | correct? |
| 18 | A | Yes, sir. |
| 19 | Q | Did you talk to your wife on June 14th? |
| 20 | A | Yes, sir. |
| 21 | Q | About them stopping and checking her car -- the |
| 22 | | van? |
| 23 | A | Yes, sir.  That was around the time I called her |
| 24 | | -- the investigator I think it was.  Whoever I |
| 25 | | talked to on the phone. |

```
 1    Q    Does it refresh your memory on June 15th, on a
 2         Friday, you called Lieutenant Martin with the
 3         Dothan Police Department?  Would that have been
 4         after your wife told you they had searched the van
 5         with her?
 6    A    Yes, sir.
 7    Q    And your wife came down you said on the following
 8         Saturday?
 9    A    Yes, sir.
10    Q    Now, you're positive that it's your testimony
11         that you know Daniella Turner?
12    A    Yes, sir.
13    Q    And you've never talked with her about the
14         robbery; is that correct?
15    A    No, sir.
16    Q    And you're sure that on the 3rd when you got there
17         you saw her?
18    A    I stayed there.
19    Q    And she would be able to say that's when you came
20         down on the 3rd; is that fair?
21    A    Yes.  It's in the deposition.
22    Q    Well, let me show you that deposition and ask you
23         if you were present when she testified on page one
24         sixty-eight when she indicated what day she saw
25         you right here that you didn't come to Orlando
```

```
1          according to her deposition under oath.  It was on
2          the 4th and not the 3rd, Mr. McNabb.  Take a look
3          at that and see if the question I asked you is
4          true.
5     A    Yes.
6     Q    It is?
7     A    Yes, sir.
8     Q    So the question I want to ask you now, you say you
9          got there on the 3rd.  You just told the jury she
10         saw you on the 3rd, correct?
11    A    Yes, sir.
12    Q    You stayed with her on the 3rd, correct?
13    A    Yes, sir.
14    Q    But you see in the deposition she gave under oath
15         she said she didn't see you and you stay there
16         until June 4th?
17    A    It's been three years since this happened, sir.
18         For me to sit here and tell you-all that I can
19         come up with date for date when things happened
20         three years ago, I would be dead wrong.  I would
21         be sitting here telling a lie then.  But I can
22         sure enough tell you specifics around that time
23         what happened.
24    Q    Thank you.
25              Now, my question is, would you answer my
```

1      question, please, sir, instead of giving an

2      explanation?  The question is, she said under oath

3      you saw her on the 4th.  It was not the 3th.

4      That's when she first said you stayed with her.

5      True or untrue, Mr. McNabb?

6   A  That's what she said in the deposition.

7   Q  Now, my question to you is, did your wife also

8      show you her deposition, in other words, and go

9      over that with you?  Yes or no?

10  A  No, sir.

11  Q  My question to you is, you just told the jury your

12     mind, your memory is not as good today as it was

13     back then, correct?

14  A  Exactly.

15  Q  Well, tell them when the deposition ago -- how

16     long ago was that?  Was that a week ago or a month

17     ago?  It wasn't, was it, Mr. McNabb?

18  A  No, sir.

19  Q  How long ago was the deposition?  Give us the --

20     tell us when the deposition was given under oath.

21     How many months ago that was?

22  A  February of last year.

23  Q  Now, is your memory better today or was it better

24     back then in February?  Which is it?

