```
 1    Q    Which was it?  The 3rd or the 2nd?

 2    A    The 2nd to my father-in-law's house.  From there

 3         he went to Orlando.

 4    Q    The question was, what day did you say he went to

 5         Orlando?

 6    A    Okay.  June 3rd.

 7    Q    The question, your father-in-law lives where?

 8    A    In Eufaula.

 9    Q    And he spent the night up there, right?

10    A    Yes.

11    Q    You know that?

12    A    Of course.

13    Q    Because you talked to him?

14    A    Yes.

15    Q    On that cell phone?

16    A    Uh-huh.

17    Q    So if your husband gave testimony a little while

18         ago in front of this jury under oath that he

19         didn't spend the night, he just went up there and

20         went to Orlando the same day, which one of you is

21         mistaken?  You or your husband?

22    A    I don't know.  I know he told me where he was at,

23         and I believed him.

24    Q    So the question, you didn't answer the question,

25         then, did you, ma'am?  I asked you if your husband
```

```
 1            gave testimony in front of this jury that he went
 2            to see his father on the 3rd and he didn't spend
 3            the night and he just saw him and drove down to
 4            Orlando the same day, I asked you what day he went
 5            and you said the 2nd, correct?
 6    A       Yes.
 7    Q       He left your house, correct?
 8    A       Yes.
 9    Q       He left the house where he just had this baby boy
10            that he loved, right?  True?
11    A       Yes.
12    Q       And you-all weren't split up at that time, were
13            you?
14    A       No.
15    Q       And you weren't having fights, though, were you?
16            You and him.
17    A       No.  I was just upset about him going to get
18            Taquasia.
19    Q       And you never been split up during this time,
20            correct?
21    A       No.
22    Q       You never told anybody that?
23    A       No.  I don't tell nobody my personal business.
24    Q       My question to you, though, is, now I've asked you
25            if your husband, who denies he did the robbery
```

```
 1           says that he drove to see his father same day and
 2           went to Orlando the say day on the 3rd, never
 3           spent the night, never did that, either you or he
 4           is mistaken, correct?
 5     A     Because he went on the 2nd, not the 3rd.
 6     Q     So the question is, though, you know he spent the
 7           night because you talked with him, right?
 8     A     Sure.
 9     Q     On the cell phone?
10     A     Yes.
11     Q     Now, I want to ask you if I could, please, ma'am,
12           you had lived in the apartment with him.  Was it
13           J-141 Barstone or 171?  Which was it?
14     A     171.
15     Q     And that's Dothan, Alabama, Houston County?
16     A     Yes, it is.
17     Q     Isn't it true you quit your job in April working
18           at Chick-fil-A?
19     A     I didn't quit my job.  I took leave.
20     Q     You never went back to work there again, did you?
21     A     No.  Because I moved away.
22     Q     Well, I'll ask you about that in a minute, ma'am.
23           My question to you is, it's your testimony from
24           April 1st, April 10th, 15th, that you got a check
25           every week from Chick-fil-A up until the time you
```

```
 1          left town?  That's not?
 2    A     No, not every week.  No.
 3    Q     So in fact you got one week's check is all you got
 4          when you left?  Is that not true, ma'am?
 5    A     I can't remember.  That was a long time ago.
 6    Q     Well, ma'am, in other words, you had a child to
 7          support in the family, correct?
 8    A     Yes.
 9    Q     What was your husband's job?  What was his
10          position at this time when he was working in May
11          before?  Where did he quit his job?
12    A     He was working at King Church Furniture.
13    Q     Was he a carpenter?
14    A     Yes.
15    Q     My question is, he left his job and quit, correct?
16    A     He didn't quit.  He took a leave.
17    Q     Well, let me ask you.  When did he take this leave
18          from there?
19    A     Probably, like, about a couple of days before I
20          had Little Ruben.
21    Q     And that was what day?
22    A     I couldn't give you a date on that.
23    Q     What day did you have the baby, ma'am?
24    A     May 8th.
25    Q     So a day or two before, which would make it in
```

```
 1            May, correct?  Is that fair?
 2    A    Yeah.
 3    Q    You sure?
 4    A    That's fair.
 5    Q    It wasn't April?
 6    A    I don't think so.
 7    Q    He wasn't working, you weren't working, right?
 8    A    Right.
 9    Q    You already had another child in the house, right?
10    A    Uh-huh.
11    Q    So that's three mouths to feed, correct?
12    A    No.  Taquasia hadn't came down yet.
13    Q    Well, Taquasia lived where?
14    A    In Orlando.
15    Q    So no other child but --
16    A    No.  I only had my daughter, Dezeray, and I was
17         pregnant with Ruben.
18    Q    That's what I'm asking about.  Dezeray was in the
19         house, correct?
20    A    Uh-huh.
21    Q    That's what I said.  Another child, Dezeray.
22         You, Dezeray, and the Defendant, correct?
23    A    Right.
24    Q    So that's three mouths to feed, right?
25    A    Right.
```

```
1    Q    And, yet, you had both quit your jobs, right?

2    A    Right.

3    Q    No income coming in, correct?

4    A    Well, we had money saved up.

5    Q    Let's talk about.  Where was your money saved up?

6    A    I had -- we had a bank account at AmSouth and we

7         had one at Washington Mutual in Orlando.

8    Q    And how would you get money to Washington Mutual

9         in Orlando?  Would you mail the money down there?

10   A    No.  We went down there pretty often.

11   Q    Ma'am, the cars that you owned were a white 19

12        what?

13   A    '89.

14   Q    '89 van with wood paneling, correct?

15   A    Yes.

16   Q    And your husband owned a tan old-model Cadillac,

17        correct?

18   A    Uh-huh.

19   Q    And an older Buick LaSabre, correct?

20   A    Yes.

21   Q    Did he have problems with the Buick LaSabre before

22        he went to Orlando?

23   A    Not that I know of.

24   Q    Did he ever work on that Buick LaSabre during the

25        the week of June 4th through June 9th, that
```

```
 1            Saturday?
 2       A    At home?
 3       Q    Uh-huh.
 4       A    He wasn't home so I couldn't tell you that.
 5       Q    Now, ma'am, it's your testimony he left on June
 6            the 3rd or 2nd?  I'll ask you one more time.  Just
 7            tell me what it was.  I won't ask you again, I
 8            promise.  When he went to see his father, what
 9            day?
10       A    The 2nd.
11       Q    And my question is, you didn't see him again until
12            what day?
13       A    The 9th when I went down to Orlando.
14       Q    Tell the jury on the 3rd, 4th, 5th, 6th, and
15            particularly the 7th, you didn't see him, did you?
16       A    No.
17       Q    You don't know where he was, do you?
18       A    I know he told me he was in Orlando.
19       Q    That's what --
20       A    And I spoke with my sister.
21       Q    That's what I want you to tell the jury.  You
22            never saw him on June 7th, did you?
23       A    No.
24       Q    And you talked with him on the phone?
25       A    Yes.
```

```
 1    Q    It's a cell phone, right?

 2    A    Uh-huh.

 3    Q    Was it in your name or his name?

 4    A    In his.

 5    Q    What was the number?

 6    A    I couldn't tell you that.  I don't --

 7    Q    Was the cell phone out of Houston County or was it

 8         out of Florida?

 9    A    I couldn't answer that either.

10    Q    How did you pay the bill on the cell phone, then,

11         ma'am?  Tell the jury that.

12    A    How I pay --

13    Q    How the cell phone bill got paid.

14    A    Ruben pay his own phone bill.

15    Q    Ma'am, my question to you is you went down there

16         on June 9th, right?

17    A    Uh-huh.

18    Q    You came back on what day?

19    A    The 13th.

20    Q    You sure it was the 13th?

21    A    I'm positive.

22    Q    You came back to your apartment, right?

23    A    Uh-huh.

24    Q    Now, let's go before June 7th of 2001.  You lived

25         in that apartment a year?
```