25  A  From reading the deposition I can't recall, sir.

```
 1    Q    So when you just told the jury that it's been a
 2         long time, you can't remember exact dates, what I
 3         want to ask you is, the last time there was a
 4         deposition under oath, it wasn't the same story
 5         about the dates, was it, Mr. McNabb, as it is
 6         today, correct?  It's different, isn't it?
 7    A    Maybe the dates, yes, sir.
 8    Q    You're charged with robbery in the first degree,
 9         correct?
10    A    Yes, sir.
11    Q    You know it's very important that you are claiming
12         you were in Orlando; in other words, that's alibi,
13         right?  True?
14    A    That's what you call it, sir.
15    Q    You were saying you were down there and you
16         couldn't have done it, correct?
17    A    Yes, sir.
18    Q    You have told the jury that these people that saw
19         you can verify you were down there on June 7th,
20         correct?
21    A    Yes, sir.
22    Q    Now, I asked you about whether you went to any
23         clubs or went out or went any other place.  Do you
24         recall me asking you that?
25    A    No, sir.
```

```
 1    Q    Do you recall what Ms. Turner said from the time
 2         you first got down there when she saw you on June
 3         4th until around June 14th you never left the
 4         house or stayed home the entire time?  Do you
 5         recall her giving a deposition saying that's what
 6         you did?
 7    A    No, sir.
 8    Q    Show you on one sixty-nine back then that's what
 9         she said.  Show you, Mr. McNabb.  He never went
10         anywhere else other than my home to stay.
11              Do you recall that?
12    A    Yes.
13    Q    Now, let me ask you if I could.  What I would like
14         to ask you, if I could, on June 15th of 2001, your
15         wife left Dothan and moved back down there to
16         where you lived in Florida, right?  True?
17    A    June 15th?
18    Q    Sometime after that?
19    A    Sometime after that.
20    Q    She moved.  She left Dothan and came to Florida
21         where you were living, right?
22    A    Yes.  Because of the police harassment.
23    Q    Police harassment.
24              Well, let me ask you something, if I could.
25         Of the police harassment, how were the Dothan
```

```
 1              police harassing you when you were down in
 2              Florida?  They couldn't, could they?
 3       A      The police harassing her.  That's what I said.
 4       Q      The police harassing her.
 5                   Let me ask you something.  If you hadn't been
 6              stopped by the Orlando police and given your
 7              brother's name -- and you did that is what you
 8              said, correct?
 9       A      Yes, sir.
10       Q      In fact, when they tried to arrest you, you ran,
11              didn't you?
12       A      Yes, sir.
13       Q      Tried to get away?
14       A      Yes, sir.
15       Q      Can you look at this jury, were you ever going to
16              come back and answer the charge of robbery in the
17              first degree which you had alibis showing you
18              didn't do it?  Were you ever going to stand trial?
19       A      I never knew they had a warrant.
20       Q      You're telling me that your wife and Lieutenant
21              Martin didn't tell you there was an arrest for
22              your warrant?
23       A      No, sir, he didn't.  He just told me to come and
24              speak to him.
25       Q      Well, tell this jury why you never came back if
```

```
1              you didn't think there was a warrant.
2     A    Because of the police harassment.
3     Q    Did you come back and help move your wife and your
4              children?  In other words, she had just had a
5              baby, did you come back and help them move out of
6              town so they would be safe?  You didn't, did you?
7     A    No, sir.
8     Q    Now, how were you paying support for your other
9              children, Mr. McNabb, if you weren't working
10             during this time?  Is that the money that you kept
11             in this bank account?
12    A    Yes, sir.
13    Q    Had you been in the Winn Dixie?  You had, hadn't
14             you?  Gone over there and purchased things before?
15    A    Not that I can recall.
16    Q    Did you discuss with your wife about how the food
17             stamps, the money clip -- the money wrapper got
18             into your house?
19    A    We never discussed that until it came up at trial
20             and we found out that they found these things in
21             our house.
22    Q    Well, let me ask you something.  You got the
23             bullets back, correct?  Or your wife did, didn't
24             you?
25    A    I guess so.
```

```
 1    Q    You got some of your clothing back, didn't you?
 2    A    Yes, sir.
 3    Q    You did in fact own tennis shoes back then,
 4         correct?
 5    A    Yes, sir.
 6    Q    Did you own a blue jean jacket?
 7    A    No, sir.
 8    Q    You didn't, did you?
 9    A    No, sir.
10    Q    Didn't own that?
11    A    No, sir.
12    Q    Let me ask you if I could.  Tell this jury on June
13         7th who you were with, 2001.
14    A    I was in Orlando, Florida.
15    Q    That's not what I asked you.  The question I asked
16         you was look at this jury and tell them who you
17         were with that day.
18    A    On June 7th I would have to be at Daniella's
19         house.
20              MR. VALESKA:  That's all.  Pass the witness.
21         Thank you.
22              THE COURT:  Anything further?
23              MR. BAXLEY:  Yes, Your Honor.
24                      REDIRECT EXAMINATION
25    BY MR. BAXLEY:
```

```
 1    Q    Mr. McNabb, Mr. Valeska got into, you know, the
 2         fact that you did have a criminal history of
 3         something there, and I want you to explain to this
 4         jury what that -- what that -- the circumstances
 5         around that robbery charge.
 6    A    I had a friend who was -- an associate who was
 7         staying with me.  One day I was working on one of
 8         my cars, and I had my wallet in my pocket.  My
 9         wallet fell out of my pocket.  He picked up my
10         wallet and stole the money out of it along with
11         the wallet.  I was charged -- me and him ended up
12         getting into a fight about this here.  Because I
13         been raised nobody going to take nothing from you
14         like that.  We got into a fright.  He ended up
15         calling the police on me because of the fight.
16         Because we got into a pretty good scuffle.  The
17         police charged me initially with robbery because
18         the laws of Florida say anytime you do something
19         with force, it's considered robbery.  Same as they
20         is here in Alabama.  When we went to court, the
21         judge would not accept my -- the charges as it was
22         with the circumstances surrounding it.  The
23         charges were dropped to battery and theft.  That's
24         what happened with that there.
25    Q    Mr. Valeska has gone into great detail about you
```