1    A    Roughly.

2    Q    You knew your neighbors?

3    A    Not really.

4    Q    Did some of your children play with the other

5         children in the neighborhood -- the apartment

6         complex?  They did, didn't they?

7    A    One little girl used to play.

8    Q    In fact, the people that lived directly behind

9         you, who were those people?

10   A    Oh, I don't know.  I don't know them.

11   Q    Let me ask you if I could.  When your children

12        played with other children, they played out there

13        at the swings or in the area inside the apartment

14        complex by the open area by the basketball court?

15        Is that fair?

16   A    No.

17   Q    Where did they play?

18   A    Right at the park -- the park was right by my

19        house.

20   Q    That's what I'm talking about.  Inside the

21        apartment complex, correct?  That park?

22   A    Yes.

23   Q    Building around it is what I'm asking.

24   A    Okay.

25   Q    What I want to ask you, if I could, where did you

```
 1              stay in Orlando?
 2     A        Now or then?
 3     Q        When you went down there on the 9th.
 4     A        To my sister's house.
 5     Q        And you came back on the 14th or 13th?
 6     A        The 13th.
 7     Q        And before that, ma'am, before you went down to
 8              Orlando, there were no -- your door was not broken
 9              in any manner or fashion, was it?
10     A        It was messed up a little bit, but not -- not --
11              not tore down or anything.
12     Q        Tell this jury every time you would go in or out
13              your door at the nighttime and daytime how you
14              would get into your apartment door.  What would
15              you have to do?
16     A        Use the key.
17     Q        Use the key.
18                  And there were how many locks on that door
19              that you had to use to open that --
20     A        Oh.
21     Q        You don't remember that?
22     A        I'm sorry.
23     Q        Ma'am, I'll refresh your memory.  Was there a
24              door knob with a knock?  Does that help you?
25     A        I don't remember.
```

```
1    Q    Ma'am, you don't remember how you got into your
2         own apartment whether there was one door lock to
3         turn to open the key?  You can't remember that --
4    A    I can't remember.  I'm sorry.
5    Q    Let me help you.  There was a handle that you put
6         the lock in with the door to turn the knob,
7         correct?  You're not sure?
8    A    I don't think --
9    Q    Was there also a deadbolt lock?  There was two
10        lock on that door --
11   A    No.
12   Q    There were, weren't there?
13   A    No.  It wasn't a dead bolt on there.
14   Q    It's a round cylinder you had to put the key above
15        the handle what you put the key in to get in?
16   A    I think it was just on the knob part.
17   Q    Just one?
18   A    Yeah.
19   Q    Well, let me ask you something, ma'am.  Before
20        June 7 of 2001, you would go to bed and sleep in
21        that apartment, right?
22   A    Yes.
23   Q    You would sleep with your child in there, right?
24   A    Yeah.
25   Q    You would sleep with your husband in there, right?
```

```
 1    A    Yes.
 2    Q    Would there be times when your husband was gone at
 3         nighttime and not come home at nighttime and you
 4         would be there with just you and your daughter?
 5         Would that ever occur?
 6    A    No, not if he wasn't at work.
 7    Q    If he was at work?  Were there times?
 8    A    No.
 9    Q    Did you ever lock the door when your husband was
10         not home?
11    A    I locked the door whoever home.
12    Q    You locked it because you wanted to be safe and
13         secure with you and your child, right?
14    A    Of course.
15    Q    What I want to ask you, ma'am, is your testimony
16         now there was problems locking that door in any
17         manner or fashion before June 7, 2001?  There
18         were?  Is that what you're saying?
19    A    No.  You just had to use a little force to open
20         it.  That's it.
21    Q    So the question is, you never made any reports to
22         the manager or the maintenance man there was
23         something with that door, you can get in it really
24         easily?
25    A    No.  They had came and fixed on it one time.
```

```
 1    Q    When was that?

 2    A    Like, when I first moved.

 3    Q    So they came and fixed it the first time just

 4         after you moved in, right?

 5    A    Yeah.  Like the side, you know how the door is the

 6         little part where the lock goes in, all that was

 7         messed up.

 8    Q    What I want to ask you, and let's do May and June,

 9         there was no problems getting in then?  In other

10         words, it was safe and secure, correct?

11    A    Yeah.  It wouldn't fall down or anything.

12    Q    But it had been fixed, right?

13    A    Well, I --

14    Q    Could you take a credit card and use to get in

15         that door?  You couldn't, could you?

16    A    I wouldn't know.  I wouldn't be able to tell that.

17    Q    You had to use your lock, didn't you?  The key?

18    A    Of course.

19    Q    Now, what I want to ask you, when you came home,

20         you're aware your apartment had been searched,

21         right?

22    A    Uh-huh.

23    Q    Did you call your husband and tell him?

24    A    No.  Not at first.  I was --

25    Q    Help me, ma'am.  Your husband was down in
```

```
 1            Orlando.  You had left him and come back after
 2            being down there how many days from the 9th
 3            through the 13th?
 4      A     Uh-huh.
 5      Q     And you brought his son, the baby, back with you,
 6            right?
 7      A     Yes.
 8      Q     And he was still down there?
 9      A     Uh-huh.
10      Q     Ma'am, why didn't he ride back with you?
11      A     Because he had his own car.  It was being worked
12            on.
13      Q     Well, let me ask you something.  You, the new
14            baby, your other child were all coming back and he
15            was going to stay down there, right?
16      A     Yeah.  Until he got his car taken care.
17      Q     When was he going to come back?
18      A     When his car was finished.
19      Q     I want you tell the ladies and gentlemen of the
20            jury, the police stopped you driving your van,
21            correct?
22      A     Yes.
23      Q     They asked you to follow them and come down to the
24            police station, and you did that, didn't you?
25      A     Yes, I did.
```