1    fleeing and not wanting to come back to Alabama.

2    Is there anything you can say to this jury that

3    would tell you -- tell them otherwise?

4  A   My wife had just had my son.  My little boy was

5    roughly, what, three weeks old.  The police were

6    so belligerent and -- the way they were treating

7    me on the phone, I didn't want to -- you know what

8    I'm saying?  Because my son had just been born.  I

9    wanted to spend time with my son.  I'm being

10    straight up honest with you.  I'm a man.  I had

11    just had my first son.  I have three other

12    daughters.  And I just got my son.  I don't think

13    any man would just run and -- you know what I'm

14    saying?  I got my son.  That's the best I can

15    say.  I wanted to spend time with my child.

16  Q   Now, isn't it true that you were let out of

17    jail --

18        MR. VALESKA:  Objection.

19        THE COURT:  Let out of jail?

20        MR. BAXLEY:  Let out of jail about --

21             (At which time the following proceedings

22              were held at the bench outside of the

23              hearing of the jury:)

24        MR. BAXLEY:  Your Honor, he's brought up

25    evidence of flight in this case and made an issue

```
 1          here.  And I think it's -- that we can bring up
 2          the evidence that he was mistakenly released from
 3          the Houston County Jail and came back on his own
 4          recognizance.
 5              MR. VALESKA:  I can't get into there was an
 6          escape warrant charge?  I can't get into that.
 7          That's not what I asked him.  I asked him why he
 8          didn't come back.  And he gave his explanation.
 9          He never said, I didn't come back because there
10          was an escape warrant.  He never got into that.
11          He can't go into it now.
12              MR. BAXLEY:  Your Honor, he's brought up the
13          thing about flight.  He said he didn't come back
14          here because of that.  It's absolute a part.  He
15          did come back on his own volition.
16              MR. VALESKA:  You missed the point.  The
17          point is, Judge White, there was a warrant for
18          him.  He was stopped by the police.  He gave a
19          phony name.  He ran and escaped.  They arrested
20          him --
21              MR. BAXLEY:  Your Honor --
22              MR. VALESKA:  Can I finish?
23              MR. BAXLEY:  Yeah.
24              MR. VALESKA:  They took him into custody and
25          brought him back.  There's no willful return then,
```

1    Judge White.  He was brought back and returned

2    because the sheriff's department made a mikstake

3    at a later point in time is not relevant to the

4    timeframe I asked him why he come back.  That's

5    after the fact, Judge.  And I didn't go into

6    that.

7         THE COURT:  There was a warrant?

8         MR. VALESKA:  There was a warrant.

9         MR. BAXLEY:  He said he was not aware of that

10   warrant.  And that's what I'm getting here, Your

11   Honor.  When he was made aware of the warrant with

12   the escape charge, he came back.  It was when he

13   was made aware of the warrant.  And that is

14   absolutely pertinent and this jury should know.

15        MR. VALESKA:  He's missing the point of the

16   escape warrant, Judge White, was after the robbery

17   indictment.  You did the bond hearing.  And that

18   has nothing to do with this time period.  And I

19   didn't ask him --

20        THE COURT:  Yeah.

21        MR. BAXLEY:  It still has to do with the

22   case, though.