| | | |
|---|---|---|
| 1 | Q | You cooperated; is that fair to say? |
| 2 | A | Yes. |
| 3 | Q | You got down there and they asked you to search |
| 4 | | the van, correct? |
| 5 | A | Yes. |
| 6 | Q | Did they have any conversations with you about |
| 7 | | your husband? |
| 8 | A | They just asked me -- you know, asked me where he |
| 9 | | was at.  Things like that. |
| 10 | Q | On June 14th, that sounds like a Thursday when |
| 11 | | they asked you to come to the police station and |
| 12 | | they talked with you with your van down there? |
| 13 | A | The 14th. |
| 14 | Q | Does that ring a bell?  June 14th, you said you |
| 15 | | came back on the 13th -- |
| 16 | A | No.  Because it was the same day. |
| 17 | Q | The same day? |
| 18 | A | The same day I had come back. |
| 19 | Q | You knew where your husband was, right?  You knew |
| 20 | | he was down in Orlando? |
| 21 | A | Uh-huh. |
| 22 | Q | They asked you where your husband was? |
| 23 | A | Yes. |
| 24 | Q | And you didn't tell them, did you? |
| 25 | A | No. |

| | | |
|---|---|---|
| 1 | Q | And, ma'am, you knew the police were looking for |
| 2 | | him for a robbery, didn't you? |
| 3 | A | From the paper that I had seen at the house. |
| 4 | Q | So the question is, when you got back to Dothan, |
| 5 | | you knew the police were looking for your |
| 6 | | husband -- |
| 7 | A | No.  No.  No.  No. |
| 8 | Q | Ma'am -- |
| 9 | A | I didn't know anything about it until I came home. |
| 10 | Q | Well, home is the apartment in Barstone, correct? |
| 11 | A | Right. |
| 12 | Q | That's what I want to ask you about.  When you |
| 13 | | came home, you then were aware of it, correct? |
| 14 | A | Right. |
| 15 | Q | Called your husband, didn't you? |
| 16 | A | No, not at first. |
| 17 | Q | Ma'am, you're telling this jury your apartment was |
| 18 | | searched by the police and a search warrant was |
| 19 | | left and you never contacted your husband -- |
| 20 | A | No.  Because I was trying to find out what -- what |
| 21 | | was the paper they had sitting on the dining room |
| 22 | | table about.  It just -- it was just kind of short |
| 23 | | and brief.  It didn't have, you know, a lot of |
| 24 | | details on what really was going on. |
| 25 | Q | Do you remember the female police officers that |

```
 1              was a woman, Sergeant Willie Williamson, and
 2              Jimmy --
 3      A       Yes, I remember both of them.
 4      Q       Have you seen them this week, today?
 5      A       Yes.
 6      Q       I don't need to bring them in, you know what they
 7              look like?
 8      A       Yes.
 9      Q       Is that fair?
10      A       That's fair.
11      Q       What I want to ask you, ma'am, did you tell them
12              that you and your husband were split up at the
13              time?
14      A       No.
15      Q       Did you tell them you hadn't seen your husband in
16              two weeks?
17      A       No, I don't remember telling them that.
18      Q       Did you tell them you could not explain why the
19              items that were taken during the search warrant;
20              in other words, from the robbery, were in your
21              apartment?
22      A       No, I couldn't.
23      Q       Did you tell them Mr. McNabb had not been home in
24              two weeks?
25      A       I don't remember what I told them.
```

```
 1   Q   Ma'am, do you want this jury to believe that you
 2       were with your husband on June 7th of 2001?  Is
 3       that what you're telling them?
 4   A   No, I wasn't with him on June 7th.  He was in
 5       Orlando.
 6   Q   Are you telling this jury that the police officers
 7       were asking you questions and you knew your
 8       husband was going to be charged or charged with
 9       robbery and you didn't call your husband and tell
10       him?
11   A   I didn't call him at first, no, I didn't.
12   Q   Did you ever call him?
13   A   Yes, I did.
14   Q   There's a warrant for robbery and they want to
15       arrest you for robbery in the first degree you did
16       didn't tell him, did you?
17   A   Not at first.
18   Q   He didn't come back to Dothan, did he, ma'am?
19   A   No.
20   Q   In fact, what happened then, you got your items
21       and left Dothan and moved down to where he was,
22       right?
23   A   Yes and no.
24   Q   Well, tell me how you got two vehicles to Orlando
25       where your husband was, his Cadillac and your van,
```

```
 1              when you're the only adult driving in that
 2              family.  How did the other vehicle get to Orlando?
 3              Who came and got it?
 4     A   The Cadillac got towed by the apartment complex I
 5              guess.
 6     Q   You just left it?
 7     A   Yeah.
 8     Q   Did you --
 9     A   It didn't work anyway.
10     Q   Did you ever inquire about it again?
11     A   No.
12     Q   How was your husband's hair back on June 9th?
13              How was he wearing his hair?
14     A   He had, like --
15     Q   Dreadlocks?
16     A   No.  Like he was trying to start it, though.
17     Q   Was it short hair?
18     A   Yeah.  About like that (indicating).
19     Q   Let me ask you something.  Did you ever have any
20              discussions with your husband about the bullets
21              that were found in your apartment?
22     A   No.
23     Q   Not at all?
24     A   (Witness nodded.)
25     Q   You wouldn't have allowed bullets in there?
```

```
 1    A    No, I wouldn't have allowed anything like that in

 2         my house.

 3    Q    Ma'am, you said your account was with AmSouth,

 4         correct?

 5    A    Yes.

 6    Q    How much money did you have in it?

 7    A    That's a long time ago.  I don't even have that

 8         account anymore.

 9    Q    That's what I want to ask you about.  Tell the

10         jury when you closed your account at AmSouth

11         Bank.  Was that after you knew they wanted to

12         arrest your husband for robbery?  It was, wasn't

13         it?

14    A    It probably was already closed before then.

15    Q    Then I'll ask you in response to what you told me

16         then, at the time you weren't working, there was

17         no money in that account, correct?

18    A    There was some money in there.

19    Q    How much money, ma'am?

20    A    I couldn't tell you.

21    Q    There wasn't enough to support three people or

22         four people with a new baby, was it?

23    A    Yes and no.

24    Q    Ma'am, did your husband go to work down there in

25         Orlando?
```

```
1     A    He did little odd jobs.
2     Q    What did he do for odd jobs?  Tell us.  While the
3          Dothan police were looking to arrest him, what was
4          his employment?
5     A    He was working on radios, doing --