23        THE COURT:  I sustain the objection.

24             (At which time the following proceedings

25             were held in open court:)

```
 1    Q    Mr. McNabb, you say that -- had you known about a

 2         warrant, you would have come back to Alabama?

 3    A    Yes, sir.

 4    Q    But you didn't know anything about a warrant in

 5         Alabama?

 6    A    No, sir.

 7              MR. BAXLEY:  Nothing further of this witness,

 8         Your Honor.

 9              MR. VALESKA:  No more questions.

10              THE COURT:  You may step down.

11                   Who will your next witness be?

12              MR. BAXLEY:  Ms. Yvette McNabb.

13                        YVETTE MCNABB,

14         having first been duly sworn, was examined and

15         testified as follows:

16                        DIRECT EXAMINATION

17    BY MR. BAXLEY:

18    Q    Ms. McNabb, can you state your name for the Judge

19         and jury?

20    A    Yvette McNabb.

21    Q    And what's your relationship with Corey McNabb?

22    A    He's my husband.

23    Q    How long have you-guys been married?

24    A    About five years.

25    Q    And do you understand why you're in court today?
```

| 1 | A | Yes, I do. |
|---|---|---|
| 2 | Q | And is it safe to say you understand that your |
| 3 | | husband was charged with first degree robbery? |
| 4 | A | Yes. |
| 5 | Q | The evidence has been presented that this robbery |
| 6 | | occurred on June 7, 2001.  Is there any way |
| 7 | | possible that Corey could have been at the Winn |
| 8 | | Dixie on Westgate Parkway on June 7, 2001? |
| 9 | A | No. |
| 10 | Q | And why is that? |
| 11 | A | Because he was going to Orlando to get my |
| 12 | | step-daughter, his daughter, for the summer. |
| 13 | Q | And when did he leave to go to Orlando? |
| 14 | A | He left June 2nd to go and see about my |
| 15 | | father-in-law because he has dialysis, and he's |
| 16 | | real sick.  So he went there first.  And then he |
| 17 | | went from there to Orlando. |
| 18 | Q | Now, Corey has testified that this daughter he has |
| 19 | | -- what's the mother's name? |
| 20 | A | Tawanna. |
| 21 | Q | Tawanna. |
| 22 | | And Keisha is the daughter's name? |
| 23 | A | Taquasia. |
| 24 | Q | Taquasia is the daughter's name. |
| 25 | | My understanding and what Corey testified to |

```
1              was there was a regular visitation rotation --
2     A    Yeah.  Every summer she come and be with us until,
3              like, that -- roughly, like, the last week --
4              weekend before school, that's when we take her
5              back.
6     Q    So regular trip he would make?
7     A    Yeah.
8     Q    And roughly when did he leave to go down and pick
9              her up?
10    A    Like, the 3rd.  It had to have been the 3rd.
11             Because I'm sure he spent the night with Papa.
12             So, like, the 3rd.
13    Q    I'm talking about regular.  End of school,
14             beginning of June, end of May?
15    A    No.  Because sometimes we don't -- it depends on
16             when school ends.  So usually, like, that Friday
17             when school end, then he will go and pick her up.
18    Q    Some point that weekend after school ended, then?
19    A    Yes.  Yes.
20    Q    Why are you so sure that he left at that exact
21             time?  What sticks out in your mind?
22    A    Because I had -- we had already talked to Tawanna,
23             and she -- like I said, we always have her for the
24             summer.  So we had already scheduled for us to
25             pick her up so Tawanna could do what she needed to
```

1      do workwise and everything like that.

2    Q    Were you in contact with Corey the whole time he

3         was gone?

4    A    Yeah.  He have a cell phone.

5    Q    How often was the contact?

6    A    Pretty frequent.  He called and checked on the

7         kids because I had just had a baby.

8    Q    Were you upset with him at any point because he

9         was gone?

10   A    Well, yeah.  Yes and no.  Because I had -- like I

11        said, I had just had a baby.  So I didn't really

12        want him to go pick up Taquasia because I didn't

13        want to have to deal with three kids.  So, yeah,

14        I was a little hot.

15   Q    Where were you working at that time?

16   A    I worked for Chick-fil-A at Wiregrass Commons

17        Mall.

18   Q    And were you still working at the time you had

19        your baby?