6     Q    He never took a job, is it fair to say, of someone
7          that would require his social security or his
8          license?  He didn't do that, did he?
9     A    Not that I know of.  I couldn't answer that.
10    Q    Was your testimony to the ladies and gentlemen of
11         the jury you wouldn't lie or try to help your
12         husband if he did something and committed a
13         robbery, right?
14    A    Right.
15    Q    But you admit to this jury that you're husband you
16         knew there was a warrant for robbery in the first
17         degree, you moved back to Orlando, you lived with
18         him all this time until the police picked him up
19         and arrested him down there, true?
20    A    That's fair, yeah.
21    Q    You knew that he was wanted for a robbery up here,
22         correct?  True?
23    A    Right.  While --
24    Q    And my question to you, ma'am, did you become
25         aware when he got arrested in Orlando that he used
```

```
 1              his own brother's name and tried to hide and
 2              conceal who he was then?  Do you know that?
 3      A       No, I didn't.
 4      Q       Did you know when the police tried to arrest him
 5              he tried to run and get away then?  Did you know
 6              that?
 7      A       After, yeah.
 8      Q       You know Reggie Hill, correct?
 9      A       Yeah.  Kind of.
10      Q       You can't tell this jury you ever saw Reggie Hill
11              ever have any problems with your husband or
12              anybody in your family, can you?  No words, no
13              cussing, no threats, no problems of any kind,
14              correct?
15      A       I don't know because I --
16      Q       You didn't see anything is what I'm asking.
17      A       No.
18      Q       But you agree, it's fair to say, that your husband
19              was friends with Reggie?
20      A       Yeah.
21      Q       They played basketball, they did?
22                  Let me ask you about the keys.  Mr. Baxley
23              asked you about Mr. Hill having you-all's keys.
24              You never had any keys go missing, did you?
25      A       We had two sets.
```

```
 1    Q    Did you have a set go missing, ma'am?

 2    A    I can't answer that.

 3    Q    Did you ever make a police report that your keys

 4         were missing and your house key was missing?  You

 5         didn't, did you?

 6    A    No.  Because I have my own key.

 7    Q    It's your testimony under oath that on the 12th

 8         when the search warrant was executed at your

 9         residence, you were not in Dothan?

10    A    No, I was not.

11    Q    And if someone said they saw you going to the

12         laundry or carrying things, that wouldn't be true?

13    A    No.

14    Q    In fact, you're aware there were previous

15         witnesses that gave a deposition under oath,

16         ma'am, that said she saw you in Dothan on the day

17         the search warrant was executed in your apartment,

18         correct?

19    A    Huh-uh.  Because I wasn't there.

20    Q    You're aware they testified to that?

21    A    No, I'm not aware of that.

22    Q    Ma'am, are you aware that there was a deposition

23         given where your husband was seen on Saturday or

24         Friday after the robbery working on his Buick

25         LaSabre and he borrowed a wrench or a tool to work
```

```
 1          on the car?  Were you aware of that?
 2    A     I find that hard to believe.  He had plenty of
 3          tools.  He wasn't there anyway.
 4               MR. VALESKA:  That's all.  Pass the witness.
 5          Thank you.
 6               THE COURT:  Anything further, Mr. Baxley?
 7               MR. BAXLEY:  No, Your Honor, not right now.
 8               THE COURT:  You may step down.
 9                    Who is your next witness?
10               MR. BAXLEY:  I need to recall Mr. McNabb for
11          one moment, Your Honor.
12               THE COURT:  Okay.
13               RUBEN COREY MCNABB (Recalled)
14          having previously been sworn, was examined and
15          testified as follows:
16                    DIRECT EXAMINATION
17    BY MR. BAXLEY:
18    Q     Mr. McNabb, we showed you Defendant's Exhibit 1 a
19          moment ago.  And you say that was something you
20          received from the automobile repair shop?
21    A     Yes, sir.
22    Q     And has it changed in any form since you received
23          it?
24    A     No, sir.
25               MR. BAXLEY:  I move to admit No. 1.
```

```
1              THE COURT:  Let it be admitted.
2                   (Defendant's Exhibit No. 1 was admitted
3                   into evidence.)
4              MR. BAXLEY:  That's all I have.
5                        CROSS EXAMINATION
6    BY MR. VALESKA:
7    Q    Can you give me the name of the person that fixed
8         your car?
9    A    Not right off.
10   Q    You can't, can you?  Can you give me the name of
11        who you paid the money to for that car getting
12        fixed?  It wasn't Greg, was it?
13   A    One of the people at his shop.
14   Q    You know Greg, don't you?
15   A    Yes, sir.
16   Q    And it wasn't Greg, was it?
17   A    No, sir.
18             MR. VALESKA:  That's all.
19             THE COURT:  You may step down.
20                   You don't have a short witness?
21             MR. BAXLEY:  I got a very short one, Your
22        Honor.  If I can recall Ron Reeves.
23             THE COURT:  You want to call Ron Reeves?
24             MR. BAXLEY:  Yes, Your Honor.
25                  RONALD REEVES (Recalled)
```

```
 1        having previously been sworn, was examined and

 2        testified as follows:

 3                      DIRECT EXAMINATION

 4   BY MR. BAXLEY:

 5   Q    Mr. Reeves, I'm going to show you what the State

 6        brought up a little while back, some speaker wire

 7        that was introduced.  Now, you saw that speaker

 8        wire a long time ago; is that correct, at another

 9        trial?  You saw that speaker wire a long time ago

10        at another trial; is that correct?

11   A    Yes.  Yes.

12   Q    And you testified then that that speaker wire is

13        not like the speaker wire you were tied up with;

14        is that correct?

15   A    That's correct.

16   Q    So the speaker wire the State has brought up and

17        shown is not like the speaker wire that you were

18        tied up with?

19   A    That's right.

20            MR. BAXLEY:  Nothing further.

21                      CROSS EXAMINATION

22   BY MR. VALESKA:

23   Q    The only question I have, Mr. Reeves.  Tell the

24        jury who had speaker wire in the office that had

25        Ms. Roach tie you up with.  Which person in this
```