20   A    No.  No.

21   Q    Were you given any sort of leave from your job?

22   A    Yeah.  My boss would -- they don't actually have,

23        you know, medical leave pay.  But my boss would,

24        you know, put time in for me to get checks because

25        it was his business.

```
1    Q    Your boss was working with you pretty good?

2    A    Yes.  Uh-huh.

3    Q    How were you and Corey supporting yourselves

4         during this time period?

5    A    Well, we had money saved up, you know.  We had to

6         get money up after having a baby.

7    Q    Did you expect to take a little bit of time off?

8    A    Well, of course, I was.  But, you know, him, too,

9         because -- for the simple fact it was just us down

10        here.  We didn't have no family down here.  And my

11        father-in-law couldn't very well, you know, help

12        with anything.  And I was having complications

13        with my pregnancy also.

14   Q    Where would Corey stay when he went to Orlando?

15   A    He stayed at my sister's house.

16   Q    Is that what he typically did when he went to

17        Orlando?

18   A    When we all went, we always stayed over there.

19        She had a pretty big apartment.

20   Q    When did you first become aware of anything about

21        this Winn Dixie robbery?

22   A    When I came back home.  Because I left --

23   Q    Let's back up on, then.  Did you go to Orlando at

24        some point?

25   A    Yes.  Uh-huh.
```

```
 1    Q   When did you go to Orlando?

 2    A   On the 8th.

 3    Q   On the 9th.

 4        And why did you go to Orlando?

 5    A   So my family could see my new baby and go down

 6        there and, you know, be with Corey, too.

 7    Q   Had you-all planned to go down there for a little

 8        extended period of time?

 9    A   Not -- not really.  Not really.  Not at first.

10    Q   Not at first.

11        What made you decide to make an extended

12        period of time?

13    A   Because I wanted to see my mom and, you know, see

14        everybody.  Everybody wasn't there when we first

15        went.

16    Q   Now, the robbery we understand occurred on June

17        7th.  I think everyone is familiar with that date

18        now.  When did you first become aware of the

19        robbery and the accusations against your husband?

20    A   When I came back home.

21    Q   When did you come back home?

22    A   On the 13th.

23    Q   On the 13th.

24        And what did you find when you came home?

25    A   Well, my front door was busted.  My house was tore
```

```
 1              up.  And it was a search warrant with a list of
 2              stuff on the table.
 3      Q       The State has introduced a couple of things into
 4              evidence here I want you to look at, that being
 5              this food stamp and this other item.  Do you
 6              recognize either one of those things?
 7      A       No, I do not.
 8      Q       Were they in your house at any point?
 9      A       No.  I would have noticed that.
10      Q       How about postage stamps?
11      A       Those, no.  But I --
12      Q       Did you-all have a substantial amount of postage
13              stamps in your house at any point?
14      A       Not like that.  But we did have postage stamps
15              because Corey had been in jail before, and I did
16              send him a lot of stamps, and he did bring some
17              home with him.
18      Q       Would you lie to protect your husband today?
19      A       No.  No, I wouldn't.  If he hurt somebody, then,
20              you know, I would want -- even though I know he
21              would be away from me and my kids, the right thing
22              is the right thing.
23      Q       But you could sit here and testify with a straight
24              face and honestly look at these people in the eyes
25              and tell them that Corey was not in Dothan at that
```

```
 1              time?
 2    A    Yes, I can.
 3              MR. BAXLEY:  Thank you.
 4                   CROSS EXAMINATION
 5    BY MR. VALESKA:
 6    Q    I would like to ask you, ma'am, you say that he
 7         left to go to Orlando on what day?
 8    A    On the 2nd.
 9    Q    So if he testified he went on June 3rd, he's
10         wrong, correct?
11    A    Well, yes and no.  Like I said, he went June 2nd.
12         He went to my father-in-law's house, and then he
13         went from there.
14    Q    Would you agree that it's very important for your
15         husband to prove that he was not; in other words,
16         to show that he couldn't have done the robbery,
17         because on June 7th he was in Orlando, right?
18    A    Right.
19    Q    In other words, he has no burden, but we have the
20         burden, but the question is, so dates are
21         important?  Would you agree in this case?
22    A    Of course.
23    Q    So it's your testimony, then, you said he left on
24         which day to go to Orlando?
25    A    The 3rd, then.
```