1       courtroom?

2   A   Corey McNabb.

3   Q   Any doubt in your mind?

4   A   No doubt.

5   Q   And let me ask you, if I could.  The speaker wire

6       McNabb had when he took out of the black pouch,

7       did he take that with or leave it there?

8   A   He left it there.

9   Q   I'm talking about the black pouch that had the --

10  A   The back pouch, yes, sir.

11  Q   Who took it?

12  A   Mr. McNabb.

13  Q   And I want to ask you, if I could.  You heard

14      testimony from Mr. McNabb and a receipt he

15      produced.  You heard him testify about that.  You

16      heard testimony about his wife saying that she

17      talked with him.  Would you tell the ladies and

18      gentlemen of the jury, any doubt in your mind, are

19      you a hundred percent sure beyond all doubt on

20      June 7, 2001, he's the man that robbed you?

21  A   Yes, sir, he's the man that robbed me.  I know his

22      voice.

23  Q   Now, I asked you about the voice now.  Is that the

24      same voice --

25  A   Same identical voice.

```
1              MR. VALESKA:  That's all.  Thank you very
2       much.
3              THE COURT:  We're ready to recess for lunch
4       now?
5              MR. BAXLEY:  Yes, Your Honor.
6              THE COURT:  Ladies and gentlemen, at this
7       time we'll recess for lunch.  While you're out of
8       the jury box and away from the courthouse, just
9       recall the instructions that I've given you about
10      not discussing the case among yourselves or with
11      anyone or allowing anyone to discuss it with you
12      or to discuss it in your presence.  If you will,
13      go to your lunch now and just be back in the jury
14      room here at one-fifteen.  Thank you very much.
15             (Jury not present.)
16             THE COURT:  We'll be at recess until
17      one-fifteen.
18             (Off the Record.)
19             THE COURT:  Bring the jury.
20             (Jury present.)
21             THE COURT:  Please, ma'am, let the Record
22      show the Defendant has arrested.
23             Mr. Valeska, you are going on rebuttal
24      now?
25             MR. BAXLEY:  Your Honor, we're going to wait
```

```
 1              for the Defendant.

 2                   THE COURT:  I'm sorry.

 3                        The Defendant is now present.

 4                        Go ahead, Mr. Valeska.

 5                   MR. VALESKA:  Thank you very much.

 6                        We call Sherry Wisdom to the stand.

 7                        ~~SHERRY WISDOM~~

 8         having first been duly sworn, was examined and

 9         testified as follows:

10                        DIRECT EXAMINATION

11    BY MR. VALESKA:

12    Q    You been put under oath, correct?

13    A    Yes.

14    Q    Tell us your name.

15    A    My name is Sherry Wisdom.

16    Q    Where is your place of employment or business or

17         occupation?

18    A    King Church Furniture.

19    Q    And who owns King Church Furniture?

20    A    Jimmy King.

21    Q    How long have you worked there?

22    A    Since December of '89.

23    Q    If I could, please, ma'am, you keep the payroll

24         records, the records in relationship to the

25         ordinary course of business of King Furniture?
```

```
 1    A    Yes, sir.
 2    Q    And what kind of business is this?  What does it
 3         make?
 4    A    We manufacture church furniture.
 5    Q    Ruben Corey McNabb, if I use that name, do you
 6         know that man?
 7    A    Yes, sir.
 8    Q    How do you know him?
 9    A    He worked for us.
10    Q    Could you tell the ladies and gentlemen of the
11         jury, his position that he had with you working
12         for the furniture company, was he a carpenter?
13    A    No, sir.  He was an upholsterer.
14    Q    Now, could you tell the ladies and gentlemen of
15         the jury, do you know approximately how long he
16         worked for you?
17    A    He began his employment on September 18th of 2000,
18         and his last day of work was May 15th of 2001.
19    Q    You're sure it was May 15th of 2001?
20    A    That's the last day he came to work.
21    Q    Would you tell the ladies and gentlemen of the
22         jury, was he given a leave of absence or maternity
23         leave or leave for his wife?
24    A    No.
25    Q    Would you tell the ladies and gentlemen of the
```

```
 1              jury, after he left, did he ever come back or show
 2              up again or contact you in any way?
 3        A     No, sir.
 4        Q     .Did you contact anybody in the business?
 5        A     No.
 6        Q     You sure?
 7        A     I'm sure.
 8        Q     The employees that worked there, please, ma'am,
 9              the supervisors, could I have their names besides
10              yourself?
11        A     We have an owner, Jimmy King, and we have a shop
12              foreman named Eddie Shouppe.
13        Q     Mr. Shouppe still work there?
14        A     Yes, sir.  He's been there a little longer than
15              me.
16        Q     Could Mr. McNabb have had any conversations with
17              Mr. Shouppe, Eddie, about not coming back or not
18              showing up?
19                   MR. BAXLEY:  Object, Your Honor.  That's
20              hearsay.
21                   THE COURT:  Well, I don't think -- he didn't
22              ask what anybody said.  He said --
23        Q     To your knowledge did he have any conversation?
24              That calls for a yes or no.
25        A     No.
```

```
 1    Q    And Eddie Shouppe still works there, correct?

 2    A    Yes.

 3              MR. VALESKA:  That's all.  Pass the witness.

 4              THE COURT:  Mr. Baxley.

 5                    CROSS EXAMINATION

 6    BY MR. BAXLEY:

 7    Q    If Mr. McNabb stated he had a conversation with

 8         Eddie or Jimmy, would you be privy to all of their

 9         conversations with their employees?

10    A    Of course not.

11    Q    So it's possible he could have had a conversation?

12    A    No, it's not possible.  I checked with both Jimmy

13         and Eddie before testifying to make sure.

14    Q    That's not -- you can't testify to what they said.

15    A    Okay.

16    Q    I'm asking you, is there any way possible outside

17         of your presence that they could have had a

18         conversation with him, yes or no?

19    A    Of course.

20    Q    And do you know if Mr. McNabb was present in

21         Dothan, Alabama, on June 7, 2001?

22    A    On June 7th?

23    Q    Yes, ma'am.

24    A    No, I would have no idea.

25              MR. BAXLEY:  Thank you.  No further
```

```
 1        questions, Your Honor.

 2                MR. VALESKA:  No more questions.

 3                THE COURT:  Please, ma'am, you may step

 4        down.

 5                MR. VALESKA:  She can be excused.  She needs

 6        to go back to work.

 7                THE COURT:  Who will you have next?

 8                MR. VALESKA:  Stephanie Reeves.

 9                        STEPHANIE REEVES

10        having first been duly sworn, was examined and

11        testified as follows:

12                        DIRECT EXAMINATION

13   BY MR. VALESKA:

14   Q    Tell us your name, please, ma'am.

15   A    Stephanie Reeves.

16   Q    Ms. Reeves, do you know Ruben Corey McNabb?

17   A    Yes, sir, I do.

18   Q    Do you know his wife, Yvette McNabb?

19   A    Yes, sir.

20   Q    Now, if I could, could you tell the ladies and

21        gentlemen of the jury, let's go back to on or

22        about May and into June of 2001, and tell the jury

23        where you lived at that time.

24   A    Barstone Apartments.

25   Q    And what was the close proximity -- how close did
```

```
 1              you live in any manner or relationship to where
 2              they lived in Barstone Apartments?
 3      A       Right next door.
 4      Q       Did you know the people that lived across from
 5              your apartment that lived next to them?
 6      A       Yes, sir.
 7      Q       Who were they?
 8      A       Wendy and Jonathan Cole.
 9      Q       Could you tell the ladies and gentlemen of the
10              jury, had you ever talked with Yvette McNabb
11              before June 14th of 2001?
12      A       Yes, sir.
13      Q       Did you ever talk to her?
14      A       (Witness nodded.)
15      Q       How many times did you talk to her?  Many times?
16      A       Uh-huh.
17      Q       Did you ever talk to McNabb himself, say hello or
18              speak to him?
19      A       Yes, sir.
20      Q       Can you tell the ladies and gentlemen of the jury,
21              between June 1st and June 15th of 2001, during
22              that time period, did you ever see Yvette McNabb
23              at the apartment complex in Dothan, Alabama,
24              Houston County during that time period?
25      A       Yes, sir, I did.
```

```
1    Q    You're sure?

2    A    I'm sure.

3    Q    Let's go particularly to the time the apartment

4         was searched by the police department.  Were you

5         aware of that?

6    A    Yes, sir.

7    Q    Can you tell the ladies and gentlemen of the jury,

8         did you see Yvette McNabb on that day?

9    A    Yes, sir, I did.  That morning.

10   Q    Did you see her after the police searched the

11        apartment?

12   A    Yes, sir.  The next following day.

13   Q    And did you ever see her again that you recall in

14        reference to the day the police searched the

15        apartment or the next day?  Did you see her again

16        yourself?

17   A    The next day.

18   Q    And after that did you see her any more that you

19        recall?

20   A    No, sir.

21   Q    You're positive you saw her on or about the 12th

22        of June of 2001?

23   A    Yes, sir.

24   Q    And then you saw her the 13th, the next day?

25   A    Yes, sir.
```

```
1    Q    So if I would ask you if she testified under --

2         excuse me, if she alleged she was in Orlando,

3         Florida, on those occasions, would she be right or

4         wrong?

5    A    She would be wrong.

6              MR. VALESKA:  Pass the witness.  Thank you

7         very much.

8                         CROSS EXAMINATION

9    BY MR. BAXLEY:

10   Q    Ms. Reeves, do you know -- did you see either of

11        them on -- did you see Mr. McNabb in town on June

12        7, 2001?

13   A    No, sir, I didn't.

14             MR. BAXLEY:  Thank you.  No further

15        questions, Your Honor.

16                        REDIRECT EXAMINATION

17   BY MR. VALESKA:

18   Q    I would ask you, Mr. Baxley asked you if you saw

19        him on June 7, 2001.  Are you saying he wasn't in

20        town or you just didn't see him that day while you

21        were there?

22   A    I just didn't see him.

23             MR. VALESKA:  That's all.  Thank you.  She

24        can be excused.

25             THE COURT:  You want to excuse her.
```

```
 1              You're excused.  And you may step down.
 2         Thank you very much.
 3              MR. VALESKA:  Mary Bessie.
 4                      MARY BESSIE
 5         having first been duly sworn, was examined and
 6         testified as follows:
 7                      DIRECT EXAMINATION
 8    BY MR. VALESKA:
 9    Q    Tell us your name, please, ma'am.
10    A    It's Mary Kimberly Bessie.
11    Q    Now, if I could, let's go back to May and June of
12         2001.  Did you know anybody in this courtroom that
13         lived at Barstone Apartments?
14    A    Yes, sir.  Corey.
15    Q    Corey referring to the defendant at the table with
16         Mr. Baxley, correct?
17    A    Yes, sir.
18    Q    Did you know his wife?
19    A    Yes.
20    Q    During May and that period of time, do you know
21         what the physical condition of his wife in
22         relationship to their family what was taking
23         place?
24    A    She was pregnant.
25    Q    Would you tell the ladies and gentlemen of the
```

```
 1              jury, did you see Corey McNabb, Ruben Corey
 2              McNabb, or his wife, Yvette McNabb, many times
 3              before June 1, 2001, at the apartment complex?
 4       A      Yes, sir.
 5       Q      Now, if I could, let me ask you, were you living
 6              in the apartment complex during this time period
 7              or just before June of 2001?
 8       A      I lived there.  Yes, sir, I did.  And right
 9              before.
10       Q      Who were you living with?
11       A      My brother and -- brother-in-law and sister.  They
12              lived in Barstone.
13       Q      Now, and can you tell the ladies and gentlemen of
14              the jury, the apartment they lived in and you
15              lived, was it close or far away from where the
16              McNabbs lived?
17       A      Right beside them.
18       Q      Now, if I could, please, ma'am, did you know the
19              lady that was going out as you were coming to
20              testify?  Who that was?
21       A      Yes, sir.
22       Q      Who was that?
23       A      That's Stephanie.
24       Q      Now, can you tell the ladies and gentlemen of the
25              jury, let's go to June of 2001.  Particularly, did
```

```
 1            something happen to you or a member of your family
 2            on or about June 6th of 2001?
 3      A     Yes, sir.  My grandmother died.
 4      Q     I don't mean to be personal, but your grandmother
 5            passed away.  Was your other grandmother still
 6            alive or if I could use the term, was that your
 7            last grandmother?
 8      A     The last one.
 9      Q     And you're sure of the day she passed away?
10      A     Yes, sir.  It was on my brother's birthday.
11      Q     Did it affect you when your grandmother passed
12            away?
13      A     Yes, sir.
14      Q     When you found out, where did you go in
15            relationship to the apartment or where your family
16            that you had been living with?  Where did you go
17            when you found out about your grandmother?
18      A     Everybody came to my sister's house in Barstone.
19      Q     June 6, 2001, the apartment complex, were you
20            present sometime after nine o'clock at night?
21      A     Yes, sir.
22      Q     I don't mean to be personal, ma'am, but does
23            anybody in your family or did your sister or
24            brother-in-law, did they smoke cigarettes inside
25            the house?
```

```
 1    A    No, sir.

 2    Q    Were there children that lived in the house?

 3    A    Yes, sir.  My daughter has asthma, and my son and

 4         my niece, we don't smoke inside.  We go outside.

 5    Q    You smoke cigarettes, correct?

 6    A    Yes, sir.

 7    Q    Did you have an occasion that night that your

 8         grandmother passed away -- on whose birthday?

 9    A    My brother's.

10    Q    Your brother's day, the same day, and go outside

11         of the apartment and smoke cigarettes?

12    A    Yes, sir.

13    Q    Were you upset?

14    A    Yes, sir.

15    Q    Did you see Ruben Corey McNabb on June 6th of 2001

16         in Dothan, Alabama, Houston County, at the

17         Barstone Apartments?

18    A    Yes, sir.

19    Q    Any doubt in your mind?

20    A    No, sir.

21    Q    Did you speak to him?

22    A    Yes, sir.

23    Q    Did he speak to you?

24    A    Yes, sir.  I was crying.  And he asked me, he

25         said, are you okay.  I said, yeah.  I mean, I've
```

```
1              seen him, and we're in the habit of saying hey.
2     Q    Where did he go in relationship when he spoke to
3              you when you were outside when I said the
4              apartments, the steps, sitting smoking, which
5              direction did he go?  Towards the parking lot or
6              back towards his apartment?
7     A    He was coming from the parking lot to his
8              apartment, and you have to pass right by my
9              apartment to get to where his is.
10    Q    And you see him in the courtroom today, correct?
11    A    Yes, sir.
12    Q    Any doubt in your mind you saw him on June 6,
13             2001, after ten o'clock p.m?
14    A    No, sir.
15    Q    Did you know what kind of vehicles he and his wife
16             drove?  When I say vehicles, cars or whatever.
17             What you saw?
18    A    I know that his wife drove a white van, and he had
19             two cars.  One of them didn't run, and the other
20             one he always -- it was, like, a brown bigger
21             older car that he used to go back and forth to
22             work.  But there was three vehicles altogether.
23    Q    If I could, did you become aware when the police
24             department executed a search warrant on his or his
25             wife's residence on or about June 12th?
```

```
 1    A    Yes, sir.

 2    Q    I want to ask you, on or about June 12th of 2001,

 3         did you see his wife, Yvette McNabb, in Dothan,

 4         Alabama, Houston County, at Barstone Apartments?

 5    A    Yes, sir.

 6    Q    What time did you see her in relationship to when

 7         the police executed the search warrant?

 8    A    I had already gone to work when the police kicked

 9         the door in next door.  I had already -- was

10         already at work.

11    Q    Did you come back home?

12    A    Yes, sir.

13    Q    And when you came back home, the police, were they

14         still there or gone?

15    A    They were still there.

16    Q    Did you come to see Yvette McNabb in that location

17         on or about the 12th of 2001 in relationship to

18         her apartment or the general area?

19    A    On my way to work, I saw her.

20    Q    And what was she doing that you saw?

21    A    Just getting in the van.

22    Q    Did you see her again after -- before June 12th of

23         2001 going backwards on the 11th or the 10th or

24         the 9th?  Did you see her during that time period?

25    A    Yes, sir.
```

```
 1    Q    Now, if I could, after you saw Corey McNabb on or

 2         about June 6th of 2001 at ten o'clock, did you see

 3         him the next day that you recall, which would have

 4         been the 7th is what I'm asking about?  If you

 5         have an independent recollection, if you know.

 6    A    I remember -- no, sir.

 7    Q    Did you see him ever again after that in the

 8         apartment complex?

 9    A    No, sir.

10         MR. VALESKA:  That's all.  Pass the witness.

11         THE COURT:  Mr. Baxley.

12                       CROSS EXAMINATION

13    BY MR. BAXLEY:

14    Q    Ms. Bessie, do you recall testifying in this case

15         a year ago?

16    A    Yes, sir.

17    Q    And at that point you never mentioned anything

18         about having conversations with Mr. McNabb; is

19         that true?

20    A    I don't recall whether I said.  I don't remember

21         if anybody asked me that question or not.

22    Q    I asked you specifically -- you had a

23         relationship with his wife really and not Mr.

24         McNabb; is that true?

25    A    I spoke more with his wife than I did him.
```

1    Q    And I asked you about that, and you didn't say
2         anything about -- you basically have -- how did
3         you put it?  You saw him in passing.  Is that
4         better term -- is that a better term to say about
5         your relationship with Mr. McNabb?  You saw him in
6         passing?
7    A    I saw him on his way to and from his apartment.
8    Q    But you never really spoke, did you?
9    A    Hello, how are you doing.  Neighborly.  We lived
10        right beside each other.
11   Q    And did you see him rob the Winn Dixie on Westgate
12        Parkway?
13   A    No, sir.
14   Q    So you can't testify he was the person that robbed
15        that Winn Dixie?
16   A    No, sir.
17   Q    See him carrying bags of money into his apartment
18        or anything like that?
19   A    No, sir.
20   Q    Bring toboggans into his apartment?
21   A    Bringing toboggan -- no, sir.
22   Q    You didn't see anything like that?
23   A    No, sir.
24             MR. BAXLEY:  Thank you.
25                 REDIRECT EXAMINATION

```
 1    BY MR. VALESKA:

 2    Q    Did you ever see him wear a toboggan?

 3    A    Yes, sir.

 4    Q    Now, Mr. Baxley asked, in other words, when you

 5         gave a deposition before under oath, the question

 6         was about whether you said he had ever said

 7         anything to you or you said anything to him.  I

 8         might have missed it.  I want to ask you.  Do you

 9         recall Mr. Baxley asking you in the deposition

10         under oath whether or not you actually spoke to

11         him?  He didn't in the deposition, did he?

12    A    No, he never asked me that.

13    Q    And the assistant district attorney who did the

14         deposition, the man identified if I could by the

15         name of Martin Adams, a lot younger than me, a lot

16         darker hair, he never asked you that, did he?

17    A    No, sir.

18              MR. VALESKA:  That's all.  Pass the witness.

19              MR. BAXLEY:  Nothing further.

20              THE COURT:  You may step down.  And you're

21         excused.  You may go.

22                        GREG DRAGON

23         having first been duly sworn, was examined and

24         testified as follows:

25                      DIRECT EXAMINATION
```

324

BY MR. VALESKA:

1

2   Q   Tell me your name, please, sir.

3   A   Greg Bryson.

4   Q   Mr. Bryson, do you run a business in Orlando,

5       Florida?

6   A   Yes.

7   Q   What is the name of your business?

8   A   Greg's Auto Repair.

9   Q   And what kind of general business?  Can you tell

10      me what the business is?

11  A   We repair automobiles.

12  Q   I want to ask you in doing automobiles and doing

13      repair work in the state of Florida, when people

14      make payments, you collect that money, correct?

15  A   Yes.

16  Q   You have to report your income or pay taxes in the

17      state of Florida to the State of Florida as well

18      as to the federal government?

19  A   Yes.

20  Q   Do you have any type of documents in relationship

21      if someone comes in, you know, to ask for work to

22      be done on their vehicle, any kind of paperwork

23      that you use, in other words, to keep up with

24      those records, if there's an estimate or what's to

25      be done or where it's to be paid or how taxes are

```
 1          kept up?

 2    A     Yes.

 3    Q     Now, do you know Ruben Corey McNabb personally?

 4    A     Yes.

 5    Q     If I could show you State's Exhibit No. 1 --

 6          excuse me, Defendant's Exhibit No. 1 for

 7          identification purposes.  Looking at Defendant's

 8          Exhibit No. 1, is that a receipt from your

 9          business?

10    A     No.

11    Q     Is there a stamp on there that indicates a stamp

12          that is in fact used on your business in the

13          ordinary course of business that you-all have when

14          you stamp bills, correct?

15    A     Yes.

16    Q     Did you give Corey McNabb that receipt?

17    A     No.

18    Q     Can you tell the ladies and gentlemen of the jury

19          in looking at the receipt, in other words,

20          whatever work was allegedly done or written, is

21          the tax correct on that?

22    A     No.

23    Q     Could you tell the ladies and gentlemen of the

24          jury, the receipt itself, what I want to ask you

25          about and the paperwork that you use, do you have
```

```
 1            when you do billing or do estimates or a customer
 2            to keep records, is there more than one piece of
 3            paper attached to your estimates or your
 4            documentation?
 5       A    Yes.
 6       Q    What other color would be attached, if any, to the
 7            papers you use?
 8       A    Yellow.
 9       Q    And the other copy that's on top is what color?
10       A    White.
11       Q    There any carbon in there?
12       A    Yes.
13       Q    And why is there carbon in there?  Can you tell us
14            why that is kept in your business?
15       A    The -- when you write on the first copy, the
16            carbon copy on the second copy.
17       Q    Do you have a document, in other words, the
18            original that you keep versus the yellow copy you
19            would give the customer?
20       A    Yes.
21       Q    Have you done that many times?
22       A    Yes.
23       Q    And have you watched other employees of yours
24            write and do receipts?
25       A    Yes.
```

1    Q    And have you seen the yellow copies as well as the

2         other copies?

3    A    Yes.

4    Q    What I want to ask you, Defendant's Exhibit 1,

5         would you take and look at it and it appears to be

6         writing or the color of ink on there, correct?

7    A    Yes.

8    Q    What color does it appear?

9    A    Blue.

10   Q    Anything on the back, could you tell us on

11        Defendant's Exhibit 1, that shows any type of

12        writing and any type of carbon in any way for any

13        writing to correspond on the front Defendant's

14        Exhibit No. 1, that receipt, in any way that would

15        show that there was a copy made of that?

16   A    No.

17             MR. VALESKA:  That's all.  Pass the witness.

18                      CROSS EXAMINATION

19   BY MR. BAXLEY:

20   Q    Mr. Bryson, the exhibit you've shown there, now,

21        you have people working for you, do you not?

22   A    Yes.

23   Q    Do your other employees possibly from time to time

24        do work outside of what you would know?

25   A    Yes.